IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

FILED
DES MOINES, IOWA

03 FEB 12 PM 1: 13

SOUTHERN DISTRICT OF I.

AMERICANS UNITED FOR SEPARATION )
OF CHURCH AND STATE; )
CAROL DELP; )
ARDENE McKEAG; and )
DOROTHY REDD; )
)
     Plaintiffs, )
)
    v. )
)
PRISON FELLOWSHIP MINISTRIES; )
INNERCHANGE FREEDOM INITIATIVE; ) **4:03 - CV - 90074**
TERRY MAPES, in his official capacity as )
Warden of the Newton Correctional Facility )
and in his individual capacity; )
WALTER "KIP" KAUTZKY; )
JOHN BALDWIN, in his official capacity as )
Acting Director of the Iowa Department of )
Corrections and in his individual capacity; )
JOHN DOE, in his official capacity as )
DIRECTOR OF THE IOWA DEPARTMENT )
OF CORRECTIONS and in his individual )
capacity; and )
HAYWOOD BELLE, FRANCES COLSTON, )
ROBYN MILLS, ARTHUR NEU, )
SUELLEN OVERTON, WALTER REED, JR., )
and DONALD TIETZ, in their official capacities )
as members of the Iowa Board of Corrections )
and in their individual capacities; )
)
    Defendants. )
———————————————————— )

## COMPLAINT

## I. Introduction

1.  Defendant Prison Fellowship Ministries ("Prison Fellowship") operates a pervasively religious pre-release program called the InnerChange Freedom Initiative ("InnerChange," or "the InnerChange program," or "IFI") in the Newton Correctional Facility ("Newton") in the State of Iowa ("the State"). Inmates who participate in the InnerChange program are housed in a separate unit of Newton, where InnerChange immerses them in "24-hour per day Christ-centered Bible-based program[ming]." During nearly all their waking hours, participating inmates are subjected to intensive, evangelical, Biblically-based instruction from a Christian fundamentalist standpoint. In rooms whose walls are lined with scripture, the inmates study the Bible, memorize Bible verses, and pray. In Prison Fellowship's own words, the "major purpose of the program" is "transformation" to be "brought about by depending on Christ."

2.  A substantial portion of the InnerChange program's budget is paid for by State funds taken from profits the State makes off telephone calls that are placed by inmates and that are often paid for by family members, friends, and attorneys of inmates. In addition, State funds received through the settlement of tobacco litigation have been allocated to support the InnerChange program. State moneys that were obtained from persons who do not subscribe to the religious teachings of the InnerChange program and from a fund that was created to generally benefit the public health have thus been used and allocated to pay for pervasively religious, evangelical, fundamentalist Christian instruction.

3.  In order to take part in the InnerChange program, inmates must agree to be subjected to intensive instruction in InnerChange's fundamentalist Christian teachings. Recruitment materials provided to prospective participants make clear that there is a place in the InnerChange

2

program only for those who subscribe to or are willing to actively cooperate in being converted to a fundamentalist, evangelical form of Christianity.  Prospective participants are told that "[t]he program confronts prisoners with the choice of embracing new life in Christ and personal transformation, or remaining in the stranglehold of crime and despair," that "[t]rue transformation begins with salvation, also called conversion," and that "[c]onversion is when you turn away from what is negative and turn to Christ."  In order to successfully proceed through the program, inmates must receive passing marks on evaluations in which they are rated on explicitly religious criteria, such as "[a]s faith proceeds joy, demonstrates a belief in Jesus Christ," "[p]rays in the Spirit," and "[p]uts God first in his life, 'serves no idol' and is quick to praise God."  The State's sponsorship and financing of the InnerChange program thus discriminates against inmates who do not subscribe to the particular form of Christianity taught by InnerChange.

4.  Inmates who participate in the InnerChange program receive numerous privileges denied to non-participating inmates.  InnerChange participants live in an "honor unit" where they are given keys to their own cells and access to private bathrooms, while non-participating inmates live in a "lock-up unit" where correctional officers have sole control over locks to cell doors and where the toilet stools are located in the middle of cells.  InnerChange participants receive a broad range of other benefits denied to non-participating inmates, such as additional visits with family members, free telephone calls to family members, access to computers and word-processing equipment, and access to big-screen televisions.   The operation of the InnerChange program therefore gives inmates incentives to subject themselves to religious indoctrination.

5.  Prison Fellowship and InnerChange have a publicly announced policy of employing

3

only Christians as staff members and allowing only Christians to serve as volunteers.  All

InnerChange employees and volunteers must subscribe to a fundamentalist Statement of Faith

affirming, among other things, that they "believe that all people are lost sinners and cannot see

the Kingdom of God except through the new birth" and "that the Bible . . . is without error in all

its teachings, including creation, history, its own origins, and salvation."  State funds are used to

pay portions of the salaries of InnerChange employees.  The State is thereby financing religious

discrimination in employment.

6.  For these and other reasons, the State's sponsorship and financing of the InnerChange

program violates the Establishment Clause of the First Amendment of the U.S. Constitution and

the Bill of Rights of the Iowa Constitution.  The plaintiffs, whose funds are involuntarily used to

finance the InnerChange program, accordingly seek injunctive and declaratory relief barring the

defendants from continuing to operate the program.


## II.  Jurisdiction and Venue

7.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and

1367.

8.  The Court has the authority to grant declaratory relief pursuant to the Declaratory

Judgment Act, 28 U.S.C. §§ 2201 and 2202.

9.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as the InnerChange

program is operated within this district, and most of the parties are located within this district.

### III. Parties

10. Plaintiff Americans United for Separation of Church and State ("Americans United") is a non-profit, non-partisan, educational and advocacy organization incorporated and headquartered in Washington, D.C. Americans United is dedicated to preserving the constitutional principle of church-state separation as the only way to ensure religious freedom for all Americans. Americans United actively opposes the use of government money to fund religious organizations or religious activity. Americans United has over 75,000 members across the country, including hundreds of members in the State of Iowa.

11. Americans United is acting as counsel for Jerry D. Ashburn, the plaintiff in a related action filed in this court, *Ashburn v. Mapes, et al.*, Case No. 4-02-CV-90447 (before the Honorable Robert W. Pratt). In order to be able to communicate by telephone with Mr. Ashburn, Americans United has sent money to the State for deposit into Mr. Ashburn's inmate telephone account, and intends to continue to do so. Mr. Ashburn has made telephone calls to Americans United to discuss the *Ashburn v. Mapes* action, and he will need to continue to do so in the future. These phone calls have been and continue to be paid for by money sent by Americans United into Mr. Ashburn's telephone account. Profits that the State makes on these phone calls are used to fund the InnerChange program. Americans United objects to this use of funds obtained from them to finance the InnerChange program. The State has confronted Americans United with a choice between foregoing communications with a client they represent, or funding a religious program which they oppose. By so doing, and by using funds obtained from Americans United to finance the InnerChange program, the State has harmed Americans United.

12. Americans United also has members who are Iowa residents, pay taxes to the State of

Iowa, and oppose the use of public funds to finance the InnerChange program. These members of Americans United object to the use of any State funds, including funds obtained from inmate telephone calls and funds obtained through the settlement of tobacco litigation, to finance or support in any manner the InnerChange program. These members have been harmed by the use of State funds, and are faced with threatened harm from the further use of State funds, to support the InnerChange program instead of to serve lawful purposes that benefit Iowa taxpayers and residents. The interests that Americans United seeks to protect in this action – such as the prevention of the use of public funds to support religious instruction – are germane to Americans United's purpose of preserving church-state separation. Neither the claims asserted herein, nor the relief requested herein, require the participation of individual members of Americans United in this lawsuit.

13. Plaintiff Carol Delp, a resident of Iowa who pays taxes to the State of Iowa, is the fiancee of an inmate in Newton. In order to be able to communicate by telephone with her fiancee, plaintiff Delp has sent money to the State for deposit into her fiancee's inmate telephone account, and intends to continue to do so. Plaintiff Delp's fiancee has made and continues to make telephone calls to plaintiff Delp, and these phone calls have been and continue to be paid for by money sent by plaintiff Delp into her fiancee's telephone account. Profits that the State makes on these phone calls are used to fund the InnerChange program. Plaintiff Delp objects to this use of funds obtained from her to finance the InnerChange program. Plaintiff Delp subscribes to the Roman Catholic faith and does not subscribe to the religious beliefs taught in the InnerChange program. The State has confronted plaintiff Delp with a choice between foregoing telephone conversations with her fiancee, or funding a religious program which she

opposes. By so doing, and by using funds obtained from plaintiff Delp to finance the InnerChange program, the State has harmed plaintiff Delp.

14. Plaintiff Ardene McKeag, a resident of Iowa, is the mother of an inmate incarcerated in Newton. In order to be able to communicate by telephone with her son, plaintiff McKeag has sent money to the State for deposit into her son's inmate telephone account, and intends to continue to send her son money for phone calls. Plaintiff McKeag's son has made and continues to make telephone calls to plaintiff McKeag, and these phone calls have been and continue to be paid for by money sent by plaintiff McKeag. Profits that the State makes on these phone calls are used to fund the InnerChange program. Plaintiff McKeag objects to this use of funds obtained from her to finance the InnerChange program. Plaintiff McKeag subscribes to the Protestant Methodist faith and does not agree with religious teachings presented in the InnerChange program. The State has confronted plaintiff McKeag with a choice between foregoing telephone conversations with her son, or funding a religious program that presents religious instruction with which she does not agree. By so doing, and by using funds obtained from plaintiff McKeag to finance the InnerChange program, the State has harmed plaintiff McKeag.

15. Plaintiff Dorothy Redd, a resident of Iowa, is the wife of an inmate in Newton. In order to be able to communicate by telephone with her husband, plaintiff Redd has sent money to the State for deposit into her husband's inmate telephone account, and intends to continue to do so. Plaintiff Redd's husband has made and continues to make telephone calls to plaintiff Redd, and these phone calls have been and continue to be paid for by money sent by plaintiff Redd into her husband's telephone account. Profits that the State makes on these phone calls are used to fund the InnerChange program. Plaintiff Redd objects to this use of funds obtained from her to

7

finance the InnerChange program.  Plaintiff Redd subscribes to the Baptist faith and does not agree with religious teachings presented in the InnerChange program.  The State has confronted plaintiff Redd with a choice between foregoing telephone conversations with her husband, or funding a religious program that presents religious instruction with which she does not agree.  By so doing, and by using funds obtained from plaintiff Redd to finance the InnerChange program, the State has harmed plaintiff Redd.

16.  Plaintiffs Delp, McKeag, and Redd further object to the use of any State funds, including funds obtained from inmate telephone calls and funds obtained through the settlement of tobacco litigation, to finance or support in any manner the InnerChange program.  Plaintiffs Delp, McKeag, and Redd have been harmed by the use of State funds, and are faced with threatened harm from the further use of State funds, to support the InnerChange program instead of to serve lawful purposes that benefit Iowa taxpayers and residents.  Plaintiffs Delp and McKeag are both former longtime smokers who have recently quit, and so they would suffer particular harm from the use of funds obtained through the settlement of tobacco litigation for the InnerChange program instead of lawful public health purposes, and they have a particular interest in ensuring that those funds are lawfully used.

17.  Defendant Prison Fellowship Ministries is a non-profit corporation that is incorporated in the District of Columbia and headquartered in Reston, Virginia.  Defendant Prison Fellowship proclaims itself to be "focused on one overriding vision: That God's kingdom will be manifested as the redemptive grace and peace of Jesus Christ are experienced by those impacted by crime."  Prison Fellowship's mission statement is: "To exhort, equip, and assist the Church in its ministry to prisoners, ex-prisoners, victims, and their families, and in its promotion

of biblical standards of justice in the criminal justice system." Prison Fellowship's stated goals include "[m]aking [d]isciples: [e]nabling believers impacted by crime to become consecrated followers of Jesus Christ." Defendant Prison Fellowship operates the InnerChange program.

18.   Defendant InnerChange Freedom Initiative is a non-profit corporation that is incorporated in Virginia, is headquartered in Reston, Virginia, and maintains an office in Newton, Iowa.   Defendants Prison Fellowship and InnerChange have jointly signed contracts with the Iowa Department of Corrections ("DOC") that provide for their operation of the InnerChange program and for the State's financing of the InnerChange program.   Defendant InnerChange is wholly controlled by defendant Prison Fellowship.   Defendant InnerChange appears to be a pass-through entity that transfers moneys received by it from government bodies to Prison Fellowship.   Defendant InnerChange has been funded mainly or entirely by government funds.   In its 2000-2001 fiscal year, over 99 percent of InnerChange's total revenue of $689,877 came from government payments, including $421,907 from the State of Iowa (and the rest from the State of Kansas, where there is also a state prison with an InnerChange program).   In the same fiscal year, all of InnerChange's revenue was transferred to Prison Fellowship.   Prison Fellowship then disbursed that money to pay for InnerChange program expenses and staff salaries.

19.   Prison Fellowship and InnerChange are named as defendants herein on the grounds that their conduct in connection with the InnerChange program constitutes state action.   Prison Fellowship and InnerChange operate the InnerChange program pursuant to contractual and administrative grants of rights and privileges to them by the State.   A substantial portion of the InnerChange program's budget is paid for by State funds, and the State otherwise significantly

aids the program, including by providing physical space and security for it. The State has delegated to Prison Fellowship and InnerChange the performance of a traditionally public function – supervision and rehabilitation of prison inmates. The InnerChange program is subject to substantial regulation by the DOC. The DOC is entwined in the management and control of the InnerChange program, including through significant involvement in the recruitment of participating inmates and in the resolution of numerous issues and disputes that arise with respect to the operation of the program. The contacts between DOC officials and InnerChange officials are so close and frequent that a symbiotic relationship exists between the State and Prison Fellowship/InnerChange. With full knowledge of the nature of the InnerChange program, the State invited the InnerChange program into Newton. The State is fully responsible for the conduct by Prison Fellowship and InnerChange described in this complaint, there is a close nexus between the State and that conduct, and the conduct may fairly be treated as that of the State itself.

20. In addition, and in the alternative, Prison Fellowship and InnerChange are named as defendants herein pursuant to Fed. R. Civ. P. 19. Prison Fellowship and InnerChange have a contractual relationship with the State that plaintiffs allege is unconstitutional. Part of the relief sought by plaintiffs in this action is an order requiring Prison Fellowship and InnerChange to return to the State all funds paid to them by the State; therefore, complete relief cannot be accorded among the other parties in the absence of Prison Fellowship and InnerChange. Resolution of this action in the absence of Prison Fellowship and InnerChange will subject the other parties to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations, for Prison Fellowship and InnerChange could attempt to protect their contractual

relationship with the State through a separate action. The interests of Prison Fellowship and InnerChange in obtaining funds through their contract with the State and in indoctrinating prison inmates in their religious views would be affected if this action were to proceed without their participation.

21. Defendant Terry Mapes is sued herein in his official capacity as Warden of Newton and in his individual capacity. Defendant Mapes is responsible for overseeing operations at Newton. Defendants Mapes has permitted and continues to permit the InnerChange program to be operated at Newton. Defendant Mapes has known, or reasonably should have known, that the State's sponsorship and financing of the InnerChange program clearly violated the Establishment Clause and the Iowa Bill of Rights.

22. Defendant Walter "Kip" Kautzky is sued herein in his individual capacity. Defendant Kautzky served as Director of the DOC from 1997 until December 31, 2002. Defendant Kautzky authorized the operation of the InnerChange program at Newton and the State financing of the InnerChange program. On behalf of the DOC, defendant Kautzky signed contracts with Prison Fellowship and InnerChange pursuant to which the InnerChange program has been operated and funded. Defendant Kautzky knew, or reasonably should have known, that the State's sponsorship and financing of the InnerChange program clearly violated the Establishment Clause and the Iowa Bill of Rights.

23. Defendant John Baldwin is sued herein in his official capacity as Acting Director of the DOC and in his individual capacity. Defendant Baldwin has served as Acting Director of the DOC since January 1, 2003. Defendant Baldwin has permitted and continues to permit the InnerChange program to be operated at Newton and to be partially financed by the State.

Defendant Baldwin has the authority to terminate the InnerChange program, but he has not done so. Defendant Baldwin has known, or reasonably should have known, that the State's sponsorship and financing of the InnerChange program clearly violated the Establishment Clause and the Iowa Bill of Rights.

24. Defendants Haywood Belle, Frances Colston, Robyn Mills, Arthur Neu, Suellen Overton, Walter Reed, Jr., and Donald Tietz are named as defendants herein in their official capacities as members of the Iowa Board of Corrections. The Board of Corrections authorized the operation of the InnerChange program at Newton and the State financing of the InnerChange program. The Board of Corrections has the authority to terminate the InnerChange program, but it has not done so. The members of the Board of Corrections knew, or reasonably should have known, that the State's sponsorship and financing of the InnerChange program clearly violated the Establishment Clause and the Iowa Bill of Rights, and so, to the extent that they individually voted to approve the operation and financing of the InnerChange program, they are named as defendants herein in their individual capacities.

25. The conduct by the State alleged to be unconstitutional in this complaint was authorized by the Board of Corrections and by defendants Kautzky, Baldwin, and Mapes.

26. Defendant John Doe, Director of the Iowa Department of Corrections, is sued herein in his official capacity and in his individual capacity. The Director of the DOC is the DOC's chief administrative officer. The Director of the DOC has the authority to terminate the InnerChange program. The Director of the DOC reasonably should know that the State's sponsorship and financing of the InnerChange program clearly violate the Establishment Clause and the Iowa Bill of Rights. Though the position of Director of the DOC is vacant as of the time

12

of the drafting of this complaint, the Director of the DOC is named as a defendant herein

pursuant to Fed. R. Civ. P. 25(d).

## IV. General Allegations

### A. The Pervasively Religious Nature of the InnerChange Program

27.  Approximately 200 Iowa prison inmates participate in the InnerChange program.

The participating inmates are housed in a separate unit in Newton.  InnerChange runs virtually

every aspect of this unit except for security.  The InnerChange program is pervasively sectarian.

During nearly all their waking hours, participants are subjected to intensive, evangelical,

Biblically-based instruction from a Christian fundamentalist standpoint.  Each inmate's day starts

with morning prayer.  Most of an inmate's day consists of taking part in InnerChange's

evangelical, fundamentalist, Biblically-based classes and programming.  The walls in the Newton

unit that houses participating inmates are lined with scripture.  Program staff pray with

participating inmates.  Chapel service is mandatory on Sundays.

28.  InnerChange's own promotional and program materials include statements that

describe the program as follows:

> • (a) The InnerChange program "is a revolutionary, Christ-centered, values-based
> pre-release prison program supporting prison inmates through their spiritual and moral
> transformation."

> • (b) "[T]he application of biblical principles is not an agenda item – it is the
> agenda."

> • (c) "All programming – all day, every day – is Christ-centered."

13

• (d) The program is a "24 hour per day Christ-centered Bible-based program."

• (e) The program is "explicitly Christ-centered."

• (f) The InnerChange program in Iowa is "one of the prisons Prison Fellowship actually runs as a Christian institution."

• (g) "Utilizing a totally Christ-centered, biblically based curriculum, IFI staff and a great number of Christian volunteers immerse member inmates in the transformational love of Jesus Christ."

• (h) "The IFI community serves as the crucible for learning and testing biblical principles."

• (i) "To facilitate this, biblical principles and core values are prominently displayed throughout the facility and promoted through memorization."

• (j) "All IFI courses are Bible-based."

• (k) The program "require[s] regular participation in Bible studies and other religious programming."

• (l) "Biblical principles are integrated into the entire course curriculum of IFI, rather than being compartmentalized in specific classes."

• (m) "Prisoners are taught biblical principles in the context of teachable moments."

• (n) The program "is anchored in biblical teaching that underscores . . . the reality of a new life through Christ."

• (o) "Transformation" is the "major purpose of the program," and "[i]t is brought about by depending on Christ and living according to the Bible."

14

• (p) "The purpose of IFI is to have a prison community where members change . . . through a spiritual new birth through Christ."

• (q) "Inmates learn how God can heal them permanently, if they turn from their sinful past, are willing to see the world through God's eyes, and surrender themselves to God's will."

• (r) In the first phase of the program, "[W]e are mainly concerned about your inside transformation – your relationship with God. . . . We want you to learn what it means to have a personal relationship with Christ. . . . And we want you to learn how to apply the Bible to your life."

• (s) "The approach of the InnerChange Freedom Initiative concerning serving those with any addictive behavior, including substance abuse addictions, shall be based on a faith-based Christian discipleship model; i.e., only Jesus Christ is the cure for addictions."

• (t) "[T]hrough biblical transformation, the deleterious effects of substance abuse can be overcome."

• (u) The program is "training up [inmates as] future spiritual leaders that will be about the business of spreading the Good News of Jesus Christ."

29.   According to InnerChange's promotional and program materials, the program includes the following courses and components:

• (a) MasterLife.  "This course is a 26-week inductive bible study authored by the Southern Baptist Convention."  It is "discipleship training . . . a sequential, developmental, group disciplining process which enables the acknowledgment of Christ

as Master."

• (b) Survival Kit. This course "[h]elps new Christians chart their course for survival in the Christian walk." The goals of this course include (i) "[l]earning about allowing Christ to indwell you;" (ii) "[t]eaching about how we become the body of Christ;" (iii) "[w]alking you[r] new walk in Christ;" and (iv) "[h]ow to reach others through Prayer and Witnessing."

• (c) Parenting Seminar. "This course is a biblical-based parenting workshop." The three goals of the course are (i) "[t]o know that God has established the family and the father to be the head of the family;" (ii) "[t]o learn how to teach Godliness to prisoners' children;" and (iii) "[t]o model and demonstrate godliness."

• (d) Mentoring. The goals of this program component include: (i) to "[t]each the biblical principles for close friendships;" (ii) to "[d]evelop a long-term relationship which centers first on Christ;" and (iii) to "[d]evelop a long-term relationship built on biblical principles of prayer, biblical foundations for living, and problem-resolution."

• (e) Experiencing God. This course "seeks to assist members in identifying ways in which God is active in their everyday lives."

• (f) Heart of the Problem. This course "focuses on God's counsel in truth in contrast to the 'world's counsel and reasoning.'"

• (g) Brothers Keepers. "This course is a weekly group meeting where members are taught biblical principles for loving, Christ-centered peer relationships."

• (h) Marriage and Family. "This interactive course teaches biblical principles using proven techniques to help the inmate and family members restore and rebuild their

16

family relationships."

&bull; (i) Sycamore Tree.  This program component provides "[a]n opportunity for the
church to help offenders, victims, and community members meet in the presence of
Jesus."  Its goals include "experienc[ing] Biblical confession, repentance, forgiveness,
and reconciliation related to specific criminal acts" and "experienc[ing] salvation or
Christian growth."

**B. The State's Funding of Religious Instruction by InnerChange**

30.  The State entered into a contract with Prison Fellowship and InnerChange in 1999.
Defendant Kautzky signed this contract on behalf of the State.  The initial contract term was from
September 1, 1999 through August 31, 2000.  The contract was renewed every year, first for a
term from September 1, 2000 through June 30, 2001, then for a term from July 1, 2001 through
June 30, 2002, and most recently for a term from July 1, 2002 through June 30, 2003.  The most
recent contract renewal gives the State the option to further renew the contract for two one-year
periods, the second of which would end on June 30, 2005.

31.  The contract provides for state financing and support of InnerChange.  Pursuant to
the contract, the State has expended $282,000 on the InnerChange program in the 1999-2000
fiscal year, $373,000 in the 2000-2001 fiscal year, and $325,025 in the 2001-2002 fiscal year.  Of
these amounts, $229,000 in cash was paid directly to InnerChange for program costs during the
1999-2000 contract term, $191,000 in cash was paid to InnerChange for program costs during the
2000-2001 term, and between $191,000 and $230,000 in cash was paid to InnerChange for
program costs during the 2001-2002 term.  The State has been paying approximately 40 to 50
percent of InnerChange's program costs.

17

32. The balance of the money provided by the State to support InnerChange has been spent on in-kind aid. The State leased and eventually purchased a modular building to provide office and program space for the InnerChange program. The State paid the full cost of leasing and purchasing this building, including a $59,000 installation fee in 1999, approximately $8,300 per month in lease payments from 1999 until early 2002, and a $61,576 purchase payment in 2002. The office and program space provided by the State for InnerChange includes air-conditioned classrooms, offices for InnerChange staff, a conference room for the staff, staff restroom facilities, library facilities, and recreational areas. The State also has been providing InnerChange with beds for the participating inmates, security staff for the Newton unit housing the program, access to chaplains and correctional counselors, and transportation for participating inmates.

33. The State's payments to InnerChange have been made out of the DOC's Inmate Telephone Rebate Fund. The DOC charges inmates rates that are substantially above market rates to make telephone calls to families, friends, and attorneys. Phone service in Iowa correctional facilities is provided and operated by a state agency called the Iowa Communications Network ("ICN"). The charges imposed on inmates for telephone calls are far greater than the costs incurred by the ICN and the DOC in connection with the calls. The State thus makes substantial profits on inmate telephone calls. The State places these profits in the Inmate Telephone Rebate Fund. By law, the DOC is required to use all funds deposited in the Inmate Telephone Rebate Fund "for the benefit of inmates." However, since the InnerChange program began, a substantial portion of the funds placed in the Inmate Telephone Rebate Fund has been spent on the InnerChange program.

34. In other words, the State has been funding InnerChange out of profits that the State makes on inmate telephone calls, including calls made to plaintiffs and paid for out of funds deposited by plaintiffs into inmate telephone accounts. The State has thereby been expropriating funds from family members and friends of inmates (including plaintiffs Delp and McKeag), attorneys of inmates (including plaintiff Americans United), and inmates themselves to finance InnerChange. The family members and friends of inmates, attorneys of inmates, and inmates themselves are presented by the State with a choice of foregoing telephone conversations with their relatives or other persons who are important to them, or funding religious instruction with which they do not agree.

35. For the 2003 fiscal year, the State has allocated $229,250 from the Inmate Telephone Rebate Fund for the InnerChange program. Of this amount, $191,625 is being paid to InnerChange for program costs. The rest is being used by the State to provide non-cash services that support the program. Moreover, an additional $172,591 has been allocated by the State from the Healthy Iowans Tobacco Trust Fund for the InnerChange program. The funds in the Tobacco Trust Fund were obtained by the State through the settlement of litigation between the State and tobacco companies arising out of conduct by the tobacco companies harmful to Iowa smokers and others. Under Iowa Code § 12.65, "[m]oneys deposited in the healthy Iowans tobacco trust fund shall be used only . . . for purposes related to health care, substance abuse treatment and enforcement, tobacco use prevention and control, and other purposes relating to the needs of children, adults and families in the state." However, the State intends to use the Tobacco Trust Fund money to expand the InnerChange program.

36. The defendants have publicly taken the position that the State funds paid to

19

InnerChange for programming costs are expended only for "non-sectarian" portions of the program. In fact, however, the State's payments to InnerChange are being used to actually pay for religious instruction, and to finance and support a pervasively religious program. According to InnerChange's own promotional materials, "Biblical principles are integrated into the entire course curriculum of IFI, rather than being compartmentalized in specific classes," and "[a]ll programming – all day, every day – is Christ-centered." It is therefore impossible to separate the sectarian aspects of the InnerChange program from the non-sectarian. The InnerChange program is wholly permeated by religion and is thus pervasively sectarian.

37. The manner in which InnerChange purports to distinguish sectarian expenses and non-sectarian expenses confirms that State funds are in fact being used by InnerChange to pay for and to support religious instruction. InnerChange attempts to allocate to each of its courses and program components a percentage that supposedly represents a "non-sectarian" portion. However, since "all programming – all day, every day – is Christ-centered" and "Biblical principles are integrated into the entire course curriculum," these allocations are without any validity. And courses that are treated as primarily non-sectarian in InnerChange's percentage allocations are described in primarily religious terms in InnerChange's program and promotional materials. Indeed, InnerChange treats as 100 percent non-sectarian an "Addiction Recovery" class that relies heavily on the Alcoholics Anonymous program, even though Alcoholics Anonymous is a religious program (as many federal court decisions have expressly held).

38. Likewise, InnerChange assigns each of its staff members a percentage that supposedly represents the non-sectarian portion of their work, and claims to bill the State only for that portion of each staff member's salary. For example, InnerChange claims that staff members

called "Biblical Counselors" devote 16 percent of their time to non-sectarian work and 84 percent to sectarian work. InnerChange further claims that 77 percent of the work done by their Office Administrator should be treated as non-sectarian, even though the Office Administrator's work consists of support tasks for a pervasively sectarian program. And InnerChange bills the State for items other than salaries, such as "advertising," "materials and supplies," "program and training materials," "postage and freight," "printing," "telephone," and "meals for staff and volunteers," without even attempting to divide these items into sectarian and non-sectarian components. Since these items support pervasively religious programming, they cannot properly be treated as non-sectarian, yet InnerChange so treats them anyway.

39. In addition, the State has not created any safeguards designed to prevent the use of money paid to InnerChange for religious instruction. The State does not monitor the InnerChange program to try to keep state money from being used for religious programming.

40. Moreover, State funds paid to InnerChange supplant and do not supplement private funds. In April 1997, before establishing the InnerChange program in Iowa, Prison Fellowship established an InnerChange program in a prison in Texas, which is still in place. State funds have not been used in Texas to pay for any InnerChange program costs there. The State of Iowa is thus using State funds to finance a religious program that could be successfully financed wholly with private dollars.

41. Furthermore, the State is delivering government funds directly to InnerChange. InnerChange then turns the money over to Prison Fellowship, which disburses the money to pay for InnerChange program costs and salaries of InnerChange staff. State cash is therefore being delivered directly into the coffers of religious organizations.

42.  Finally, the State is providing InnerChange with substantial in-kind aid, such as physical program and office space and facilities, which is not restricted to secular use but is used to support the entirety of InnerChange's pervasively religious programming.

**C. The InnerChange Program's Religious Discrimination Among Inmates**

43.  InnerChange claims that the program is open to inmates of all faiths.  In fact, however, the InnerChange program discriminates among inmates based on religion and is available only to inmates who subscribe to or are willing to actively cooperate in being converted to a fundamentalist, evangelical, form of Protestant Christianity.

44.  InnerChange screens and selects its participating inmates.  InnerChange requires participating inmates to "be willing to productively participate in a program that is explicitly Christian in both content and delivery."  Non-Christian inmates are eligible only if they are "willing to actively participate in a Christ-centered, biblically based program."  All inmates who wish to participate must sign an agreement stating that they understand that "the program contains religious content and is based upon Christian values and principles."  InnerChange's criteria for selecting inmates include "demonstrated commitment to participate in the IFI program" and "sincere motivation to cooperate."

45.  Recruitment materials given to prospective participants make clear that there is a place in the InnerChange program only for those who are willing to embrace fundamentalist Christianity.  The statements made in these materials to inmates who are considering the program include:

> • (a) "You need to understand that this is a Christian program."

> • (b) "The program confronts prisoners with the choice of embracing new life in

22

Christ and personal transformation, or remaining in the stranglehold of crime and despair."

• (c) "IFI is a 24-hour-a-day program that promotes personal transformation of prisoners through the power of the Gospel."

• (d) "[T]he program is based on the Gospel of Jesus Christ."

• (e) "An overall goal of Phase 1 [of the program] is for you to begin life transformation through the Gospel of Jesus Christ."

• (f) "True transformation begins with salvation, also called conversion."

• (g) "Conversion is when you turn away from what is negative and turn to Christ."

• (h) "Then you try to live your life by His example and instructions found in the Bible."

• (i) "As you are transformed into the image of Christ, you have more and more integrity."

• (j) "Above all else," through the program, "you may discover the transforming love of Jesus Christ."

• (k) The program offers "a different group of people to hang with.  Christians with positive values."

• (l) "All IFI graduates are expected to have  . . . a Christian mentor . . . and a home church when released."

46.  Selection for the InnerChange program involves a six-week introduction program followed by a one-month orientation program, both of which are conducted by Prison

23

Fellowship. As part of this process, prospective participants must complete a "Survey of Religious Beliefs and Practices," where they are asked to indicate their level of agreement or disagreement with various religion-related statements. One subsection in this survey is a "Religious Attitude Inventory," where the prospective participants must agree or disagree with religion-related statements such as "Christ died for sinners." Another subsection is a "Scriptural Literalism Scale," where agreement or disagreement must be expressed with statements such as "[t]he precise words spoken by God may be found in the scriptures." InnerChange selects participants for its full program by evaluating the performance of prospective participants in the introduction and orientation programs and examining their "degree of spiritual walk." The DOC does not select InnerChange participants; it only has veto power over InnerChange's selections.

47. Once inmates are actually admitted into the InnerChange program, they continue to be judged through religious criteria. They receive monthly evaluations based on various criteria on a scale of 1 to 5. Many of these criteria are explicitly religious, including:

- (a) "As faith proceeds joy, demonstrates a belief in Jesus Christ."

- (b) "Puts God first in his life, 'serves no idol' and is quick to praise God."

- (c) "Prays in the Spirit."

- (d) "Has a vision/understanding of the Father and is enlightened spiritually as demonstrated by his personal attitudes."

- (e) "Conquers trials and tribulations through spending time in His Word."

- (f) "Maintains high spiritual morale without complaining and criticizing."

- (g) "Acts as a witness of God's grace to others."

Obtaining an average score of less than 2 on an evaluation is grounds for removal from the

24

InnerChange program.  Obtaining an average score of 3 in each of eight behavior areas, some of which are dominated by religious criteria, is necessary to advance from one phase of the program to the next phase.

48.  Any non-Protestant inmates who decide to and are permitted to participate in the InnerChange program are given little opportunity to continue to adhere to their faith.  Program participants who are Catholic, Muslim, or of other non-Protestant faiths are permitted to attend religious services other than the Protestant ones provided by the program only if the time of the services does not conflict with program activities.  Special requests made by non-Protestant program participants to accommodate their religious practices are not granted if they would keep an inmate from fully taking part in the program or from meeting program requirements.  Faiths other than Protestant Christianity are denigrated during the program.  As stated in an InnerChange brochure, "It's the earnest desire of IFI that residents convert to Christ and follow His ways that lead to transformation."

49.  Moreover, the State's sponsorship of the InnerChange program creates incentives for inmates to undertake religious indoctrination in the specific tenets of the program.  The State does not offer any program similar to InnerChange for inmates who do not subscribe to and are not willing to be converted to the religious tenets taught in the InnerChange program.  And inmates in the InnerChange program receive numerous privileges that are not available to the other inmates in Newton.  Unlike other Newton inmates, who are housed in what is referred to as a "lock-up unit," participants in the InnerChange program are housed in what is referred to as an "honor unit."  Participants in the InnerChange program are given keys to their cell doors.  The other inmates in Newton are not, and the locks to their cell doors are controlled solely by

correctional officers.  Participants in the InnerChange program are permitted to leave their cells at night, while other Newton inmates are locked in their cells for the night.  Participants in the InnerChange program have access to bathrooms stalls that are divided by partitions and have doors with sliding locks.  The other inmates in Newton have access only to toilet stalls that are located in the middle of their cells, with no privacy.  Participants in the InnerChange program are housed two to a cell, while most other inmates in Newton are housed three to a cell.  Participants in InnerChange live in cells with wooden doors; other inmates in Newton live in cells with steel doors.

50.  The "honor unit" that now houses InnerChange participants was formerly reserved for inmates who established a record of good behavior while incarcerated and did not represent major security risks.  In order to make room for the InnerChange program, the State expelled the inmates who were living in the "honor unit" from that unit.

51.  Participants in InnerChange also have the following privileges that are denied to the other inmates in Newton:

        (a) special visiting privileges;

        (b) religious worship services with members of their family;

        (c) free telephone calls to their family;

        (d) the right to make videos and send them home to their family;

        (e) preferences for better jobs at Newton;

        (f) certain certified treatment and rehabilitation programs;

        (g) payment of an allowance in exchange for taking education classes;

        (h) certain education classes of a higher degree and quality than what is available

to other inmates;

(i) different discipline procedures that tend to result in less severe discipline for violations of prison regulations;

(j) access to computers and word-processing equipment;

(k) free religious articles;

(l) additional and different clothing;

(m) access to art supplies and opportunities to do art work;

(n) the right to continue relationships with volunteer counselors and mentors after release;

(o) assistance with housing and jobs upon release;

(p) access to big-screen televisions;

(q) a music room;

(r) access to musical instruments;

(s) three-ring binders; and

(t) access to food prepared by outside vendors during celebrations.

52. Inmates at Newton must choose between foregoing all of the above-described privileges or submitting to intensive indoctrination in religious tenets to which they do not subscribe.

53. Furthermore, recommendations from InnerChange staff members can favorably influence parole decisions.  To receive such recommendations from InnerChange staff, inmates must successfully proceed through the InnerChange program. The State has thus created a system under which inmates can increase their chances of being paroled by submitting to and

accepting intensive indoctrination in fundamentalist Christian religious teachings.

### D. The InnerChange Program's Religious Discrimination in Employment

54.   InnerChange and Prison Fellowship have publicly-announced policies of employing only Christians as staff members and of requiring all volunteers to be Christian.  InnerChange's website states that InnerChange "requires that all staff and volunteers are Christians who are living vital, empowered lives."  The website further states, "IFI staff and volunteers seek to model Christ through being controlled by the fruit of the Spirit."  Similar language appears in paper InnerChange promotional and informational materials.

55.   InnerChange staff members and volunteers must subscribe to and abide by Prison Fellowship's Statement of Faith, which reads:

> We believe in one God, Creator and Lord of the Universe, the co-eternal Trinity; Father, Son, and Holy Spirit.

> We believe that Jesus Christ, God's Son, was conceived by the Holy Spirit, born of the Virgin Mary, lived a sinless life, died a substitutionary atoning death on the cross, rose bodily from the dead and ascended to heaven where, as truly God and truly man, He is the only mediator between God and man.

> We believe that the Bible is God's authoritative and inspired Word.  It is without error in all its teachings, including creation, history, its own origins, and salvation.  Christians must submit to its divine authority, both individually and corporately, in all matters of belief and conduct, which is demonstrated by true righteous living.

> We believe that all people are lost sinners and cannot see the Kingdom of God except through the new birth.  Justification is by grace through faith in Christ alone.

> We believe in one holy, universal, and apostolic Church.  Its calling is to worship and witness concerning its Head, Jesus Christ, preaching the Gospel among all nations and demonstrating its commitment by compassionate service to the needs of human beings and promoting righteousness and justice.

> We believe in the necessity of the work of the Holy Spirit for the individual's new birth and growth to maturity, and for the Church's constant renewal in truth, wisdom, faith,

holiness, love, power, and mission.

We believe that Jesus Christ will personally and visibly return in glory to raise the dead and bring salvation and judgment to completion.  God will fully manifest His kingdom when He establishes a new heaven and new earth, in which He will be glorified forever and exclude all evil, suffering, and death.

56.  State of Iowa funds are used to pay a portion of the salary of each InnerChange staff member.  The State is thereby financing religious discrimination in employment, including with funds expropriated from plaintiffs.  Moreover, InnerChange's contract with the State specifically provides that InnerChange may base employment decisions upon religious criteria, notwithstanding any federal, state, or local laws, rules, ordinances, regulations, or orders to the contrary.  The State is thus significantly aiding invidious religious discrimination in employment by Prison Fellowship and InnerChange, and that discrimination is fairly attributable to the State.

### E. The State's Backroom Agreement With and Cooperation With InnerChange

57.  The State agreed to allow Prison Fellowship to start the InnerChange program in Iowa without first making similar opportunities available to other groups.  In early 1998 and mid-1998, Prison Fellowship officials had discussions with defendant Kautzky and other State officials about bringing the InnerChange program to Iowa.  In mid-1998, defendant Kautzky and other State officials agreed to allow an InnerChange program to be started in Iowa.  After this agreement was privately reached, the State issued a public Request for Proposal that was tailored for the InnerChange program.

58.  This Request for Proposal, issued in August 1998, was entitled "Request for Proposal for Non-Compensated Values Based Pre-Release Program."  Though nominally inviting open bidding on a contract to provide "values based pre-release" programming, the Request for

29

Proposal was actually designed to result in Prison Fellowship being awarded the contract.  The

Request for Proposal falsely stated that it sought only "non-compensated services" and that

"[t]here will be no state monies or compensation, in any form, given to the Contractor for the

programming services provided."  In fact, the State agreed to pay a substantial portion of the

InnerChange program's costs.  Understandably, only Prison Fellowship responded to the Request

for Proposal.

59.  The manner in which the State agreed to contract with Prison Fellowship reflects

State endorsement of and preference for religion in general and the specific religious tenets of the

InnerChange program in particular.  The DOC does not make available to inmates any "values

based pre-release" programming from a secular perspective or from the perspectives of faiths

other than InnerChange's fundamentalist, evangelical Christian belief system.

60.  In addition, state officials closely cooperate with InnerChange officials with respect

to administration of the InnerChange program.  State officials and employees have regular and

close contact with InnerChange officials and employees with respect to numerous issues that

arise out of the operation of the program.  State officials also provide considerable assistance to

InnerChange with respect to recruitment of inmates for the program.  The State's involvement

with the InnerChange program has thereby resulted in excessive government entanglement with

religion.

## V. Claims for Relief

### Count One

### (Violation of the Establishment Clause of the U.S. Constitution)

61.  Paragraphs 1 through 60 above are incorporated herein as if fully set forth herein.

62.  The Establishment Clause of the First Amendment of the Constitution of the United States provides, "Congress shall make no law respecting an establishment of religion." The Establishment Clause applies with full force and effect to the acts of state and local government entities and officials pursuant to the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

63.  By sponsoring and financing the InnerChange program, the defendants have violated and continue to violate the Establishment Clause in many ways, including as described below.

64.  The State's sponsorship and financing of the InnerChange program has the primary effect of advancing religion.  It results in governmental indoctrination.  State funds are being used to finance and support a pervasively religious program, and those funds are put to specifically religious use.  Government cash aid is being delivered directly into the coffers of religious organizations.  This aid supplants and does not supplement private funds.  No adequate safeguards exist to prevent the aid from being used for religious instruction.

65.  The State's sponsorship and financing of InnerChange gives inmates incentives to subject themselves to religious indoctrination, and coerces them to do so.  Inmates must choose between submitting to indoctrination in religious tenets with which they do not agree, or foregoing numerous privileges offered to participants in the InnerChange program.  The InnerChange program defines the recipients of government benefits by reference to religion.

Only those inmates who subscribe to evangelical, fundamentalist Christian beliefs or are willing to be converted to those beliefs can participate in the program.

66. The State's sponsorship and financing of the InnerChange program conveys to reasonable observers a message of endorsement of religion in general and of the specific form of Christianity taught by the InnerChange program in particular. The State's sponsorship and financing of the InnerChange program constitutes a governmental preference for Christianity in general and for the specific form of Christianity taught in the InnerChange program in particular.

67. The State is financing invidious discrimination in employment based on religion by Prison Fellowship and InnerChange. Prison Fellowship and InnerChange require all of their staff members to be Christians and to subscribe to and abide by Prison Fellowship's Statement of Faith, and the State is partly paying the salaries of InnerChange staff.

68. Other than continuing to take responsibility for security, the State is allowing InnerChange to run the section of Newton in which participating inmates are housed. The State is thereby delegating government power to a religious organization.

69. State officials closely cooperate with InnerChange officials with respect to administration of the InnerChange program. The InnerChange program has thereby resulted in excessive government entanglement with religion.

70. By violating the Establishment Clause as set forth above, the defendants have, under color of statute, ordinance, regulation, custom, and/or usage, deprived plaintiffs of rights secured by the First and Fourteenth Amendments of the U.S. Constitution, entitling plaintiffs to a remedy under 42 U.S.C. § 1983.

71. By virtue of the defendants' violations of the Establishment Clause, plaintiffs are

32

entitled to injunctive relief, declaratory relief, and nominal damages.

## Count Two

### (Violation of Section 3 of the Iowa Bill of Rights)

72. Paragraphs 1 through 71 above are incorporated herein as if fully set forth herein.

73. Article I, Section 3, of the Iowa Constitution provides, "The General Assembly shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; nor shall any person be compelled to attend any place of worship, pay tithes, taxes, or other rates for building or repairing places of worship, or the maintenance of any minister, or ministry."

74. By expropriating funds from plaintiffs and using those funds to pay for the support of a ministry, and for the reasons given in Count One, defendants have violated Article I, Section 3 of the Iowa Constitution.

75. By virtue of defendants' violations of Article I, Section 3 of the Iowa Constitution, plaintiffs are entitled to nominal damages and declaratory relief against all defendants, and injunctive relief against defendants Prison Fellowship and InnerChange.

## VI. Prayer for Relief

76. Paragraphs 1 through 75 above are incorporated herein as if fully set forth herein.

### Injunction

77. The plaintiffs have no adequate remedy at law. WHEREFORE, plaintiffs respectfully request a permanent injunction prohibiting continued operation of the InnerChange program in Newton or in any other Iowa correctional facility. In the alternative, or in addition,

plaintiffs respectfully request a permanent injunction:

(a) prohibiting the payment of any State funds to Prison Fellowship or InnerChange and the use of any State funds or State in-kind aid to otherwise support the InnerChange program in any manner (and, alternatively, prohibiting the use of any State funds to pay any portion of the salaries of Prison Fellowship or InnerChange employees so long as Prison Fellowship or InnerChange continue to use religious criteria to select employees); and

(b) requiring that benefits given to inmates participating in the InnerChange program be made available to non-participating inmates and that "values based pre-release programming" from the standpoints of all faiths and from a secular standpoint be made available to inmates.

### Declaratory Judgment

78. An actual controversy exists between the parties as to whether the operation of the InnerChange program, and the State's financing and sponsorship of the program, violate the Establishment Clause of the U.S. Constitution and the Bill of Rights of the Iowa Constitution. WHEREFORE, plaintiffs respectfully request a declaratory judgment declaring that:

(a) defendants Mapes, Kautzky, Baldwin, Doe, Belle, Colston, Mills, Neu, Overton, Reed, and Tietz violated the U.S. and Iowa Constitutions by authorizing the operation of the InnerChange program in Newton, the State's financing and sponsorship of the InnerChange program, and the other conduct described in this complaint; and

(b) defendants Prison Fellowship and InnerChange violated the U.S. and Iowa Constitutions by discriminating against inmates based on their religious beliefs in the

34

offering and provision of "values-based pre-release programming," and by discriminating in employment based on religion with respect to positions partly financed with government funds.

## Nominal Damages

79.  Plaintiffs' rights under the Establishment Clause of the U.S. Constitution and the Bill of Rights of the Iowa Constitution were violated by defendants.  WHEREFORE, plaintiffs respectfully request nominal damages against:

(a) defendants Mapes, Kautzky, Baldwin, and Doe, for authorizing the operation of the InnerChange program in Newton, the State's financing and sponsorship of the InnerChange program, and the other conduct described in this complaint;

(b) those defendant members of the Board of Corrections who individually voted to authorize the operation of the InnerChange program in Newton and the State's financing and sponsorship of the InnerChange program, for so doing; and

(c) defendants Prison Fellowship and InnerChange, for utilizing government funds to support discrimination based on religion in the provision of government services and in employment.

## Recoupment

80.  Defendants Prison Fellowship and InnerChange knew or reasonably should have known that the State's payments to them for InnerChange program costs were unconstitutional, and therefore they could not have reasonably relied on the payments for their expenses.  Return to the State of the funds paid by the State to InnerChange would protect and advance the constitutional rights raised by this action by deterring Prison Fellowship, InnerChange, and other

private organizations from accepting government funds in the future where, as here, such payments of funds are clearly unconstitutional.  WHEREFORE, plaintiffs respectfully request an order requiring Prison Fellowship and InnerChange to return to the State all payments ever made to them by the State, and requiring that the State restore those monies to the special state funds (such as the Inmate Telephone Rebate Fund) from which they were taken.

\

\

\

\

\

\

\

\

\

\

\

\

\

\

\

\

\

**Other Relief**

81.  Plaintiffs further respectfully request an order awarding plaintiffs the costs of this action, including attorneys' fees, pursuant to 42 U.S.C. § 1988.

82.  Plaintiffs further respectfully request that the Court award any other relief that the Court deems just and proper.

Respectfully submitted,

By: _Dean Stowers_       Date: _2/12/03_
     Dean Stowers, Esq.

Dean Stowers, Esq.
Rosenberg, Stowers & Morse
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, Iowa 50309
Phone: (515) 243-7600
Fax: (515) 243-0583
E-mail: *deanstowers@aol.com*
Cooperating Attorneys, Americans United
  for Separation of Church and State

By: _[signature]_       Date: _February 5 2003_
     Alex J. Luchenitser, Esq.

Ayesha N. Khan, Esq., Legal Director* (D.C. Bar No. 426836**)
Alex J. Luchenitser, Esq., Litigation Counsel (D.C. Bar No. 473393**)
Americans United for Separation of Church and State
518 C Street NE
Washington, DC 20002
Phone: (202) 466-3234
Fax: (202) 466-2587
E-mail: *khan@au.org* / *luchenitser@au.org*
*lead counsel
**petition for admission *pro hac vice* submitted herewith

Counsel for plaintiffs

37