2084

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - X
AMERICANS UNITED FOR        :
SEPARATION OF CHURCH AND    :
STATE, et al.,              :
                            :
      Plaintiffs,          :
                            :
vs.                         :     Civil No. 4:03-cv-90074
                            :
PRISON FELLOWSHIP           :
MINISTRIES, et al.,         :     TRIAL TRANSCRIPT
                            :
      Defendants.          :         VOL. X
- - - - - - - - - - - - X

RECEIVED
DEC 2 1 2005
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

Second Floor Courtroom
U.S. Courthouse
East First and Walnut Streets
Des Moines, Iowa
Monday, November 28, 2005
8:30 a.m.

BEFORE:   THE HONORABLE ROBERT W. PRATT, Judge.

- - -

# ORIGINAL

ANN T. MOYNA - CERTIFIED SHORTHAND REPORTER

pleading # 347

APPEARANCES:

For the Plaintiffs:          ALEX J. LUCHENITSER, ESQ.
                             HEATHER L. WEAVER, ESQ.
                             Americans United for Separation of
                               Church and State
                             518 C Street NE
                             Washington, DC  20002

                             DEAN STOWERS, ESQ.
                             Rosenberg, Stowers & Morse
                             1010 Insurance Exchange Building
                             505 Fifth Avenue
                             Des Moines, Iowa  50309

For Defendants Prison        ANTHONY F. TROY, ESQ.
  Fellowship &               ROBERT A. ANGLE, ESQ.
  InnerChange:               MICHAEL E. LACEY, ESQ.
                             Troutman, Sanders L.L.P.
                             1111 East Main Street
                             P.O. Box 1122
                             Richmond, Virginia  23218

                             BRENT R. APPEL, ESQ.
                             Wandro, Baer, Appel & Casper, P.C.
                             2501 Grand Avenue, Suite B
                             Des Moines, Iowa  50312

For Defendants              GORDON E. ALLEN, ESQ.
  Mapes, et al.:            Deputy Attorney General
                            H. LORAINE WALLACE, ESQ.
                            Assistant Attorney General
                            Special Litigation/Corrections
                            Department of Justice
                            Hoover State Office Building
                            Second Floor
                            1305 East Walnut Street
                            Des Moines, Iowa 50319

1      P R O C E E D I N G S

2          (In open court.)

3          THE COURT:  Good morning.

4          Mr. Luchenitser, my law clerk said you had some court-

5    keeping matters you wanted to talk about.

6          MR. LUCHENITSER:  Yes.  The first matter is that

7    Plaintiff Jerry Ashburn sent a letter to me in care of the

8    Court.  I wasn't in the office over Thanksgiving.  He felt that

9    was the best way to quickly get it to me.  The letter was

10   placed--the entire letter was placed on the Court's ECF filing

11   system on Friday.

12         When that happened, I called the Clerk's Office and I

13   asked them to address the issue.  My understanding, I haven't

14   actually checked this, but my understanding is Judge Gritzner

15   ordered that it be placed under seal so that only the Court

16   could see it.

17         We have two things that we would like to be done.

18   First, if possible, we would like the letter to be removed from

19   the file entirely.  It's a matter of an attorney/client

20   communication

21         THE COURT:  I was out of town.  Is it to the lawyer,

22   not me?

23         MR. LUCHENITSER:  It's a letter to me in care of the

24   Court.  He sent a cover letter and then there's a letter to me

25   attached.

2088

1          THE COURT:  You're asking that your letter be given to

2   you?

3          MR. LUCHENITSER:  Well, I already have a copy.  I'm

4   asking that at least the letter that's to me be removed from the

5   Court file.

6          THE COURT:  Okay.  I don't see any reason that it

7   would be in the Court file.  I haven't read it.

8          MR. TROY:  Your Honor, I have.  It was sent across the

9   Internet.  I don't want to speak for Iowa, but two things; one,

10  Mr. Ashburn suggests that there was a note that he has given to

11  Mr. Luchenitser threatening him with wrong doing.  And if that's

12  true, it's evidence of a crime, and we would ask Mr. Luchenitser

13  to hand it over.

14          Secondly, Mr. Ashburn is suggesting that he might

15  commit some violent act, and, consequently, I don't think it's

16  appropriate to keep it under seal and away from the prison

17  officials, nor to keep evidence of a crime out of the public

18  record.

19          THE COURT:  Okay.  Mr. Troy, when you say threatening

20  him with wrong doing, threatening Mr. Luchenitser?

21          MR. TROY:  No, sir.  There are two things.

22  Mr. Ashburn suggests that there is a note that he received

23  threatening he, Mr. Ashburn.  If that's true, then it's

24  suggested that he gave it to Mr. Luchenitser.  If that's true,

25  there is evidence of a crime at the hands of Mr. Luchenitser

1  that I respectfully suggest isn't something that should be held

2  in confidence.

3          Secondly, Mr. Ashburn himself is threatening to

4  apparently commit some sort of violent act, which is not

5  something, respectfully, that should be kept away from the

6  prison authorities.

7          THE COURT:  I think that's true.  Okay.  Why don't I

8  read the letter, since everybody's, apparently, read it but

9  me, and we can have a conference at a break.  Does that make

10  sense?

11          MR. LUCHENITSER:  Yeah, Your Honor.  I'm going to try

12  to set up a call with Mr. Ashburn.  I don't know if it will be

13  possible, or not.  I want to try to get some more information

14  from him as to who he wanted to see this letter.

15          THE COURT:  Obviously, the threat is some security

16  breach.  We want to prevent that.

17          Okay.  Anything else?

18          MR. LUCHENITSER:  Yes, Your Honor.  The second issue

19  was Your Honor issued an order allocating ICN costs, and we paid

20  the--we gave the check to your deputy this morning.

21          And then Defendants last week filed a motion for

22  reconsideration of the allocation, and we respectfully would ask

23  permission to deal with that issue as part of the briefing, and

24  any attorneys fees and costs that follows entry of judgment,

25  because we think it would be wasteful to deal with it now

1  because who has to pay these costs may be affected by who is the

2  prevailing party; two, we would like to reserve the right to

3  modify the allocation.

4          THE COURT:  Okay.  It's been, I don't know if you've

5  seen the order, but it's been reconsidered and denied.

6          MR. LUCHENITSER:  Okay.  Thank you.

7          THE COURT:  Ms. Wallace.

8          MS. WALLACE:  Yes, Your Honor.  We have seen the order

9  entered on the defendants' motion to reconsider.  We would,

10 however, further object to any of the ICN that's currently

11 hooked up.  Plaintiffs are currently watching these proceedings

12 via the ICN.  That is being done, again, at Mr. Luchenitser's

13 request.

14          The defendants object.  These plaintiffs have no

15 right to be at this trial.  We would object not to them being

16 here, but to then in any way sort of fashion ever, win, lose

17 or draw, being assessed any costs for this.  This is a waste

18 and the defendants should not have to incur the expense of the

19 ICN.

20          We never agreed to it.  In fact, we informed

21 Mr. Luchenitser that that would be on his dime from the very

22 beginning.  Mr.--Judge Shields, in the pretrial of this matter,

23 informed counsel that these plaintiffs do not have a right to be

24 in these proceedings via ICN or in person.

25          I just want to make sure, for the record, the

1   defendants have paid, as ordered by the Court, this morning,

2   after you ruled on our motion to reconsider, as ordered to

3   by the Court.  But from heretofore forward, I want this record

4   to reflect that these Defendants object to any of these ICN

5   costs that they have not reserved being assessed to these

6   Defendants.

7           THE COURT:  Okay.  Well, I didn't know anything

8   about--I should have, it's nobody's fault.  Judge Shields didn't

9   inform me of this until, I think we were in day seven or six, or

10  whatever.

11          Mr. Luchenitser, Counsel makes a good point.

12          MR. LUCHENITSER:  Your Honor, first, we need these

13  Plaintiffs to be able to watch these proceedings because they

14  are very knowledgeable about what goes on in prison.

15          THE COURT:  Let me interrupt.  I don't doubt that.

16  Her point is, did Judge Shields at the pretrial bring this up,

17  that it would, quote, be on your dime?

18          MR. LUCHENITSER:  I don't believe that was addressed.

19  I don't believe the issue of who would pay for the ICN, it was

20  not addressed.  We reached an agreement with Defendants before

21  trial started that the plaintiffs would be allowed to watch the

22  defendants entire case.  I don't believe the issue of costs was

23  addressed at all.

24          THE COURT:  We've got a practical problem.  The State

25  has no money.  The Clerk's Office is being cut every day by the

1   Congress.  I'm hard pressed to think that I can continue to run

2   somebody's tab without asking in advance.  They don't have a

3   right.  It's their lawsuit.  They can be here.  But it seems to

4   me that it's not like a criminal case where the accused has to

5   be here.  They are plaintiffs.

6           Had you discussed this with them absent the use of the

7   ICN, or the security concerns?

8           I mean, generally when I have a conditions of

9   confinement trial I have six deputies, I think Ms. Wallace has

10  been here during some of those cases, or Mr. Allen.  I know

11  there is a substantial expense there as well.

12          Have you discussed the plaintiffs being here absent

13  the use of the ICN?

14          MS. WALLACE:  Yes, Your Honor.

15          MR. LUCHENITSER:  Be here physically?

16          THE COURT:  Yes.

17          MR. LUCHENITSER:  Yes.  The defendants would not agree

18  to bring them here physically, but they agreed to ICN.

19          MS. WALLACE:  That's not true, Your Honor.  The

20  defendants told Mr. Luchenitser that they would bring the

21  defendants to this trial, but on Mr. Luchenitser's dime.

22          MR. LUCHENITSER:  I respectfully disagree with

23  Ms. Wallace's recollection.  The defendants just said that they

24  would not voluntarily bring them here.  They didn't discuss

25  costs, they said they didn't want to bring them in person, they

2093

1  would do it over ICN.

2          THE COURT:  I'm going to terminate the ICN.

3          THE COURTROOM DEPUTY:  Cindy, Diane, we'll be turning

4  off the ICN now.

5          THE COURT:  Okay.  Mr. Troy, did you want to present

6  your case?

7          MR. TROY:  Yes, Your Honor.

8          MS. WALLACE:  Your Honor, if I may.

9          THE COURT:  Yes.

10          MS. WALLACE:  I have one further matter that I would

11  like to address with the Court before we begin.

12          During examination of several of the inmate witnesses

13  the Court suggested, and I believe it was a fruitful one,

14  suggested that the State produce for each inmate who has

15  testified, and who will be testifying, I believe that would be

16  Mr. Robert Robinson and Mr. Jessie Weise, their records with

17  regard to their sentence summary, their movement summary, as

18  well as their disciplinary summary.

19          I have compiled--the State has compiled those records

20  for each inmate who has testified or will be testifying.  I

21  compiled those, put them in alphabetical order, and labeled them

22  Defendants' Exhibit F, as in Frank, 9.  I would like to offer

23  them to the Court at this time.

24                      (Defendants' Exhibit F9 was offered

25                          in evidence.)

1          THE COURT:  Is there an objection?

2          MR. LUCHENITSER:  Your Honor, if I could confer with

3    my co-counsel.

4          Your Honor, we object.  This is untimely.  It should

5    have been produced during our case.

6          THE COURT:  Here is my recollection of it.

7    Ms. Wallace, you tell me if I'm right.  I think your first

8    cross-examination of one of the plaintiffs I suggested rather

9    than, there was a suggestion that, is it 609, whatever rule it

10   is, that says you can go back in a civil case so many years to

11   impeach.  I don't remember the number of the rule.

12         I suggested that rather than cross on that, that you

13   give me the records.  I think part of this was not only with

14   respect to credibility, but also the defendants position with

15   respect to recidivism rates, and that sort of thing.

16         I'm going to accept F9.

17                    (Defendants' Exhibit F9 was

18                    received in evidence.)

19         THE COURT:  Mr. Troy.

20         MR. TROY:  Yes, Your Honor.

21         Your Honor, can you hear me okay?

22         THE COURT:  I can.  I can.

23         MR. TROY:  I didn't know whether to put that--one

24   preliminary matter, if I may address the Court, which is simply

25   to give a one-minute overview.  I will tell the Court, if I may,

1   that as we indicated prior to the break, during the break, but

2   for responding to some additional motions filed by the

3   plaintiffs, we did try to streamline our case.

4          In doing so, we will present to the Court some

5   witnesses representing the Innerchange Freedom Initiative

6   demonstrating the nature of the program and the goals to be

7   achieved.  Some State witnesses, which will articulate the

8   State's needs in how the program meets those needs.  Two, I

9   believe, perhaps three, right now two, inmates, IFI inmates, so

10  the Court can see inmates who have gone through the program and

11  what was accomplished.  In doing that, that's what we will be

12  presenting.

13         One matter, however, in trying to streamline the case

14  and analyzing the testimony to date, we determined that we will

15  not be calling, will not need, Mr. Jerry Wilger.  Mr. Wilger is

16  no longer, Your Honor, an employee or a consultant, has no

17  connections with IFI.  He resides in Durango, Colorado, outside

18  of the subpoena jurisdiction of the Court.

19         We don't have the ability to force him to be here.

20  With traffic, the airline traffic, and everything, it's quite

21  expensive to try to get him here.  He was trying to get here and

22  could not get airlines.  Last night we made the final decision

23  that we would not be needing him.

24         We have no objection, however, because I know that

25  when I stood here before we indicated that if we called

1   Mr. Wilger, we had no objection to Mr. Luchenitser going

2   beyond the scope of direct.

3          We have no objection to Mr. Luchenitser, if he wants,

4   to take the seven-hour deposition of Mr. Wilger and use all or

5   parts of that for the record.  Provided, of course, that we

6   would have the opportunity to cross designate if Mr. Luchenitser

7   chose not to put in the entire transcript.

8          THE COURT:  All right.  That's fine, Mr. Troy.  Thank

9   you very much.

10         Should I plan, I know you can't speak for Ms. Wallace

11  or Mr. Allen, does it appear that your case would take most of

12  the week, do you think?

13         MR. TROY:  We would hope, Your Honor, to be through by

14  the end of the week, if not before.

15         THE COURT:  All right.  Great.  Thanks so much.

16         MR. LUCHENITSER:  Your Honor, could I speak about the

17  ICN issue some more?

18         THE COURT:  Yes.

19         MR. LUCHENITSER:  Can we get the ICN if we pay for it?

20  Let me make sure--

21         THE COURT:  That's what the Clerk tells me.

22         MR. LUCHENITSER:  So to understand your ruling, if we

23  want them on ICN we have to pay for the whole thing.

24         THE COURT:  Well, according to the discussion that

25  happened at the pretrial, that was the understanding.

1          MR. LUCHENITSER:  I mean, that's not--

2          THE COURT:  If we can somehow--it's the case that--

3    the plaintiff parties obviously have an interest in this.  It

4    seems to me if you want to bring them here, consistent with

5    working that out with the State, I'm up for that.  If you want

6    to pay for them to view via ICN, I'm for that as well.  I can't

7    very well ask the State to continue to pay for it, or you, for

8    that matter.  I mean, I feel like I got somehow blindsided on

9    this.

10         To answer your specific question, if you want this

11   week, however long this continues, the plaintiffs to be able to

12   view this, you've got to pay for it.

13         MR. LUCHENITSER:  Will we have the right to move

14   that the cost be taxed against the defendants if we win at the

15   end?

16         THE COURT:  You can ask for costs, and if the case law

17   is such that the prevailing party would normally receive those,

18   I think that you would receive those.

19         MR. LUCHENITSER:  Okay.  In that case we would like to

20   turn it back on and we would like to have them watch.

21         THE COURT:  Okay.  Are you going to pay for it?

22         MR. LUCHENITSER:  We will for now, but we will ask--we

23   will intend to ask, if we win, that the costs be taxed against

24   the defendants.

25         THE COURT:  All right.

2098

1        MR. TROY:  Your Honor, that's fine.  I do think--I

2   think I recall some Fourth Circuit, I don't know in the Eighth

3   Circuit, that if he does do that that's on his tab and it's not

4   awarded on costs.

5        THE COURT:  Yeah.  I have no idea what the law is.

6        MR. TROY:  I understand.

7        THE COURT:  I don't want that to go farther than just

8   that subject, but I have no idea what the law is.

9        MR. TROY:  I did not construe it that way.

10        MR. ALLEN:  I wrote it down.

11        MR. TROY:  Your Honor, while we're doing that, we

12   would call Mr. Norman Cox.

13        THE COURT:  Would you please raise your right hand and

14   be sworn.

15      NORMAN ROSS COX, DEFENDANTS' WITNESS, SWORN

16        THE COURT:  Mr. Troy, I have been informed that to get

17   it back on will take about five minutes and that Mr. Moorlach

18   has to make a phone call.  Why don't we just wait.  Do you want

19   to make your phone call and I will just--

20        MR. LUCHENITSER:  Your Honor, while we're waiting, for

21   the record, Exhibit F9 that Ms. Wallace just presented to you,

22   we believe there are some--

23        THE COURTROOM DEPUTY:  Patti, this is John Moorlach.

24   We need to go back to Newton.  Is our session still on?

25        MR. LUCHENITSER:  Your Honor, for the record, this

2099

1  Exhibit F9 Ms. Wallace just offered, we also want to object

2  to--some of the information in there seems to be either old

3  criminal convictions that are not admissible under Rule 609 or

4  there is disciplinary records that we would object to on the

5  basis of relevance.  We want to make that objection for the

6  record.

7          THE COURT:  All right.  You may do so.  I will take it

8  under advisement.

9          THE COURTROOM DEPUTY:  Ms. Wallace, Warden Mapes, I

10 think we need to have Newton connected.

11         THE COURT:  Warden Mapes, I want to thank you for

12 accommodating all of us at your facility.  That was very

13 professional.  I, for one, appreciate it.  I know it's a lot of

14 work to do, the security necessary to have this visit.  You were

15 very accommodating and I really appreciated it.

16         WARDEN MAPES:  Thank you, Your Honor.

17         MR. TROY:  Your Honor, while we're waiting, I know the

18 Court has expressed an interest in background.  I'm going to go

19 into detail with Mr. Cox.  I handed out a copy of his resume,

20 which I think might be helpful, without objection.  I don't know

21 if there is any.

22         MR. LUCHENITSER:  No objection, Your Honor.

23         THE COURT:  All right.  Thank you very much.

24         MR. LUCHENITSER:  Your Honor, would it be okay to

25 start this witness while we're rounding up Newton?

2100

```
 1              THE COURT:  That's fine.
 2              Mr. Troy if you want to proceed.
 3                      DIRECT EXAMINATION
 4   BY MR. TROY:
 5   Q.  Good morning, Mr. Cox.
 6   A.  Good morning.
 7   Q.  Mr. Cox, please introduce yourself to the Court, identifying
 8   yourself by name and address and your position with the
 9   InnerChange Freedom Initiative.
10   A.  My name is Norman Ross Cox, Jr.  I live at 2029 Weltown Road
11   in Clear Brook, Virginia.  I work for Innerchange Freedom
12   Initiative.  I'm a vice-president with Prison Fellowship, and
13   I'm assigned full-time as the national director of the IFI
14   program.
15   Q.  And Clear Brook, Virginia, where is that located in
16   Virginia?
17   A.  About eight miles north of Winchester in the Shenandoah
18   Valley.
19   Q.  All right.  That's what is called roughly northern Virginia,
20   which is near the headquarters of the IFI/Prison Fellowship
21   Ministries?
22   A.  Yes.  The headquarters is located in Lansdowne, Virginia,
23   which is about four miles from Clear Brook, Virginia.
24   Q.  How long have you been the national director of the
25   InnerChange Freedom Initiative?
```

2101

1   A.   About 19 months.   Since February of '04.

2   Q.   And we'll get into this in more detail.   As the

3   vice-president--excuse me--national director of InnerChange

4   Freedom Initiative, or IFI, if I may, what is your general

5   duty?

6   A.   Well, I have general management and supervisory duties for

7   the staff that are assigned to the IFI program for Prison

8   Fellowship.

9   Q.   I believe the record is that there are currently four IFI

10  programs in operation.

11  A.   That's correct.

12  Q.   And they are in the states of--

13  A.   Tennessee, Minnesota--

14  Q.   Tennessee or Texas?

15  A.   Texas.   I'm sorry.   We're going to be in Tennessee in a

16  couple of weeks.   Texas, Minnesota, Iowa, Kansas.

17  Q.   Are also part of your responsibilities overseeing the

18  establishment of any new programs?

19  A.   Yes.   We have been awarded contracts in the State of

20  Arkansas and the State of Missouri.

21  Q.   So that would be six programs overall once operational?

22  A.   That's correct.

23  Q.   All right.   You have a copy of what I have marked and handed

24  to the Court and Defendants--excuse me--Plaintiffs' as Cox

25  Exhibit No. 1.

1   A.   Yes, I do.

2   Q.   Mr. Cox, can you basically give the Court a little

3   background on your education.  Do you have college degrees, and,

4   if so, from what institution and when did you receive them?

5   A.   Yes.  I have an undergraduate degree from Virginia

6   Polytechnic Institute and State University.  I completed that

7   degree in 1966 and my major was history and minor in political

8   science.  I have a master's degree in criminal justice from

9   Auburn University.  I received that in 1976.

10  Q.   Once you graduated from Tech, Virginia Tech, what did you

11  do?

12  A.   Well, I went into the United States Army for four years.  I

13  went to officers candidate school.  I went to military

14  intelligence school and served in Europe and Vietnam.

15  Q.   Did you receive an honorable discharge?

16  A.   Yes, sir, I did.

17  Q.   And when?

18  A.   19--March, I believe, of 1971.

19  Q.   All right.  Up until that time you had a degree in history

20  and political science, you served in military intelligence.  Did

21  you have any experience in the criminal justice system?

22  A.   Only in college.  As part of my extracurricular activities I

23  served with the honor court.  I was a member of the cadet corp

24  at VPI.  I served as defense attorney and assistant defense

25  attorney, sergeant-at-arms--not in that order, in reverse order.

1  My senior year I was chief justice.

2  Q.  And that's with the school's honor system?

3  A.  That's correct.

4  Q.  That honor system has some national prestige; is that

5  correct?

6  A.  That's correct.

7  Q.  All right.  According to Cox Exhibit No. 1, approximately

8  1971 you started to get involved in the criminal justice system.

9  Explain to the Court how you got involved and the progress of--

10  how your career progressed.

11  A.  Well, when I came out of the military I was a captain and

12  was ready to go to work and couldn't find a job.  I answered an

13  ad in the newspaper for a vocational counselor.  I was hired and

14  found myself working in a job development program for probation

15  and parolees.

16  Q.  Who was your employer?

17  A.  The Virginia Probation and Parole Board.

18  Q.  And how long did you remain in that position and what duties

19  did you have in that position?

20  A.  Well, I began as a vocational counselor.  I administered

21  certain vocational tests.  I worked with inmates to identify

22  job opportunities that matched their potential and their

23  skills.  I worked about six months in that position when my

24  supervisor resigned and I became supervisor of one other

25  counselor.

1          Then I was assigned responsibility for grant

2     management for--actually, I was given responsibility to write a

3     renewal grant for the program that hired me.  I did so and it

4     was successfully awarded.  Suddenly I was a grant officer for

5     the Virginia Probation and Parole Board.  I was actually taken

6     out of that job development program and remained planning

7     supervisor of the board for several years.

8          As planning supervisor I oversaw the opening of the

9     first halfway house in Virginia.

10    Q.  The first--

11    A.  The first.

12    Q.  --halfway house?

13    A.  Halfway house; correct.

14    Q.  You indicated that you were dealing with return-to-community

15    issues?

16    A.  That's correct.

17    Q.  And then grant--who was the grant application made to?

18    A.  Well, it was to--it was a justice department grant.  At that

19    time the law enforcement assistance administration was very

20    active in terms of supporting programs in the criminal justice

21    area.  The Virginia Probation and Parole Board had six active

22    grant programs, one of which was to initiate the halfway house

23    program for the state.

24    Q.  And is this the interfacing that occurs among all the states

25    when the Department of Justice was handing out money to be

1  delivered through a state agency that had to be created?

2  A.  That's correct.  All states had the same access to those

3  federal funds through an agency within the state that was

4  created for that purpose.

5  Q.  What was the agency in Virginia called?

6  A.  The Virginia Law Enforcement Assistance Association.

7  Q.  All right.  Assistance Authority?

8  A.  Authority.  That's correct.

9  Q.  And there were similar such authorities throughout--

10  A.  Throughout the country.

11  Q.  --throughout the various states throughout the country; is

12  that correct?

13  A.  Yes.  That's correct.

14  Q.  Once you started and were successful in the grant in

15  establishing the halfway house, did you also get involved

16  with any pre-release centers, and, if so, explain that to the

17  Court?

18  A.  While I was still working for the probation and parole board

19  there was some difficulties in the work release program.  And so

20  the chairman of the parole board assigned me to do a review of

21  the work release and pre-release program for the state.  That

22  was administered by the Department of Welfare and Institutions,

23  which later became the Department of Corrections.

24      I did that study.  It took me about 30 to 45 days to

25  do the study and get it published.  Then about a month after

1  that the director--the new director of corrections--they were in

2  the process of splitting those two agencies--asked if I would

3  come and take over the program.  I had the opportunity to

4  implement my own recommendations.

5  Q.  And did you?

6  A.  I did, yes.

7  Q.  And as a result of that, what was established?

8  A.  I'm sorry.  I'm not sure--

9  Q.  Were there--in addition to halfway houses, were there any

10 work release centers established?

11 A.  The work release program was already in existence at the

12 time.  Basically what we did is we identified the fact that the

13 classification process that had placed persons in work release

14 was not rigorous enough.  So we--I oversaw the reclassification

15 of all inmates currently in the program.  In other words, we had

16 a reclassification review on a hundred percent of the inmates.

17 Also, we revised the procedures for the selection of inmates to

18 go into that program.

19 Q.  All right.  Now, up to now you seem to be concentrating on

20 issues involving inmates being released back into the community;

21 is that accurate?

22 A.  That's correct.  My office was located in the state

23 pre-release center in Chesterfield, Virginia.  Then they had

24 four work release centers across the state in addition to the

25 pre-release center.

1   Q.  Chesterfield is a suburb of the City of Richmond; is that

2   correct?

3   A.  That's correct.

4   Q.  Now, did there come a time when you, because of your work,

5   had an interest in achieving more education in this field?

6   A.  Yes.  Once I became superintendent of pre-release

7   activities, which oversaw pre-release and work release, I

8   started taking graduate level courses in, actually in planning.

9   The Virginia Commonwealth University where I attended did not

10  have a criminal justice program and it did not have a public

11  administration program, but it did teach some public

12  administration classes under their urban and regional planning

13  development.

14  Q.  Virginia Commonwealth University is a university in,

15  essentially, downtown Richmond?

16  A.  That's correct.

17       MR. LUCHENITSER:  Your Honor, I'm going to make an

18  objection.  It seems we have his resume here, I'm not sure what

19  the purpose is of going into his background in this much detail.

20  He's not being offered as an expert.

21       THE COURT:  Well, I think by way of background it

22  always helps me when I know something about the witness.  I

23  haven't had a chance to read the resume, but I suspect he's

24  hitting the highlights.  I'm going to take the testimony.

25       MR. TROY:  Your Honor, the reason I was adding these

2108

1   other little matters is just to put it in context for the Court

2   and for the record--

3           THE COURT:  Right.

4           MR. TROY:  --the location of these places.

5           THE COURT:  Right.  Mr. Troy, were these LEAA grants?

6   We had a number of them in Iowa.  That was the genesis of his

7   beginning work within the Virginia correctional system, I take

8   it?

9           MR. TROY:  It was the transfer, in essence, from

10  parole over to the Department of Corrections.

11          THE COURT:  All right.  Thank you.  Proceed.

12  BY MR. TROY:

13  Q.  You believe that's accurate?

14  A.  That's correct.

15  Q.  All right.  Did there come a time when--explain to the

16  Court, you were taking courses at Virginia Commonwealth

17  University.  Then you ended up I know at the University of

18  Auburn at Montgomery, Alabama.

19  A.  One of the professors that I had at VCU became the head of

20  the department of criminal justice at Auburn University, the

21  Montgomery campus of Auburn University.

22          He contacted me after several months and told me that

23  he had a graduate teaching assistantship available and was

24  wondering if I would be interested.  I was.  In order to get my

25  master's degree I had to do a residency somewhere.  It couldn't

2109

1  be at VCU because they didn't have the degree that I was looking

2  for.

3          Basically with the GI bill, and the graduate

4  teaching assistantship, my wife and I relocated to Montgomery

5  and in nine months I finished up my master's degree in criminal

6  justice.

7  Q.  And received a master's degree in criminal justice?

8  A.  That's correct.

9  Q.  And did you also, during that period of time, or shortly

10 thereafter, teach undergraduate courses or do any consulting,

11 and, if so, explain what you did to the Court.

12 A.  I did both.  I taught undergraduate courses and introduction

13 to corrections and criminal justice, general courses in criminal

14 justice.  I taught community-based corrections.

15         The University at the time had a program, a

16 legislative technical assistance program.  It was funded by the

17 state legislation.  It was a state university.  The various

18 state agencies could request technical assistance through this

19 program.  The University would put together a team of their

20 faculty and some graduate students, and they would go out and

21 provide whatever consulting assistance was appropriate for the

22 request.

23         I became a part of the corrections team.  Since I had

24 had--by that time I had about six years of experience in

25 corrections and the other professors were certainly well

1  qualified, but they had not actually worked in the corrections

2  field.  They encouraged me to become a part of that team.  I

3  did, I worked on several projects for the state.

4  Q.  Now, the State of Alabama?

5  A.  That's correct.

6  Q.  And during this time did you interface at all with the

7  federal district court for the middle district of Alabama, and,

8  if so, explain that, please, to the Court.

9  A.  Yes.  I was part of a team that--it was a joint--  May I

10  look at the resume for a second?

11  Q.  Certainly.

12  A.  I want to get the terms correct.

13  Q.  What page are you referencing?

14  A.  Six.  Yes.  I was consultant to the Alabama Department of

15  Corrections to evaluate the inmate--agency's inmate

16  classification system.  That was by appointment of a judge of

17  the federal district court, middle district of Alabama.

18  Q.  That's a situation where a federal court had a lawsuit

19  regarding prison conditions in Alabama?

20  A.  That's correct.  I came in as a consultant.  I was part

21  of a team that was working on that classification system.  I

22  was appointed by the judge to do the evaluation and make a

23  report.

24  Q.  All right.  Now, where did your career take you next,

25  Mr. Cox?

1  A.   After I graduated I was offered a job teaching at the

2  University of Texas in San Antonio as an instructor.   I

3  relocated there.   That was a new criminal justice program as

4  well.   I taught corrections courses and some introductory

5  courses.   I was also responsible for managing the intern program

6  where I would work with various criminal justice agencies,

7  including the courts, to place student interns during their

8  junior and senior year in actual agencies to get agency

9  experience.

10  Q.   And were you at this time also dealing with release issues,

11  inmates being released back into the community?

12  A.   Yes, that's correct.   Many of the students worked in both

13  probation and parole agencies.   We were very much active in

14  terms of program development in that area.

15  Q.   Were you doing grant administration at this time as well?

16  A.   Yes.   That seemed to follow me about everywhere I went.

17  Once I did that first successful grant application, I think just

18  about every job I have had since then included some form of

19  grant management and grant applications.

20  Q.   And did there come a time when you got involved with the

21  local--   How do you pronounce it, Bexar?

22  A.   Bexar.

23  Q.   B-E-X-A-R is pronounced Bexar?

24  A.   That's correct.

25  Q.   Bexar County Sheriff's Office?

1  A.   Yes.  I did some consulting work, through the university,

2  with the sheriff's office on inmate programming.

3  Q.   Where is Bexar County?

4  A.   San Antonio, Texas.  That's the third largest city in Texas.

5  Q.   What did you do in relationship to your responsibilities or

6  duties relating to the Bexar County jail system or sheriff's

7  office?

8  A.   Well, at that time I did about a three-month study of the

9  program offerings there at the jail.  It was very meager.  And

10  made a series of recommendations as to how the programming could

11  be improved and expanded.

12  Q.   Was that on a consulting basis?

13  A.   That was on a consulting basis.  That was in the summer.

14  Then the following January the sheriff--I came back from a

15  conference and I had a message from the sheriff.  He wanted to

16  meet me at a local restaurant on a Saturday morning, which was

17  very suspicious to me.  Anyway, he--I went and met him.  He

18  offered me a job as jail administrator.

19  Q.   And did you accept that?

20  A.   I did.

21  Q.   And as a result of being the jail administrator, did you

22  accomplish anything that resulted in recognition through any

23  awards?

24  A.   Yes, I did.  The county was under conditions of confinement

25  litigation and the sheriff wanted to insure that the jail was,

1   in fact, running appropriately when he went to court regardless

2   of what had happened in the past.

3          As I mentioned, I had done a consulting job on inmate

4   programs.  He wanted me to implement those recommendations

5   particularly, and we did so.  The following year we were awarded

6   an exemplary award for excellence in jail programming by the

7   American Correctional Association.

8   Q.  And is there some significance relating to that award?

9   A.  I was very happy with it.  The American Correctional

10  Association is the preeminent corrections--professional

11  corrections association in the country.  These awards were very

12  prestigious at the time.  At the time they did about five, maybe

13  six a year.  It got a lot of national recognition and certainly

14  helped my subsequent consulting business very much.

15  Q.  And was there anything regarding the basis of that award

16  that related to any programs that you helped implement with the

17  help of volunteers?  If so, explain that to the Court.

18  A.  One of the reasons it was exemplary is that there were no

19  state or county or federal funds involved.  And we had over 200

20  volunteers a week coming in and out of the jail system providing

21  services.  Everything from GED instruction to balancing your

22  checkbook.

23  Q.  And where did those volunteers come from?

24  A.  Well, when I first did the consultant study, and then later

25  became the director of the jail, the San Antonio Council of

1   Churches, which included churches of all denominations in the

2   San Antonio area, were providing chaplains on sort of a rotating

3   basis through the jail system.  I went to the San Antonio

4   Council of Churches and challenged them to go back to their

5   churches and recruit volunteers and bring them into the jail to

6   provide services.  They responded and they did a fantastic job.

7   Q.   Resulting in the recognition by the American Corrections

8   Association?

9   A.   That's correct.

10  Q.   Is this the first time that you reached out into the private

11  sector to get demonstrable help for an issue that the government

12  couldn't handle by itself?

13  A.   No.   When I was superintendent of pre-release activities in

14  Virginia, each of my four work release centers and the

15  pre-release centers had a citizens advisory committee.  At that

16  time the ACA standards recommended such a committee, and this

17  consisted of leaders from the community, business, government,

18  and religious leaders in the community to sit on the panel and

19  review the program, discuss issues, especially regarding the

20  interface of the program with the community, and make

21  recommendations to me, as the superintendent, as to improvements

22  that could be made to the program.

23  Q.   In the San Antonio situation, though, you reached out to the

24  religious community in that instance?

25  A.   That's correct.

2115

1  Q.  You mentioned a second ago that the award, you felt, was not

2  only prestigious, but assisted you in your consulting business.

3  Can you explain to the Court what that business was and just a

4  little quick explanation of when it started and what you did?

5  A.  Well, the sheriff that hired me ran for reelection the

6  second year I was there.  He lost in his party's primary.  He

7  was--that was in, like, May, I think.  The election was in

8  September.  He was out in January.  The new sheriff wanted a new

9  jail administrator.

10         The county--since I put a little over two years

11  into assisting the county and preparing for the litigation,

12  class- action litigation, the county commissioners retained

13  me as a consultant, and I worked for them about another four

14  years.  Basically in that capacity as an expert witness for

15  litigation, and also assisting them in negotiating a consent

16  decree, which included construction of a new 1,700 bed jail

17  facility.

18  Q.  What was the name of your consulting business?

19  A.  N.R. Cox Associates.

20  Q.  And did you serve as an expert witness in any litigation

21  through that consulting business?

22  A.  Yes.  I had over, I guess, a hundred different jurisdictions

23  that I served over about an eight- or nine-year period.

24  Q.  How long were you in that business?

25  A.  Eight or nine years.  Nine years, I think.

1   Q.   '81 to '90?

2   A.   That's correct.

3   Q.   Okay.  So--

4   A.   About 18 of those cases involved litigation support, most of

5   which resulted in some type of settlement.  But I did testify in

6   five federal district court jurisdictions and was certified as

7   an expert in those cases.

8   Q.   And that is five federal district courts?

9   A.   That's correct.

10  Q.   And is that reflected on Cox 1, if so, can you direct the

11  Court to what page that would be?

12  A.   Pages 10, 11 and 12.

13  Q.   During this period of time did you consult with state

14  agencies?

15  A.   I did.

16  Q.   Did you consult with local agencies?

17  A.   Yes, I did.

18  Q.   Did you consult with federal agencies?

19  A.   Yes.

20  Q.   What federal agencies?

21  A.   Well, late in about '88, '89, it was the U.S. Marshals

22  Service.  They were planning to develop two detention facilities

23  just for U.S. Marshal prisons.

24          Prior to that I worked for the National Institute of

25  Justice as a technical assistance consultant.  They have what

1  they called a letter grant program whereby a state or local

2  jurisdiction can write a letter to the agency and request

3  assistance.  The agency then selects a consultant from a list of

4  persons that they have prequalified and certified, and then

5  sends that person, at no charge to the jurisdiction, to assist

6  with the problem.  The federal justice department pays for it.

7          That was through the National Institute of

8  Corrections.  I did a lot of work through the national

9  institute--national jail center, also the prison center as well.

10  Q.  With respect to the U.S. Marshal Service and their detention

11  centers, where were those to be located?

12  A.  One was located--they were going to locate two of them; one

13  in the northeast and one in the Midwest, in Kansas, Leavenworth,

14  Kansas.  They only awarded one in Leavenworth.

15  Q.  All right.  Did there come a time when, after your

16  consulting business, you decided to get into the prison

17  business?

18  A.  Private prison business?  Yes.

19  Q.  Yes.

20  A.  I guess about '86 I put together a team and bid on a project

21  in the State of Texas, fairly large project, for pre-release

22  centers across the state.  It came in a distant eighth in the

23  field of eight.

24  Q.  Eight out of eight?

25  A.  Right.  I was eight out of eight.  At least I got a taste

2118

1   for it.  And a few years later, in 1990, I ran into a gentleman

2   who had a good financial background and good credentials in the

3   business community, and the two of us got together and formed

4   our own company.

5   Q.  What was that called?

6   A.   Initially called Cornell Cox Group.  Today it's known as the

7   Cornell Companies.  I served as chief operating officer--

8   president/chief operating officer and director from 1990 through

9   1996.

10  Q.  And how did that company progress?

11  A.  Well, we got a first funding of $600,000 and we were both

12  just about broke at the time, in December of 1990.  When I left

13  in '96 we were generating about 23 million in revenue.

14  Q.  And why did you leave in '96?

15  A.  The company was getting ready to go public and I had some

16  interest in developing some specialty facilities for geriatric

17  and mentally ill offenders.  I wanted to go in that direction

18  and the board of directors felt it was best that I leave before

19  they took the company public rather than after.  I agreed.  We

20  reached a settlement and I left.  I still have done some

21  consulting work with them since.

22  Q.  What is the stature or nature of Cornell Companies today?

23  A.  It's a publicly-traded stock on the American Stock Exchange.

24  Q.  And it constructs and operates private prisons?

25  A.  That's correct.

1  Q.  And so in '96 you branched off into a new venture

2  institution specializing in geriatric inmates?

3  A.  Yes.  I did some consulting work in the process because I

4  wanted to have some revenue income.  I did some strategic

5  planning for various jurisdictions.  I had one two-year

6  consulting job on strategic planning with a county up in

7  New Jersey.  I also did some consulting work with other private

8  corrections companies.  Over the next six years, or so, I did

9  something for just about every recognized company in the

10 business.  The only thing I didn't do well was the geriatric and

11 mentally ill facilities.

12 Q.  You were a little ahead of your time?

13 A.  That's the way I describe it, yes.  I was a little ahead of

14 the time.  Actually, I just couldn't get the funding to back it

15 at that time.

16 Q.  How long did--  According to your resume, now that's

17 basically '96 to approximately 2003 or '04?

18 A.  That's correct.

19 Q.  All right.  Then there came a time in 2003 when you started

20 to take a look in, and what you did eventually get involved

21 with, the Prison Fellowship Ministries; is that correct?

22 A.  That's correct.  Yeah.

23 Q.  Explain to the Court, first of all, anything--what evolved

24 in your life that made you look in that direction?

25 A.  Well, my company was not doing particularly well.  I was

COX - DIRECT

2120

1  doing consulting, and that was fine.  I just felt like I needed

2  to do something more substantial.  My wife and I were

3  participating in a small group and studied--were studying the

4  *Purpose Driven Life* by Rick Warren.

5  Q.  Who is Mr. Warren?

6  A.  Well, he's an author and pastor, very active in World View

7  Ministry, a Christian ministry.

8  Q.  Would he be described as an Evangelical minister?

9  A.  I guess some may describe him as that.  He's pretty middle

10  of the road if you meet him face to face.

11  Q.  What religion are you, Mr. Cox?

12  A.  I'm a member of the United Methodist Church.

13  Q.  All right.  *The Purpose Drive Life*, explain that to the

14  Court a little more and what resulted--how long of a course is

15  it, what impact did it have on you and your family?

16  A.  Well, both my kids are grown and off in different

17  directions.  My wife and I were a member of a small group.  This

18  book was the focal point of what was called the 40 days of

19  purpose.  You meet--we met once a week.  It took us 40 weeks to

20  go through it.  You study a chapter or two each session.  And

21  then at the end--it helps you reevaluate where you are in your

22  Christian life.  At the end there's a little test that you take

23  and determine how well you're doing on evangelism, service and

24  various aspects of your religious life.

25          My wife and I felt like we needed to expand our

2121

1   service.  I started looking for opportunities to do so.

2   Q.  So that resulted in a call to service, is that fair to say?

3   A.  Yes.

4   Q.  As a slight aside, *The Purpose Driven Life*, that's the book

5   that got some notoriety when the prisoner escaped in Atlanta,

6   captured that woman, and she read that book to him?

7   A.  That's correct.  That's the same book.

8   Q.  Having taken this course, how did you come to be involved

9   with the InnerChange Freedom Initiative?

10  A.  Actually, I saw an advertisement in the American Corrections

11  Association Journal, which is a magazine, for a national

12  director.

13  Q.  What were they advertising for?

14  A.  National director of the IFI program.  I didn't know what it

15  was at the time.  It said if you would like more information go

16  to the web site.  I went to the web site, read about it, got

17  interested in it.  It said if you want more information send in

18  your resume, and I did.  They called me the next day and started

19  the process.

20  Q.  Were they looking for someone with a certain type of

21  background?

22  A.  Yes.

23  Q.  What was that?  What did the IFI program need and what was

24  it advertising for in terms of--

25  A.  It was specifically looking for someone with a corrections

1  background.  Especially someone who had experience in terms of

2  negotiating contracts, administering programs under contract

3  with the state and local governments.

4  Q.  And those programs dealt with community release issues?

5  A.  Yes, pre-release and reentry.

6  Q.  And that's your background; correct?

7  A.  That's correct.

8  Q.  And as a result of meeting you, what happened?

9  A.  They wanted to move a lot faster than I did.  It took me a

10  while to get to the point where I was comfortable with it.  I

11  had never worked for a nonprofit.

12        I served on a couple of boards of small nonprofits in

13  San Antonio.  One was for a juvenile program and the other one

14  was for a tissue bank, but I really didn't have any experience

15  in nonprofits.  I certainly had not worked for a ministry

16  before.  I wasn't--I was a little cautious at first.

17  Q.  What approximate period of time did you first respond or

18  notice the ad that the IFI program had put out?

19  A.  I guess it was about six months from the time I saw the ad

20  to the time I accepted the position.

21  Q.  And you accepted the position, I think we've established, in

22  February of '04?

23  A.  That's correct.

24  Q.  So this is sometime, then, in the fall of '03?

25  A.  That's correct.

2123

1  Q.  But the bottom line is, eventually you became the national

2  director for IFI; is that correct?

3  A.  Yes.

4  Q.  Who was your predecessor?  Who did you replace?

5  A.  Jerry Wilger.

6  Q.  All right.  Then we touched briefly on your duties as the

7  national director.  Specifically, how many people report to you

8  and what is the sort of corporate flow chart?

9  A.  Well, I'm located in the national office of Prison

10 Fellowship in Lansdowne.  Each of the directors of the local

11 programs in Texas, Iowa, Minnesota, Kansas, report directly to

12 me.

13 Q.  In Iowa that would be who?

14 A.  Dan Kingery.

15 Q.  All right.

16 A.  Then I have a national program manager, who is responsible

17 for quality control and program audits and who also oversees the

18 startup of new programs.

19 Q.  And what is that person's responsibility?

20 A.  He oversees the startup of new programs and does program

21 audits and quality control.

22 Q.  And do the local directors, such as Mr. Kingery, report to

23 that individual?

24 A.  No.  That's Sam Dye.

25 Q.  Sam Dye is the individual you were just describing?

2124

1  A.  That's correct.

2  Q.  And is this a new position that you created in terms of--

3  A.  It's new in terms of the sense that it's not outsourced.

4  Previously, a consultant team was hired, and that included Jerry

5  Wilger and several other persons.  But this is a position that

6  was created, as my position was, my position did not exist

7  within Prison Fellowship, these two positions were created when

8  the decision to stop outsourcing the management was made.

9  Q.  So Mr. Dye has audit and programming oversight that he can

10  independently audit; is that fair?

11  A.  Yes.  We wanted his role to be one of assistance and

12  advisory.  Basically what he does is he audits each of the

13  programs and we look for best practices and most successful

14  practices.  We bring that back, we review them.  We staff them

15  several times through our own staff network.  We use resources

16  of Prison Fellowship sometimes to assist in that.  If we decide

17  that that's something we should standardize, then we standardize

18  it.

19  Q.  So is it fair, then, that the program, you're looking at it

20  constantly and changing it for best practices?

21  A.  Absolutely, yes.

22  Q.  That is an ongoing activity regardless of this litigation?

23  A.  Yes.

24  Q.  Who do you report to?

25  A.  I report to a senior vice-president in charge of ministry

1  delivery of Prison Fellowship.  His name is David Lawson.

2  Q.  And then that individual reports to Mr. Mark Early, who is

3  president and CEO--

4  A.  That's correct.

5  Q.  --of Prison Fellowship Ministry?

6  A.  Correct.

7  Q.  Let's go to the IFI program itself, if I may.  Can you tell

8  the Court the history of the program, its origins?

9  A.  Well, the program is modeled on a program that was started

10 in Brazil, San Jose D'Compo, Brazil.  In Brazil the legal system

11 is somewhat different than it is here.  Once a person is

12 convicted they are sentenced to an institution usually in the

13 geographic region of their home.  Each institution is overseen

14 by a member of the judiciary.  There's a judge that oversees

15 each prison in a particular jurisdiction.

16       This particular prison was notorious for its high

17 level of violence and crime within the prison.  The judge that

18 was overseeing that prison basically said come to me with

19 suggestions and tell me what can be done.  Several people came

20 forth with the concept of using the faith-based programming.  It

21 ran for several years with volunteers coming in.  The program

22 was successful in--with the inmates that were involved, but the

23 prison was still so notorious that it was shut down.

24       Finally, the individual involved convinced the judge

25 to reopen the prison under total control of the religious

2126

1   volunteers.  That included everybody in the institution, from

2   security officers to program officers, food service people,

3   everybody.  I think food service was still under government

4   control, but most everything else was pretty much volunteer run.

5        Over a period of years that prison just produced--just

6   made a complete turn around.  It became one of the most docile

7   prisons in the country and began being replicated throughout

8   Brazil, and today there are over 90 prisons in Brazil that use

9   the same system.

10        No change in inmates, by the way.  There was no

11   different population, just a different approach.

12        MR. LUCHENITSER:  Your Honor, I'm going to object to

13   that last answer.  Lack of personal knowledge.  He's talking

14   about something that happened in Brazil before he even got

15   involved with PFM or IFI.

16        THE COURT:  Okay.  I'll take it subject to your

17   objection.

18        Mr. Cox, when we're talking about this happening in

19   Brazil with the judge, apparently, soliciting many faith-based

20   ideas, when did that happen?  Is that in the seventies,

21   eighties, nineties?

22        THE WITNESS:  That was the early seventies.

23        THE COURT:  By the way, Mr. Troy, was that in the

24   submitted materials on summary judgment?  I don't remember any

25   of this.

1          MS. WALLACE:  No.

2          MR. TROY:  I'm not sure.  I don't think so, Your

3   Honor.

4          THE COURT:  That's all right.  Okay.

5          THE WITNESS:  I'm relying on a study that was

6   commissioned in 1991 by the Eckert Foundation.

7          THE COURT:  All right.  Thank you very much.

8          THE WITNESS:  That's the source of my information.

9   BY MR. TROY:

10  Q.  You have a copy of that study with you?

11  A.  I do, yes.

12  Q.  This is part of the material that you studied in order to

13  determine part of your duties and the implementation of the IFI

14  programs?

15  A.  That's correct.

16         THE COURT:  Back on your record, Mr. Troy, Mr. Early,

17  was he the former attorney general of Virginia?

18         MR. TROY:  He was, Your Honor.

19         THE COURT:  He lost for governor, if memory serves.

20         MR. TROY:  That is correct, Your Honor.

21         THE COURT:  All right.  Thank you.

22         MR. LUCHENITSER:  Again, Your Honor, we would add to

23  our objection that if he is relying on a study, it applies to

24  the best evidence rule.  We would also suggest that the study

25  was not introduced as an exhibit.

2128

1          THE COURT:  I don't think anybody is relying on it.

2  They are telling me that's the origin of it.  I don't suspect

3  you're relying on it, are you, Counsel?

4          MR. TROY:  That's right, Your Honor.  It's the origin

5  of the program.  This individual comes in and has

6  responsibilities, one of the things he does is becomes

7  knowledgeable of what he's there for.

8          THE COURT:  Thanks very much.  Proceed.

9  BY MR. TROY:

10  Q.  There came a time, obviously, when somebody involved with

11  Prison Fellowship Ministry took notice of what the experience

12  was in Brazil and started to try to implement similar programs

13  here in the United States; correct?

14  A.  Correct.  The justice department organized a team of persons

15  from various aspects of corrections to go down and actually see

16  the program in operation.  I don't remember the exact date.  It

17  was in the early nineties.  We had representatives of Prison

18  Fellowship attend and also other states, federal agencies.  One

19  was a representative of the State of Texas.

20          When that trip was completed the individual that

21  represented Texas went back and reported to the governor that he

22  thought it was a worthy program, it could be replicated, and

23  eventually Texas came out with a request for proposal.

24          MR. LUCHENITSER:  Again, Your Honor, may I have a

25  standing objection to this whole line of questioning where he's

1  talking about the history of the program and what happened

2  before he joined IFI?  It seems to be all hearsay.

3         THE COURT:  You may.  You may.

4  BY MR. TROY:

5  Q.  Mr. Cox, in order to perform your duties as national

6  director of the InnerChange Freedom Initiative, was it incumbent

7  on you to catch up on the past history of the program so that

8  you could learn from the past as to what has to be implemented

9  in the future?

10  A.  Yes.  When I first took over the program Jerry Wilger sent

11  me about 10 boxes of materials from his office in Colorado.  I

12  had to go through every box to see what was in there and see

13  what was worth keeping and what was not worth keeping.  A lot of

14  this material was documented in there, and, of course, I read as

15  much as I could to learn about the history of the program.

16  Q.  And the program was eventually established, you said,

17  pursuant to an RFP issued by the State of Texas?

18  A.  That's correct.

19  Q.  Since Texas it has, we know, expanded.  Where did it expand

20  to next?

21  A.  Iowa.

22  Q.  And then?

23  A.  Kansas.

24  Q.  And then?

25  A.  Minnesota.

2130

1  Q.  And next?

2  A.  Arkansas and Missouri.

3  Q.  Where does--  Let me back up.

4        It came to Iowa, we know, in--Your Honor, I'll just go

5  through this quickly, because I think it's in the record.  In

6  the fall of 1998 there was an RFP, a contract issued in the

7  spring of 1999, and implementation of the Iowa program in the

8  fall of 1999.

9  A.  Yes, that's my understanding.

10  Q.  What is the IFI relationship with Prison Fellowship

11  Ministry, Mr. Cox?

12  A.  Prison Fellowship Ministry originally started the IFI

13  program in 1997 in Texas.  Then I believe it was '98--excuse

14  me--'99 that IFI was separated from Prison Fellowship and

15  incorporated as a separate 501(c)(3) organization with its own

16  board of directors.

17        Then IFI entered a series of agreements with Prison

18  Fellowship to provide staffing and support services for the

19  program.

20  Q.  How would you describe Prison Fellowship Ministry, is it, in

21  essence, a ministry?

22  A.  Yes.

23  Q.  And the InnerChange Freedom Initiative, I think you just

24  said a moment ago has separate articles of incorporation.

25  A.  That's correct.

1    MR. TROY:  Your Honor, I believe that's Exhibit A.

2  I'm not going to go into a lot of detail, but I would, if I

3  might, direct the Court to Exhibit A.

4    THE COURT:  All right.  That's fine.  Thank you.

5  BY MR. TROY:

6  Q.  In the articles of incorporation for the InnerChange Freedom

7  Initiative, is it stated in there that rather than a ministry,

8  that its goal, one of its goals, is the reduction of recidivism?

9  A.  That's correct.

10    MR. LUCHENITSER:  Do you have a page number,

11  Mr. Troy, for that cite?

12    MR. TROY:  No.

13  BY MR. TROY:

14  Q.  All right.  You're familiar with various contracts that

15  emanated between the InnerChange Freedom Initiative and the

16  State of Iowa?

17  A.  Well, historically I have a record of them, and just

18  recently responded to a request for proposal.

19  Q.  Those were in '98, 2002, and the most recent one was 2005,

20  this year?

21  A.  Yes.  That's correct.

22  Q.  What is it that-- You have in the separate articles of

23  incorporation for InnerChange Freedom Initiative, one of the

24  goals is reduction of recidivism.  How does InnerChange Freedom

25  Initiative approach the recidivism issue as compared to other

1  programs?

2          I ask it because we've heard a lot in the course of

3  testimony between a therapeutic versus a transformational model.

4  Can you, first of all, explain to the Court the differences

5  between those models, and then I want to go into issues

6  involving recidivism.

7  A.  Well, the two models are very similar in many ways.  I'll

8  focus on the differences as opposed to the similarities.  A

9  therapeutic model uses some type of treatment effect to change

10  behavior.  The transformational model uses the purposeful

11  introduction of religion as the change agent.  It also focuses

12  on teaching religious values.

13          The purpose is to change the way people behave, to

14  restore the family, to restore the individual to the community,

15  not only as a crime-free citizen, but also as a person who gives

16  back to the community, be a productive citizen.  Recidivism is

17  the way we measure the success of the program.

18  Q.  You mentioned change agent.  Can there be various change

19  agents other than religion?

20  A.  Yes.  There are all types of change agents.  It depends

21  on--as a matter of fact, the IFI program is a holistic program

22  in the sense that we recognize that individuals can change and

23  do change, but we also recognize that they have to have the

24  skills that they need to cope despite what happens inside.

25  Q.  And in responding to the State of Iowa for a values-based

1 program, was the IFI view of that request a transformational

2 program?

3 A.   Well, we responded to the RFP as it was stated, a

4 values-based program.   Transformation is the process or the

5 treatment effect that we use to bring about that result.

6 Q.   To bring about the values that you're trying to accomplish?

7 A.   Right.   That's correct.

8 Q.   And the change agent that you use to accomplish the

9 acquisition of these values is a religious component; correct?

10 A.   That's correct.   The original study in '91 of Brazil, one of

11 the greatest criticisms of the Brazil program was--I'm sorry--

12 it wasn't a criticism, it was a characteristic, was that it was

13 holistic.   It not only included religion, but it included a

14 broader service area.   That was replicated in this country.

15       What we know about what works in corrections is that

16 all change is a uniquely personal process.   Whether it's a

17 spiritual transformation or whether it's simply internalizing

18 values, the individual has to make the choice, first, that they

19 want to change, and, secondly, that they want to use this

20 process to change.

21       Some programs rely on, say, psychotherapy, which is

22 one of the most sophisticated.   A lot of people aren't

23 comfortable with the exploration of the inner-self at the depth

24 that psychotherapy requires in order to make change.

25       They steer away from those types of programs and go to

1  less intrusive programs like social work counseling or cognitive

2  therapy of some type that's less intrusive.  Our therapy, for

3  example, I've heard people credit their changed lives to the

4  fact that they were given opportunity to discover art and

5  discover a method of expressing themselves.

6        We introduce religion because we, as Christians,

7  believe that the only true change and lasting change occurs

8  through spiritual transformation, but we don't require it.  We

9  don't compel it.  We don't track it.  It would be foolish to try

10  to do so.

11  Q.  Why?

12  A.  Why?  Well, a person can verbally say yes, I have been

13  transformed or I have been changed, but you have no way of

14  measuring that or determining whether that's true, or not.

15        We teach values from a Christian perspective, which

16  includes the spiritual side of the Christian religion, which

17  includes the transformation through the spirit, and we also

18  teach the values that you should live by as a Christian, and

19  then we measure behavior.  Because behavior is what reflects the

20  change.

21        Secular research tells you that one of the first signs

22  of a changed individual has nothing to do with the source of the

23  change, but one of the first signs of a changed behavior is

24  respect for authority.  They change the way they relate to

25  authority.

2135

1          As a matter of fact, if you look at the

2     sexual--secular literature, and especially the what works

3     literature, that tells you any successful program has to include

4     these five, six or seven things, you'll basically see that the

5     IFI program follows that research very, very closely.

6          MR. LUCHENITSER:  Objection, Your Honor.  I'm going to

7     object to him talking about literature that is not before the

8     Court.  He's not an expert.  It's hearsay under the best

9     evidence rule.

10          THE COURT:  Okay.  I'll take it subject to your

11     objection.  Proceed.

12          MR. TROY:  Thank you, Your Honor.

13     BY MR. TROY:

14     Q.  Do you rely on any secular authorities in the implementation

15     of the overall IFI program?

16     A.  Well, that's my background.  I mean, I've worked in

17     corrections for 32 years before coming to Prison Fellowship and

18     IFI.  Part of my master's degree training was in statistics.

19     Not that I would be a statistician, but I would be an informed

20     consumer of research.

21          I followed the literature for years and I've

22     contributed to it in some small way myself.

23     Q.  And identify, if you would, for the Court some of the

24     literature that you rely upon in implementing the IFI program,

25     the secular literature.

2136

1   A.   I looked--of course, we use recidivism, which is a standard

2   measure of success.  I looked at what is the so-called what

3   works literature.  This emerged, like, in the early 1990's.

4   It's basically secondary research.  In other words, it's not

5   primary research in corrections, but it's a review of all

6   research, all social science research, which includes, like,

7   research on the family, research on employment, and other types

8   of research that tells you what makes the successful--how an

9   individual makes a successful adjustment to society.

10          We collect that information in corrections and distill

11  it down to several principles.  I don't necessarily do it, but

12  there are several distinguished authors who have done so.

13  Basically it becomes the focal point of guidelines for

14  developing new programs and to evaluate programs.

15          I know I've mentioned to you the American Correctional

16  Association several times, but they have two conferences a year,

17  and much of that conference time is involved in workshops, and

18  this literature is very thoroughly reviewed and discussed among

19  professionals in the community.

20  Q.   Let me go back to that literature in a moment.  With regard

21  to the American Corrections Association, in your background were

22  you involved actively on any standing committees of that

23  association?

24  A.   In the seventies and early eighties I was very, very active

25  in committees with the American Corrections Association, program

1    committee, for about three years, three or four years straight.

2         I was involved in bringing some of these authors to

3    the workshops and seminars.  But also I was on the adult

4    detention committee and chaired that committee for several

5    years.  But then in '83 I was elected president of the American

6    Jail Association--'81, I was elected president elect and then in

7    '83 I became president.  I focused my attention in that

8    direction the balance of the eighties instead of the ACA.

9    Q.  Some of the secular literature that you rely upon, we've

10   discussed authors Bush and Milladew (phonetic).

11   A.  Yes.

12   Q.  Explain to the Court those individuals.

13        MR. LUCHENITSER:  Your Honor, I'm going to object.

14   This seems to call for expert testimony.  He's--this individual

15   has never been disclosed as an expert.  The rules require

16   experts to be disclosed before trial.  It seems a lot of what

17   he's testifying to is really what you would--it's really expert

18   testimony.

19        We would ask that his examination be confined to the

20   actual facts that he knows, based on his experience, starting in

21   2004, about the operation of the IFI program.

22        THE COURT:  Okay.  I'll take your objection, and I'll

23   treat Mr. Troy's testimony here as an offer of proof.

24        MR. LUCHENITSER:  Okay.  I'll have a standing

25   objection to this whole line of questions.

1           THE COURT:  Yes.  Yes.

2   BY MR. TROY:

3   Q.  Mr. Cox, let me ask you this:  When you started in February

4   of 2004, did you have any past involvement in the corrections

5   system or did you just start on a clean slate not knowing

6   anything when you took office in February of 2004?

7   A.  It was just the opposite.  I had 32 years of professional

8   experience in corrections.  And then I had no experience in

9   nonprofit or ministry.

10  Q.  And did you bring that 32 years of experience to your job

11  when you came in 2004?

12  A.  I did.  They were looking for someone with my background.

13  Q.  And--

14  A.  And that's what I brought.

15  Q.  --with that background and experience did you, in dealing

16  with the corrections system and community, return to community

17  issues, rely on certain secular authorities?

18  A.  Yes.  I brought with me the literature and research and the

19  experience that I had come to rely on in my 32 years of

20  corrections.

21  Q.  And what you're using, as you've indicated, what works best

22  are initiatives and changes that you're implementing in the

23  InnerChange Freedom Initiative program?

24  A.  Yes.

25  Q.  And that includes where we were a second ago, authors Bush

1  and Milladew (phonetic)?

2  A.   Yes.   It actually started with Genlo and Drews (phonetic)in

3  1990.   They came up with five attributes associated with

4  criminal behavior and recidivism.   Basically they said any

5  program that's going to be successful in addressing recidivism

6  and changing criminal behavior had to deal with these five

7  issues.

8  Q.   Which were?

9  A.   They were, one, antisocial attitudes, values and beliefs,

10  which basically they characterize as criminal thinking.   This is

11  the thinking that I'm a victim.   It's not my fault.   It's

12  society's fault, or it's my parents fault, or it's the

13  authorities fault, or somebody else's fault.   In other words,

14  I'm a victim of my circumstances, and, therefore, I commit

15  crimes as a result of that.   That's pretty much what's described

16  as criminal thinking.

17       The other attribute is that they generally have

18  criminal associates.   In other words, other people that think

19  the same way.   It need not be a gang, but it may be.   It may be

20  family members.   A lot of offenders come from families that have

21  a history of criminal activity.

22       Also, the third is particular temperament and behavior

23  characteristics.   For example, egocentrism, whereby you look out

24  for No. 1.   You constantly look out for No. 1.   That tends to be

25  a characteristic.   Weak problem solving and social skills and

1   criminal history rounds out the first five.

2          Since then other offices have attributed several more.

3   One being negative family factors, low levels of vocational and

4   educational skills, and substance abuse.  The most recent, since

5   2000, we've added an element of procedural justice and the

6   community model of resocialization.

7   Q.  Can you explain a little more what you mean by that?

8   A.  Well, procedural justice is what I referred to earlier about

9   respect for authority.  One of the components of procedural

10  justice is that criminals will respond better to punishment or

11  discipline if it's delivered in a respectful manner.  Even if

12  it's harsh discipline or harsh sentencing, if they are treated

13  with respect in the process, they take it better.

14         The corridor is once they begin to change, that's the

15  first behavior that they change in terms of their respect for

16  authority.  They begin to demonstrate that respect.

17         The community model of resocialization was--has always

18  been with us, but it highlighted in the mid-nineties.  And that

19  basically is where you bring people that are experiencing a

20  common problem together in a housing unit, for example, where

21  they live together so that the learning process continues after

22  class stops.

23         If they spend three-and-a-half, four hours a day in

24  class, they go back to the dorm, or back to the housing unit, or

25  back to the day room and they sit there and talk about it,

2141

1  sometimes they argue about it, but they learn from it.

2          That's the social learning model, social theory of

3  learning.  Many programs, whether it's substance abuse or

4  whatever, rely on the community model as a part of the learning

5  process.

6          Then the alignment of services with the types of

7  greatest risk.  The Bureau of Justice statistics report that of

8  all persons released from prison in this country, 30 percent are

9  rearrested within six months.  One of the things that we do in

10  every reentry program is we front load the services.

11          In other words, that first six months they get a lot

12  of attention, a lot of intensive service because we know that

13  that's when they are at their greatest risk for reoffense.

14  After three years it's only 67 percent.  Almost half of that

15  occurs in the first six months.

16          That's what I mean about going to the secular

17  literature and looking at the program and seeing what we're

18  doing right and what we're doing wrong.  That's what I focus on.

19  That's what Sam and other directors focus on because we want to

20  make sure that we address these attributes.

21          IFI does that.  We go directly to the criminal

22  thinking issue.  We go there with Christian principles and we

23  teach them that they can live a different life, and that life of

24  service is better than egocentric thinking.

25          They talk about it.  They explore it.  They determine

2142

1   whether or not that's something they want to do.

2   Q.   They explore it in a community model--

3   A.   Yes.

4   Q.   --of resocialization?

5   A.   Yes, in the congregate living area.

6   Q.   Is that like in Iowa, Texas, and others, the program is all

7   under one roof?

8   A.   Correct.  That's the primary reason, yes.

9   Q.   All right.  So the IFI program, then, based on secular

10  literature, has that implementation, which I guess we can call

11  No. 2, which is the community aspect.

12  A.   Right.

13  Q.   And then you just mentioned the third part, which is

14  assignment of service once individuals are released back into

15  the community?

16  A.   That's correct.

17  Q.   Does the IFI program use the words front load?

18          MR. LUCHENITSER:  Objection; leading.

19          THE COURT:  Overruled.

20  A.   Yes.  We begin the process six months prior to release.  We

21  begin release planning.  Every individual makes their own

22  personal plan for release.  It includes a plan for housing, a

23  plan for work, a plan for restoration of family.  They are

24  assigned a mentor to work with them one-on-one.  We try to keep

25  that same mentor with them throughout the 12 months after they

2143

1  are released.

2          We look at these attributes, the fact that--we talk

3  with the inmates about the negativity of pro-criminal

4  associates.  That's one of the reasons we try to hook them up

5  with a church as quickly as possible, because then they have

6  positive role models to replicate rather than negative role

7  models.  It gets them into a new prosocial environment.  It may

8  seem pretty tame in terms of church suppers and Bible studies,

9  but it fills a void, and these individuals have experienced that

10  while in prison.  It's a continuation of the programming, the

11  values-based program that we introduce them to while they're in

12  the prison program.

13          Weak problem solving.  We try to address those through

14  both our classes and in coaching sessions, as well as small

15  group sessions.  Many of our volunteers come in in the evening

16  and work with them on these types of skills.

17          The family is an extremely important factor.  Most of

18  the individuals that we work with have been alienated from their

19  families for years.  That's a source of pain and discomfort to

20  them.  Many of them would like to go back to their families and

21  sometimes their families won't have anything to do with them.

22  We try very hard to reconcile the individual with the family

23  months before they are released.  Many of our programs include

24  marital counseling and marital seminars and family counseling of

25  all types.

1          Whether they are alienated from parents, or siblings,

2   or spouse and children, we try to address that.  The research

3   tells us that persons who have strong family support continue to

4   do better in the community after release than those who do not.

5   The same thing with substance abuse, it may be common sense,

6   those that are abusing substances don't do as well as those that

7   are substance free.

8   BY MR. TROY:

9   Q.  Mr. Cox, with regard to the goals of IFI and using the

10  transformational model, change criminal thinking, is it

11  necessary in this transformational model that there be a

12  conversion to Christianity?

13  A.  We, as Christians, believe that, but as far as the program

14  goes, it does not.

15  Q.  Is a conversion to Christianity required for an IFI inmate

16  for enrollment?

17  A.  No.

18  Q.  For progression through the program?

19  A.  No.

20  Q.  Or for graduation from the program?

21  A.  No.

22  Q.  Is there a necessity for enrollment progression or

23  graduation, for an IFI inmate to demonstrate a conversion from

24  antisocial behavior to prosocial behavior?

25  A.  Yes.  That's the way we measure success.

2145

1  Q.  And are these based on what the record has already

2  indicated, the six core values of the IFI program; integrity,

3  restoration, affirmation, productivity, reconciliation and

4  fellowship?

5  A.  Yes.

6  Q.  Are these exclusive values, exclusively Christian values in

7  your mind?

8  A.  No, certainly not.  We teach them in the context of

9  Christian religion and it's Bible based.  We go to the Scripture

10  for examples of these values.  There are many stories in the

11  Bible that illustrate these Christian values, as we consider

12  them, but they are not unique to Christians by any stretch of

13  the imagination.

14          THE COURT:  Mr. Troy, I need to give the reporter a

15  break.  We'll be in recess until 25 minutes to 11:00.

16          (Recess.)

17          (In open court.)

18          THE COURT:  Mr. Troy, I think when I interrupted you

19  you were talking about the transformational model with the

20  witness.

21          MR. TROY:  Yes, sir, Your Honor.  I believe I had

22  finished that.  I hope I had.  There was a necessity to progress

23  in a change of attitude.

24          THE COURT:  Right.

25          MR. TROY:  But not a necessity to convert to

1 Christianity.

2         THE COURT:  Right.

3 BY MR. TROY:

4 Q.  Mr. Cox, in trying to accomplish the goals of the IFI

5 program, in using the change agent that you testified to, and

6 the secular authorities that you also rely upon, is there any

7 other source or single source to revalidate the type of programs

8 that are necessary to achieve the changes that you're attempting

9 to make?

10 A.  I try to get as much of the IFI staff involved with the

11 American Correctional Association as possible.  Because there

12 is--there are a lot of workshops on reentry.  As a matter of

13 fact, the American Correctional Association has just come out

14 with a new book on what works in reentry.  I have given them all

15 a copy of that.  I want them to keep abreast of the literature.

16 And, as I said, we are in the process of continuing reviewing

17 the program for best practices.  I want them to know what to

18 look for.

19 Q.  Do you happen to recall the name of this most recent

20 publication?

21 A.  I believe it's *What Works in Reentry*.

22 Q.  And are things working in the IFI program?  In other words,

23 are you seeing the results of the program, and, if so, please

24 let the Court know what they are.

25 A.  Yes.  We see it at many different levels.  Initially when

2147

1   the program goes in it's usually treated with some suspicion,

2   and, perhaps, even some disregard by many of the corrections

3   officers.  After a few months the inmates start saying yes,

4   ma'am, and yes, sir, to them, and they have a different attitude

5   towards the program.  Many officers see it as a good place to

6   work and apply for transfers to come into the unit because there

7   are fewer fights, there are fewer arguments, there is very

8   little theft.

9          There is still some of that that goes on, especially

10   with the newer members, but by in large the inmates in the

11   program are much better behaved institutionally and exhibit much

12   more respect for authority.

13          It goes beyond that.  Because once they are released

14   into the community, we find that those who have participated in

15   the in-prison program do very well in terms of national

16   statistics, national averages in terms of rearrest or

17   reincarceration.

18          MR. LUCHENITSER:  Objection, Your Honor.  There is no

19   foundation for this testimony, talking about recidivism data,

20   there is--he's not an expert.  There is no foundation.

21          THE COURT:  I think he's relating anecdotal, what he

22   claims is anecdotal evidence, and I will give it the weight I

23   think it's entitled to.  I assume, perhaps, there is an opinion

24   that's forthcoming.

25          MR. TROY:  In a second, Your Honor.

1  BY MR. TROY:

2  Q.  Are you receiving reports of similar attitudinal changes in

3  the Iowa program?

4  A.  Yes.

5  Q.  And in response to His Honor's statement a second ago about

6  empirical studies, would that emanate from the study done in the

7  Texas program?

8  A.  Yes.  The Texas program is the study that was highly

9  publicized and structured as closely as possible to a resources

10 design.  Its results showed very favorable precision.

11       MR. LUCHENITSER:  I'm going to object.  The Texas

12 study has not been designated as an exhibit by the defendants.

13 Any testimony about it should not be admissible.  He's not

14 designated as an expert.

15       THE COURT:  It will go to weight.  I will receive the

16 testimony.  Continue.

17 BY MR. TROY:

18 Q.  You are familiar with that study?

19 A.  I am, very.

20 Q.  You are familiar with some criticisms with regard to that

21 study as well?

22 A.  Yes, I am.  I happen to defend it constantly.

23 Q.  What is your overall analysis, based on your background,

24 experience, and the need to perform your duties as national

25 director of IFI regarding that Texas study?

2149

1   A.  Well, I looked at it very closely.  I think the conclusions

2   about--I think many of the criticisms are valid as well.

3   Q.  Let's go a step at a time.  What are the conclusions?

4   A.  Well, the conclusions are that rearrests and

5   reincarcerations are lower for the IFI graduate than for a

6   controlled group that was structured to have similar

7   characteristics.

8          MR. LUCHENITSER:  Again, Your Honor, may I have a

9   standing objection about this testimony?  Hearsay, best evidence

10  rule.

11         THE COURT:  You may.

12  BY MR. TROY:

13  Q.  Were those results demonstrably lower for IFI?

14  A.  Yes, they were.

15         THE COURT:  Mr. Luchenitser, I don't think there are

16  any secrets here.  I have read the same law review articles

17  about the empirical evidence probably that you have.

18         MR. LUCHENITSER:  I think that's correct, but the

19  defendants consciously did not designate this study as an

20  exhibit.  I don't think it should be--everybody knows about it,

21  but they didn't designate it.  I don't think it should be

22  considered.

23         MR. TROY:  I wasn't sure how many additional trees we

24  needed here, Your Honor.

25         THE COURT:  Okay.  Proceed.

1  BY MR. TROY:

2  Q.  The--you indicated that there were some criticisms with

3  regard to the study.

4  A.  Yes.  Selection bias was one.

5  Q.  What do you mean by that?  Explain your view of that.

6  A.  Well, in order to have a pure research design, then you

7  should take your experimental group and your control group, you

8  should select them both randomly so that there is absolutely no

9  selection bias.  It's impossible to do in a program where people

10  volunteer.

11  Q.  Why?

12  A.  Because you have to say to half of them, "Okay.  Now that

13  you have volunteered, you go into the controlled group, you

14  don't get any treatment."  It's just not something that's

15  acceptable in terms of programming.  If it's voluntary, it

16  should be voluntary.  If the inmates meet the criteria, they

17  should be allowed in.  You can't deny them treatment in order to

18  experiment on them.  At least from an ethical standpoint you

19  shouldn't do that.

20      Texas inmate selection bias was there.  You do have

21  people that want to change.  You do have people that have

22  decided to change, and you do have people that have chosen this

23  method of change to take place.  There is a selection bias.

24      But most other secular programs run into the same type

25  of bias to a lesser extent, I'd say.  To some extent it's all

2151

1  human service.  All research involving humans runs into that

2  same difficulty.

3  Q.  Let me change the subject now.  You indicated that you were

4  familiar with the contracts that existed or were entered into

5  between Iowa and the Department of Corrections and the IFI

6  program, 1998 and 2002.  You were not involved with those;

7  correct?

8  A.  No.  No.

9  Q.  But you did have involvement in the 2005 building process?

10  A.  I did.  I also--the program extended in '04, that was part

11  of the previous award.  The state had the authority to extend an

12  additional year.

13  Q.  And they did?

14  A.  Yes.

15  Q.  All right.  And--

16  A.  There were some amendments to that contract.

17  Q.  Well, let me ask you with regard to one of the amendments.

18  You should have in front of you, I believe, defense Exhibit X5

19  in those books.

20          MR. TROY:  Your Honor, may I approach?

21          THE COURT:  You may.

22  BY MR. TROY:

23  Q.  I'm sorry.  Our label on the front was confusing.

24          Do you have Exhibit X5 in front of you, Mr. Cox?

25  A.  I do.

1   Q.   And can you identify that document for the Court, please?

2   A.   Yes.   This is a cover letter transmitting the IFI response

3   to the--well, actually regarding a memo to the contract.

4   Q.   And what is the nature of the--does this relate to the

5   extension of the contract in the year 2004?

6   A.   Yes.   That's correct.

7   Q.   And what is the nature of the amendment that is being

8   implemented in June of 2004?

9   A.   The method of compensation was changed.

10   Q.   From what to what?

11   A.   From a quarterly payment to a per diem payment.

12   Q.   And was the quarterly payment based on a per diem concept?

13   A.   No.   It was one-fourth of the annual appropriation.

14   Q.   Based on an approximation or anticipation of X number of

15   inmates in the program?

16   A.   That's correct.

17             MR. LUCHENITSER:   Objection; leading.

18             THE COURT:   Overruled.

19   BY MR. TROY:

20   Q.   And Exhibit X5 goes to what?   Because if I say it goes to a

21   pure per diem, which would save the Court time, Mr. Luchenitser

22   is going to object as leading.

23   A.   Well--

24             MR. LUCHENITSER:   Objection; leading.

25             THE COURT:   Overruled.

1  A.   Basically we wanted to go to a more equitable method of

2  billing.   One that we could document in terms of service level.

3  Per diem rate does that.   For each individual in the program we

4  charge a rate of $3.47 per day for each day that they are in the

5  program up until they complete the 18-month in-prison program.

6        Once that's completed we no longer charge the state

7  because they are no longer providing them with the program that

8  we contracted to provide.   They might stay in the housing area,

9  they may give an orientation to new inmates coming in, they may

10  assist with some of the classes, but we don't charge the state

11  for those inmates because they are now contributors to the

12  program and not receiving the program.

13  BY MR. TROY:

14  Q.   And the inmates that are in the last phase in the community,

15  you indicated a six-month, or more, program?

16  A.   That's correct.   We follow them for 12 months.

17  Q.   Is there a per diem charge for those individuals?

18  A.   Yes, there is.

19  Q.   Okay.   But overall cost per day for IFI to implement the

20  program, can you estimate for the Court what that is?   Is it

21  more than $3.47?

22  A.   Yes.   I don't know what the per diem is, but it's much more

23  than that.   That should equal about 35 or 40 percent of the

24  total cost.   Now that I think about it, I don't believe we do

25  bill for aftercare services on a per diem basis.

1  Q.  All right.  With respect to--once the contract was extended

2  to 2004, did there come a time when the state issued a request

3  for proposal in 2005?

4  A.  Yes.  I think it was April or early May.

5        MR. TROY:  I believe the record would show May 4, Your

6  Honor.

7  BY MR. TROY:

8  Q.  Did you have any communications with the Department of

9  Corrections in Iowa regarding that RFP before it was issued?

10  A.  No.

11  Q.  Did you have any meetings with any individuals with regard

12  to representing the State of Iowa before that RFP was issued?

13  A.  Yes, but not related to the RFP.  It was related to my

14  supervisory and management duties in IFI.  When I go to the unit

15  I try to make the courtesy call on the warden if he or she is

16  available.

17  Q.  That is who?

18  A.  Terry Mapes in Iowa.

19  Q.  And so you met him how many times before that RFP was

20  issued?

21  A.  I don't recall just in passing.

22  Q.  Did you have any discussions of any nature with him relating

23  to the reissuance of the RFP?

24  A.  No.

25  Q.  The record shows that a Jeanette Bucklew was also involved

2155

1   in the issuance and analysis of the responses to this RFP.   Do

2   you know Ms. Bucklew?

3   A.   Yes, I do.

4   Q.   And did you meet--   How do you know her?

5   A.   Well, she issued the RFP.   She is the DOC procurement

6   officer and all responses had to go through her.   As a matter of

7   fact, we were prohibited from talking to any other member of the

8   Department of Corrections during this process once the RFP was

9   issued.   Everything has to go to her in writing.   Verbal

10  communication is not accepted.

11  Q.   Did you have any meetings with Ms. Bucklew prior to the

12  issuance of the RFP?

13  A.   No.

14  Q.   Had you ever met Ms. Bucklew prior to the issuance of the

15  RFP?

16  A.   No, never heard of her.

17  Q.   Did you meet her in person once the RFP was issued?

18  A.   I did, but it was in conjunction with this trial, not in

19  conjunction with the RFP.

20  Q.   She testified here.   Prior to seeing her here at trial, had

21  you ever met her in person?

22  A.   No.

23  Q.   You submitted a bid in response to the request for proposal?

24  A.   Yes, we did.

25  Q.   And you are familiar now that you had a competitive bid from

1  a company called Emerald?

2  A.  Yes, I am aware of that.

3  Q.  Had you heard of or were you aware of Emerald Corporation

4  prior to their response to the Iowa RFP?

5  A.  Yes.  They interviewed me several years ago as a consultant

6  on a geriatric facility that they were considering undertaking.

7  They didn't hire me though.

8  Q.  From your background and education, are you familiar with

9  something on an economic principle called the first of the

10  market theory?

11  A.  Yes.

12  Q.  Explain to the Court what that is.

13  A.  Well, it's basically--

14         MR. LUCHENITSER:  Objection.  Calls for more expert

15  testimony.  He's not an expert.

16         THE COURT:  It does seem to me that it's expert

17  testimony.  Is--I thought he was giving me background in the IFI

18  program.  Is that something that's unique?

19         MR. TROY:  Yes, sir, it is, in relationship to some of

20  the bidding process and his knowledge of how he works in his

21  job.

22         THE COURT:  Okay.  Overruled.  You can answer.

23  A.  Well, basically my experience has been in public corrections

24  and private corrections.  Private corrections, as a consultant

25  and later as part of a private corrections company that managed

1   jails and prisons under contract with the government.

2          In the early eighties the first company to do this was

3   Corrections Corporation of America.  They had to go out and sell

4   the concept and then sell themselves.  They were selling two

5   different things.  The rest of us came lately and were able to

6   provide some competition.  But for several years the first of

7   the market was out there by themselves and there was no

8   competition.

9          Many states were reluctant to advertise for bids

10  knowing that only one company would respond.  Other states felt

11  like it was an appropriate thing to do because it generated--it

12  would generate competition eventually if they put out these

13  RFPs.

14  BY MR. TROY:

15  Q.  And the reason it generates competition is people start

16  realizing there is a market out there?

17  A.  There is a market, right.  In private corrections, like the

18  first award, I think, was made in '82 or '83, and I cofounded

19  that company in 1990.  We were about the sixth or seventh,

20  eighth firm, I guess, in the market at that time.

21  Q.  Now, the amount of money that you responded to--the amount

22  of your bid in response to the Iowa RFP was, I believe,

23  $310,000.

24  A.  Well, we proposed a per diem rate, as we had previously, not

25  to exceed $310,000.

1   Q.  And what is the status--  Well, let me back up a moment.

2           Did you monitor, or anyone on behalf of IFI monitor,

3   the appropriations process here in the State of Iowa?

4   A.  Well, when I was preparing the proposal I wanted to know

5   what was appropriated.  I don't remember whether it was Sam or

6   Rod Brouwer, but somebody got a copy of the appropriations bill

7   and told me what was in it.

8   Q.  And that information was public information?

9   A.  Well, I think it was.  I don't remember if it was.

10  Q.  It was a--

11  A.  The Tobacco Fund.  Anyway, they went to public documents to

12  get the information to know how much was available.

13  Q.  To your knowledge, could anybody have done that?

14          MR. LUCHENITSER:  Objection; leading.

15          MR. TROY:  If you know.

16          THE COURT:  Overruled.

17  A.  Yes, I think so.  The state has that information available

18  through their web site.

19  BY MR. TROY:

20  Q.  Let me show you, if I may, Exhibit T.  I believe you should

21  have that in front of you, Defendants' Exhibit T.

22          MR. TROY:  May I approach, Your Honor?

23          THE COURT:  You may.

24  BY MR. TROY:

25  Q.  Mr. Cox, do you have in front of you what has been marked as

2159

1  Defendants' Exhibit T?

2  A.  Yes, I do.

3  Q.  Can you identify that document for the Court?

4  A.  It's a notice of intent to award dated July 14th signed by

5  Jeanette Bucklew.

6  Q.  And is that the notice that you became aware of?

7  A.  That's the hard copy, yes.

8  Q.  All right.  Is this the official notice to IFI?

9  A.  Yes, it is.

10  Q.  And as a result of that notice, have you been negotiating a

11  contract for a values-based program as advertised in the RFP?

12  A.  Yes, we have.

13          MR. LUCHENITSER:  I'm sorry to interrupt.  What

14  exhibit are we looking at?

15          MR. TROY:  T.

16          MR. LUCHENITSER:  That says the notice is to Emerald

17  Companies.

18          MR. TROY:  I'm sorry.  Your Honor.

19          MR. ALLEN:  You're looking at S.

20          THE WITNESS:  It's U.  No, T.  Correct.

21          MS. WEAVER:  Our S.

22  BY MR. TROY:

23  Q.  Mr. Cox, go back, if you would, to Exhibit T, Defendants'

24  Exhibit T.  It's a document on the State of Iowa Department of

25  Corrections letterhead; is that correct?

2160

1  A.   Yes.   That's the one I'm looking at.

2  Q.   What is the date of the document?

3  A.   July 14th--

4  Q.   And--

5  A.   --2005.

6  Q.   And it is--it's a notice of intent to award; is that

7  correct?

8  A.   That's correct.

9  Q.   Who is it addressed to?

10 A.   InnerChange Freedom Initiative.

11        MR. LUCHENITSER:   The one in our set, the exhibits

12 were transposed.   It doesn't matter.   Don't worry about it.

13        THE COURT:   Mr. Troy, I have a question.   I have

14 Volume V, my Exhibit T6 through U6.   Is there a T that I should

15 have?

16        MR. TROY:   Yes, there is, Your Honor.

17        MS. WALLACE:   Volume II, Your Honor.

18        THE COURT:   Volume II.   Thanks very much.

19        All right.

20 BY MR. TROY:

21 Q.   Mr. Cox, I think what I was asking you is, as a result of

22 receiving the notice of intent to award, what is the status of

23 the contract negotiations that emanated from that notice?

24 A.   A final draft has been sent to Ms. Bucklew for review,

25 approval and execution.

1   Q.  With regard to the RFP process that took place, are you

2   familiar with a process in that--in the RFP called a technical

3   assistance workshop?

4   A.  Yes.  That's like a pre-bid conference.

5   Q.  And to your knowledge, was anybody from IFI present and

6   representing IFI at that conference?

7   A.  I believe Chris Geil represented IFI at that conference.

8   Q.  And that conference is open to any interested bidder?

9   A.  Yes.

10  Q.  And you indicated that the contract has been forwarded for

11  review and approval and execution.  What is the manner of

12  payment that's set forth in that document?

13  A.  It is a per diem.

14          MR. LUCHENITSER:  Objection; best evidence rule.  We

15  would like to see the actual document instead of having somebody

16  testify about what it says.

17          THE COURT:  Overruled.

18  A.  It's a per diem payment, $3.47.

19  BY MR. TROY:

20  Q.  The same as or similar to what we looked at as Exhibit X5?

21  A.  That's correct.

22          THE COURT:  Mr. Luchenitser, wasn't that in your

23  stipulation?

24          MR. LUCHENITSER:  The stipulation covers the most

25  recent contract that goes up to June of 2005.  We haven't seen

1    this new draft contract they're talking about.

2             THE COURT:  But it's the same concept.

3             MR. LUCHENITSER:  That's what they're saying.  We

4    can't stipulate to that because we haven't seen it.

5             THE COURT:  Okay.  Thanks very much.

6             MR. TROY:  The document isn't finalized, Your Honor,

7    so the best evidence is right now.

8             THE COURT:  All right.

9    BY MR. TROY:

10   Q.  Let me change to one final question--or series of questions,

11   Mr. Cox, and that is the issue of what I would phrase

12   recoupment.  How much money has IFI received, if you know, from

13   the State of Iowa for services since its initial contract in

14   1999?

15   A.  I don't know precisely, but it's just under $2 million, $1.9

16   million.

17   Q.  And did IFI provide services to the State of Iowa Department

18   of Corrections in return for that money or consideration?

19   A.  Yes, in accordance with the contractual relationship.

20   Q.  And were those services provided in good faith?

21   A.  They were.

22   Q.  Are you aware that the plaintiffs in this case have a claim

23   of recoupment?

24   A.  Yes, I am.

25   Q.  What would the impact be on IFI, its programs throughout the

2163

1  United States, if it had to return the approximate $1.9 million

2  to the State of Iowa.

3          MR. LUCHENITSER:  Objection; relevance.

4          THE COURT:  Overruled.

5  A.  Well, the current budget for the four active IFI's is a

6  little over $3 million a year.  The majority of that we raise

7  through donations.  It would be a pretty drastic impact to take

8  two-thirds of that--to have to return two-thirds of that to the

9  state.

10  BY MR. TROY:

11  Q.  Which would impact programs not only in Iowa, but in the

12  other locations in the United States?

13  A.  Right.  You add the other two locations and you're talking

14  about close to $4 million.  It's about half of what it takes us

15  to operate in six states for a year.

16  Q.  Has the State of Iowa asked IFI to return any money or asked

17  for any recoupment?

18  A.  Not to my knowledge, no.

19  Q.  To your knowledge does the Department of Corrections in

20  Iowa feel that it's received value for the money it's paid to

21  IFI?

22  A.  My experience is that--

23          MR. LUCHENITSER:  Objection.  He can't testify to what

24  the Department of Corrections--

25          THE COURT:  Sustained.

2164

1  BY MR. TROY:

2  Q.  Well, in that relation, is the State of Iowa negotiating and

3  coming to finalization of a new contract with IFI for the same

4  or similar services that it's been providing since 1999?

5  A.  Yes.  We were very pleased that they chose us to continue

6  the service over a very well qualified firm.

7          MR. TROY:  Thank you, Your Honor.  I have no further

8  questions.

9          THE COURT:  Okay.  Thank you.

10          Is there cross-examination?

11          MR. LUCHENITSER:  Yes, Your Honor.

12          MR. ALLEN:  Your Honor, I think it would make more

13  sense if I ask my couple of questions and then go to him.

14          MR. LUCHENITSER:  No objection, Your Honor.

15          THE COURT:  That's fine.  Mr. Allen.

16          MR. ALLEN:  I only have a few.

17                    CROSS-EXAMINATION

18  BY MR. ALLEN:

19  Q.  Mr. Cox, to clarify, the $3.47 per diem is per inmate, is it

20  not?

21  A.  That's correct.

22  Q.  And that $3.47 is for services provided to those inmates

23  while they are in the 18-month program housed in Cellhouse E at

24  Newton; correct?

25  A.  That's correct, for 18 months.

1  Q.  So that when they complete that 18-month or 12-month program

2  and yet continue to live in Cellhouse E, they are not--the State

3  of Iowa is not billed?

4  A.  That's correct.

5  Q.  And if and when they are released from Newton and they

6  receive the benefits of your 12-month aftercare program, the

7  State of Iowa is not billed?

8  A.  I believe you're correct.

9  Q.  And then just to clarify, on the annual budget, I believe

10  you said you received a little less than $2 million.  That's

11  from the inception of the contract to date, is it not?

12  A.  Correct.

13  Q.  The annual budget from--you receive from Iowa on an annual

14  basis is about how much, if you know?

15  A.  About 300,000 from Iowa--$310,000, I believe.

16  Q.  Do you know the annual budget for IFI for Iowa total?

17  A.  Close to 800,000.

18  Q.  800,000?

19         MR. LUCHENITSER:  I'm going to object.  There's

20  specific exhibits that show that.  I'm going to object.  Best

21  evidence.

22         THE COURT:  Which exhibit is it, Mr. Luchenitser?

23         MR. LUCHENITSER:  Taking a couple of minutes to find

24  it.  But there is--actually, there's--it's also in the

25  stipulations.  Stipulations have got some stuff about the

2166

1  annual--

2          MR. ALLEN:  Your Honor.  That's fine.  If there's

3  stuff in the stips, that's fine with me.  I have no further

4  questions.

5          MR. LUCHENITSER:  All right.  Thank you.

6          My apologies.

7                    CROSS-EXAMINATION

8  BY MR. LUCHENITSER:

9  Q.  Let's see.  Mr. Cox, I believe you testified that you are an

10  employee of Prison Fellowship Ministry; is that correct?

11  A.  That is correct.

12  Q.  And is it correct that you have authority over IFI?

13  A.  That is correct.

14  Q.  And I believe you testified that the each local director of

15  the four current IFI programs report to you; is that correct?

16  A.  That's correct.

17  Q.  So is it correct that you're the boss?

18  A.  I'm one of the bosses.  I have to report to someone as well.

19  Q.  Okay.  Is it correct that they have to do what you tell them

20  to do?

21  A.  Generally, yes.  They don't always, though.

22  Q.  If they don't do what you tell them to do, is that--  Are

23  they expected to do what you tell them to do?

24  A.  Yes, they are.

25  Q.  And I believe you testified that there's a--what is Sam

1 Dye's title again?

2 A.   National program manager--director.   I'm sorry.   National

3 program director.

4 Q.   Is it correct that he's an employee of IFI?

5 A.   No.   He's an employee of Prison Fellowship.

6 Q.   And is he--do you expect him to do what you tell him to do?

7 A.   Yes.   I usually tell him to advise me.

8 Q.   Is it correct that PFM has the final say over all of the

9 decisions that involve hiring or terminating IFI staff?

10 A.   No.   Well, I do.   I mean, at the vice-president's level I

11 have hiring and firing authority.

12 Q.   You have authority over who the IFI local offices hire and

13 fire?

14 A.   Well, the local director makes the decision, I approve it,

15 it also goes through human resources.

16 Q.   Uh-huh.   And then do you have the right--do you have the

17 authority to disapprove a hiring or firing decision made by a

18 local director as to the IFI staff?

19 A.   I do.

20 Q.   Now, is it correct that all IFI staff are actually employees

21 of PFM?

22 A.   Yes, that's correct.

23 Q.   And is it correct that all IFI staff are paid by--  Let me

24 rephrase that question.   Is it correct that all IFI staff

25 receive their paychecks from PFM?   PFM cuts the payroll for the

2168

1  IFI staff?

2  A.  Yes.  In accordance with an agreement between IFI and PFM to

3  provide those staffing and support services.

4  Q.  And is it correct that PFM appoints IFI's board of

5  directors?

6  A.  No.  That's not correct.  They appoint three members, I

7  think.

8  Q.  How many members are there?

9  A.  Nine, I believe.  I'd have to go back and look.

10 Q.  Do you know how the other six are appointed?

11 A.  The board recruits them.

12 Q.  So the board appoints itself?

13 A.  Well, usually, yes.  They recruit members.

14 Q.  They recruit them and then they--the current board votes on

15 who the six other members are going to be?

16 A.  Well, it doesn't usually occur that way.  It usually occurs

17 one vacancy at a time, sometimes two vacancies at a time.

18 Q.  So for the six members of the board that are not appointed

19 directly by PFM, whoever is on the board at that time selects

20 the remaining members one or two at a time?

21 A.  I'd really have to go back and look at the bylaws to answer

22 that.  I'm not sure exactly how that process works.

23 Q.  Do you know how all of the IFI board members were originally

24 appointed?

25 A.  No.

2169

1  Q.  You don't know whether they were all originally appointed by

2  PFM?

3  A.  Do I know that?

4  Q.  Were they all originally appointed by PFM?

5  A.  I don't know.  I'd have to go back and research that.  I'm

6  sure I've read it somewhere, but I don't recall the details.

7  Q.  I'm going to hand you an exhibit binder.

8         MR. LUCHENITSER:  May I approach, Your Honor?

9         THE COURT:  You may.

10        MR. LUCHENITSER:  Hopefully the cord will be long

11 enough that I'll actually be able to get there.

12 BY MR. LUCHENITSER:

13 Q.  If you could flip to Exhibit 136, please.  First, can you

14 tell me what this document is?

15 A.  Financial statement for the years ending June 30, 2004 and

16 2003, with independent audit report.

17 Q.  This is for InnerChange Freedom Initiative?

18 A.  It's for the InnerChange Freedom Initiative.  It's from

19 Fitzgerald, Snyder and Company, PC, certified public

20 accountants.

21 Q.  Do you believe the information in this document to be true

22 and correct?

23 A.  I do.

24 Q.  And I'm just going to draw your attention to page 6 of this

25 document, also Bates stamped 777.  If you look at the bottom

1  there, related parties, it says in the first paragraph, "Members

2  of IFI board of directors are currently appointed by PF."  Does

3  PF refer to Prison Fellowship?

4  A.  I'm sorry.  Say that again.  I was reading.

5  Q.  Does PF, when the abreviation PF is in this document, does

6  that refer to Prison Fellowship?

7  A.  Yes.

8  Q.  Do you have any reason to disagree with that statement in

9  that document, "The majority of the members of IFI's board of

10  directors are currently appointed by PF"?

11  A.  I don't have any reason to disbelieve it at all.

12          MR. LUCHENITSER:  Okay.  Your Honor, I'm going to

13  refer you to stipulations 132 through 134 for additional

14  information about the relationship between Prison Fellowship

15  Ministries and InnerChange Freedom Initiative.

16  BY MR. LUCHENITSER:

17  Q.  I'm going to hand you another exhibit binder.

18          MR. LUCHENITSER:  I apologize, Your Honor, I lost--

19  the mic came off.

20          MR. TROY:  Can we know what exhibit we have?

21          MR. LUCHENITSER:  Sure.  I'm about to tell you.  It is

22  Exhibit 47.

23  BY MR. LUCHENITSER:

24  Q.  Have you been able to find it?

25  A.  Yes, Break Point Online, Every Day Miracles.

1  Q.  Can you tell me what Break Point Online is?

2  A.  Yes.  It's an online version of the radio commentary by

3  Chuck Colson.

4  Q.  And is this something that's published on Prison Fellowship

5  Ministry's web site?

6  A.  Yes.  You have access to it through the web site.

7  Q.  And is Prison Fellowship, do they produce this program or

8  are they involved in it somehow?

9  A.  Break Point?

10  Q.  Yes, sir.

11  A.  Yes.  That's the world view out of the Prison Fellowship

12  Ministry.

13  Q.  Let's go on to--  I'm not sure if you have this in your

14  binder, or not.  You should have it in the same binder.  Exhibit

15  72.  Can you tell me what this document is?

16  A.  It's Form 990, the Internal Revenue Service.

17  Q.  And is this something IFI filed with the IRS?

18  A.  I don't have any firsthand knowledge of it, but it looks

19  official.

20  Q.  And would the information in here be true and correct?

21  A.  I can't testify to that.  This is in 2003.  I wasn't here

22  then.

23  Q.  Well, it says for calendar year beginning July 1, 2003, and

24  ending June 30, 2004.  Since it covers the period ending June

25  30, 2004, would it be reasonable to assume it was filed after

1  you became employed by Prison Fellowship?

2  A.   That is reasonable to assume, yes.

3  Q.   And would it be reasonable to assume that IFI would not file

4  something with the IRS unless the material in the document was

5  true and correct?

6  A.   I think that's reasonable to assume, yes.

7  Q.   And if you look at the third page of this document, which is

8  Bates stamped PFM702--PFM/IFI702.

9  A.   Right.

10 Q.   At the top there's a statement of organization's primary

11 exempt purpose.  Is it correct that that explanation of the

12 organization's primary exempt purpose is, quote, "To convey the

13 ministry and provide evangelical participation to prisoners"?

14 A.   That's what it says.

15 Q.   Let's--

16        MR. LUCHENITSER:  May I give him another exhibit

17 binder?

18        THE COURT:  You may.

19 BY MR. LUCHENITSER:

20 Q.   This next exhibit is going to be Exhibit 80.

21 A.   Did you say 80?

22 Q.   Yes, 80.  I'll wait for you to get there.

23 A.   I'm there.

24 Q.   Can you tell me what this document is?

25 A.   Handbook for employees of Prison Fellowship Ministry.

1  Q.  Are employees of PFM expected to follow what it says in this

2  handbook?

3  A.  Yes, by in large they are.

4  Q.  And are there any exceptions?

5  A.  I don't have the handbook memorized.  Is there something in

6  particular you want me to comment on?

7  Q.  You said by in large they are.  Was there something that you

8  were thinking of?

9  A.  There are some exceptions in terms of employment processes,

10  recruitment, things of that nature.

11  Q.  Are employees of IFI also expected to--  Let me try to

12  rephrase it.

13        You testified before that IFI staff are employees of

14  PFM.

15  A.  That's correct.  But they are assigned a hundred percent of

16  their time to support the IFI program.

17  Q.  So are IFI staff expected to follow the--what it says in

18  this handbook, that's Exhibit 80?

19  A.  It is with some exceptions.  For example, recruitment is

20  handled differently for IFI than it is for Prison Fellowship

21  Ministry in general.

22  Q.  Can you think of any exceptions that relate to IFI staff

23  from this handbook other than relating to recruitment?

24  A.  I would have to go through the handbook in some detail to

25  tell you that.  I don't have it memorized.  I guess through

2174

1  their table of contents I could look through that.  I don't see

2  a table of contents here.

3  Q.  Let me ask you about page 4 of the handbook.  Is it correct

4  that page 4 of this handbook, what's stated on page 4, is fully

5  applicable to IFI staff?

6  A.  Generally I'd say that the IFI staff supports the mission of

7  Prison Fellowship, but our mission is somewhat different, that's

8  why it's a separate 501(c)(3) organization.

9  Q.  Are IFI staff expected to--where it says, "Our core values,"

10  that section, are IFI staff expected to follow those values?

11  A.  We have a different set of core values because we have a

12  contractual relationship with state government, and our scope is

13  much narrower than the scope of Prison Fellowship Ministry.

14  Q.  Of these core values listed on this page 4, are there any

15  specific ones that IFI staff don't have to follow or believe in?

16  A.  Well, I don't require them to recite them or give any

17  allegiance to them per se.  This is a handbook they are given to

18  read and review.  I can't tell you if all of my IFI members

19  adhere to this.  Generally, I think they do support the Prison

20  Fellowship mission and core values.

21          Again, we have a little bit of a different focus.  We

22  don't focus on these core values, we focus on a different set of

23  values in terms of conducting the IFI program.

24  Q.  Is it correct that IFI believes in these values also?

25          MR. TROY:  Your Honor, I'm sorry.  I didn't understand

1   the question.

2   BY MR. LUCHENITSER:

3   Q.  Is it correct that you expect IFI staff to believe in these

4   seven values?

5           MR. TROY:  Asked and answered.

6   A.  I make no such requirement, no.

7           THE COURT:  Overruled.

8           Mr. Luchenitser and Mr. Troy, I've treated them as one

9   in the same for purpose of the lawsuit.  Do I make a mistake

10  when I do that?

11          MR. LUCHENITSER:  I think that's correct.

12          MR. TROY:  I believe you do make a mistake when you do

13  that.

14          THE COURT:  Will you clarify that for me at some point

15  because I thought they both had the same type of beliefs and

16  ministry.

17          His statement that it's more narrow, narrow only in

18  the sense of delivering services, but the philosophy that

19  underlies both organizations, I took to be the same.

20          MR. TROY:  I think the document that is before the

21  Court right now reflects a core mission of the Prison Fellowship

22  Ministry, which is a ministry.  It is a true ministry as opposed

23  to the IFI program, which, as the evidence indicated, under its

24  articles of incorporation, it's purposes are to reduce

25  recidivism.  It uses the core values of integrity, et cetera,

2176

1  that we've gone over to instill a change.  I think that's what's

2  happening.  Mr. Luchenitser, obviously, tries to suggest that

3  they are one in the same.  They are separate corporations.

4      THE COURT:  I know they are separate corporations.  I

5  thought their religious philosophy, in terms of what they

6  believed in, was the same.  I thought the difference was IFI

7  provided services to now six states, or proposed to.  That was

8  the only difference.  It was a legal difference.

9      MR. TROY:  Respectfully, Your Honor, it would be a

10  scenario where if PFM goes into a prison, it's going in through

11  a chaplain, see, aspect.  IFI is going in as independent

12  contractor to provide a certain service, reduction of

13  recidivism, using a values-based approach from a faith-based

14  change agent.

15      THE COURT:  Which they derive from Prison Ministry.

16      MR. TROY:  Which they derive from the values that we

17  articulated in the IFI program, the six values, which don't

18  necessarily--aren't necessarily inconsistent with, but not

19  synonymous with the core values that Mr. Luchenitser is now

20  asking about.

21      MR. LUCHENITSER:  Your Honor, would you like me to

22  briefly state my position on this issue?

23      THE COURT:  I would because I'm confused.

24      MR. LUCHENITSER:  While IFI is separately

25  incorporated, we think that that's just really a legal shell,

1  and, perhaps, they did this for some legal reason, perhaps to

2  shield them from liability.  We don't know why.  We think that

3  the matters that I have been going through with Mr. Cox for--the

4  beginning of this cross-examination, show that PFM really

5  controls IFI.  Mr. Cox is a PFM officer and he has full

6  authority over the IFI staff.

7          PFM pays IFI employees.  PFM actually provides IFI

8  funding if it doesn't come from the state.  We think it's really

9  one in the same.

10          THE COURT:  Mr. Troy thinks otherwise.

11          MR. LUCHENITSER:  Yes.

12          MR. TROY:  One is a religious program and one is a

13  treatment program.

14          THE COURT:  Okay.

15  BY MR. LUCHENITSER:

16  Q.  Mr. Cox, is there a separate employee handbook for IFI

17  staff?

18  A.  We have an operating manual and Field Guide.

19  Q.  Okay.  The operations manual, is the one you mentioned?

20  A.  We have an operations manual and a Field Guide.

21  Q.  And are IFI staff expected to follow what is stated in the

22  operations manual?

23  A.  Yes.

24  Q.  Now, is it correct that you have been working on a new

25  version of the operations manual?

2178

1  A.  Well, we're revising it.  This is, I think, the fifth

2  revision.  It's something that we do periodically to make sure

3  that the operating manual reflects what's actually happening on

4  the ground.  When we make changes, and we do several times a

5  year, then we want to--we go back and make sure that the manual

6  reflects those changes.  When we start a new program, like in

7  Arkansas, we start off with all the lessons learned rather than

8  part of the lessons learned.

9  Q.  Mr. Cox, if you could please flip to Exhibit 76.  It will be

10 in one of the binders that you have in front of you.

11 A.  Yes.  This is the fourth edition of the operations manual.

12 Q.  Is this the most recent version that's been completed?

13 A.  This is the one that's been completed.  We have a new

14 version, but it hasn't been completed.  We're still working on

15 the appendices.

16 Q.  And are IFI staff expected to follow what's stated in this

17 fourth version at this point in time?

18 A.  Yes, basically they are.  But the director has some

19 discretion.

20 Q.  Let me go back to Exhibit 80, page 4, the core values at the

21 bottom, page 4.  Would you approve hiring somebody to be a staff

22 person for IFI if they indicated that they did not agree with

23 one of the values listed on page 4?

24 A.  That's not part of my interview process, no.  That's not

25 part of my process.

2179

1   Q.  But if you knew that they didn't agree with one of these

2   values, would you agree to hire them?

3   A.  Since I don't require it, I wouldn't know.  It's not

4   something that I can answer for you.  I mean, if they told me

5   that they did not believe in Jesus Christ I would say, "You're

6   probably in the wrong place because this is a Christian

7   ministry."  If they said they don't read the Bible, I don't

8   think I would hire them.  If they said they didn't--they weren't

9   dependent on prayer, I would advise them to be.  I don't know

10  that I would stop the hiring process.

11          Anchored in the church simply means Prison Fellowship

12  works through the church as its source of volunteers, and its

13  source of support for prisoners in the community.

14          Committed to Christ, I would not include that in an

15  employment interview.  Compelled to evangelize, I would not

16  include that in the interview.  Focus on all people, we have a

17  very narrow focus.  I wouldn't include that in an employment

18  interview.  Seeking excellence, I would say yes, that's

19  something I would look at.  No, I would not use all of these to

20  screen an employee.

21  Q.  Let's go on to Exhibit 81.  Can you tell me what Exhibit 81

22  is?

23  A.  Prison Fellowship employee process and procedures, last

24  updated 7-29-05.

25  Q.  And are PFM employees expected to follow these policies and

1  procedures?

2  A.   Yes.

3  Q.   And are IFI staff expected to follow these policies and

4  procedures?

5  A.   Yes.   Again, I would have to go through them and look at

6  them individually.   I think generally that's correct.

7  Q.   Okay.   I will take you through these one by one.

8  A.   Okay.   That's fine.

9  Q.   We didn't include the whole exhibit in this exhibit binder.

10  I believe that the whole thing should be in the one that's

11  called Plaintiffs' Complete Exhibits, that separate binder.   Let

12  me ask you about the ones included in here.

13          Are IFI staff expected to follow this first policy

14  here, Policy No. EMP1, statement of faith?

15  A.   Yes.   They are required to accept the statement of faith and

16  sign it that they accepted.

17  Q.   And let's go on to the next one.   Are IFI staff expected to

18  follow this Policy No. EMP15, section employment entitled

19  homosexuality?

20  A.   Yes.   It's inconsistent with Christian values.   We're

21  teaching Christian values.

22  Q.   And let's go down to the next one, EMP16, section employment

23  entitled employment of ex-prisoners.   Are IFI staff expected to

24  follow this policy?

25  A.   I'd have to look at that in more detail to see.   This one

1   seems to be somewhat lengthy.  It's, like, two pages.  If you

2   will give me a moment, I will look it over.

3   Q.  Okay.

4   A.  I would say probably not because most of our departments of

5   corrections will do a background check and they have their own

6   requirements in terms of whether or not sex offenders can--what

7   period of time they have to be out, if any.

8   Q.  What about the section on page 2 of this policy where it

9   says personal life.  Are IFI staff expected to abide by that

10  policy?

11  A.  Where specifically on page 2 are you referring?

12  Q.  Near the bottom there's a section called personal life.

13  A.  Yes.  IFI is a Christian program.  We are Christians.  We

14  would like to see them set the example for the inmates that they

15  work with.  This would be something that we encourage and

16  require.

17  Q.  And let's go on to the next--

18  A.  Encourage, the policy says encourage.

19  Q.  Let's go on to the next section, the next policy, policy

20  EMP17, section ministry relations entitled government funds.  Is

21  this a policy that's applicable to IFI and its staff?

22  A.  No.  This is particularly--this is one of the reasons IFI is

23  a separate entity, because you will notice the last bullet there

24  says, "The combined funds received by PF and its affiliates from

25  all government sources will not be more than 10 percent."  Well,

1   in Iowa it's around 40 percent and Kansas, I think it's, like,

2   27 percent, and Minnesota it's about 22 percent.  I think we

3   exceed that in IFI.

4   Q.  Now, does this policy--this might actually help address an

5   issue Judge Pratt was asking about before--the next paragraph,

6   after the last bullet point, if you look at that paragraph,

7   there's a sentence that says, "In each instance funds will be

8   accepted from a government entity only as a result of a policy

9   of exception based on the above criteria and for a specific

10  program or service that can be administered through a separate

11  501(c)(3) corporation, established and controlled by PF for that

12  purpose, transition of prisoners, InnerChange Freedom

13  Initiative."

14          Does this policy help explain why IFI was established

15  as a separate 501(c)(3)?

16  A.  This paragraph, I think, grants an exception to IFI.

17  Q.  Right.

18  A.  The purpose of this policy is so that Prison Fellowship does

19  not become dependent on federal funds.  If it were dependent on

20  federal funds, and those funds dried up for some reason,

21  Congress decided to cut back on those types of programs, it

22  would be difficult to replace a large amount of funds.  It's

23  been restricted to 10 percent so that in the event Congress or

24  state legislators, or whatever, decide not to fund these types

25  of programs anymore, then it would be--would be a minimal effect

 1  on the overall position.

 2  Q.  So IFI, one of the subsidiaries of PFM, has been given an

 3  exception from this policy based on the specific criteria set

 4  forth in this?

 5  A.  I think--

 6          MR. TROY:  Object to the form of the question.  It

 7  assumes facts that IFI is a subsidiary where the evidence shows

 8  to the contrary.

 9          THE COURT:  You can answer.  Overruled.

10  A.  I didn't quite get the question.  Would you repeat it,

11  please?

12          THE COURT:  He used the term subsidiary.  He used IFI

13  is one of the subsidiaries.

14          You go ahead, Mr. Luchenitser.

15          MR. LUCHENITSER:  Actually, if the court reporter

16  could read that back, I might not be able to phrase it the same

17  way.

18          THE COURT:  Don't use the term subsidiary, that's what

19  I was suggesting.  I think that was his objection.

20  BY MR. LUCHENITSER:

21  Q.  Is IFI one of the entities that's been given exception from

22  this policy, pursuant to its terms, one of separate entities

23  related to PFM?  That's been given exception to this policy, but

24  implemented pursuant to this paragraph that follows the bullet

25  points?

1  A.  It appears so from this paragraph.

2  Q.  Let's go to the last policy, policy MR31, section ministry

3  relations, entitled theological review.

4          Is it correct that this is a policy that is applicable

5  to IFI staff?

6  A.  Yes.  This is consistent with IFI's nondenominational

7  nature.  The theoretical--the theological committee reviews

8  materials that are used to make sure that it's consistent and

9  does not reflect the doctrine of any one denomination, but is a

10  mainstreamed Christian doctrine.

11  Q.  Now, the materials do have to be consistent with the PFM

12  statement of faith; isn't that correct?

13  A.  That's correct.

14  Q.  So they do have to reflect the views--they do have to

15  reflect certain specific Christians views, that's correct;

16  right?

17  A.  Yes.  That's correct.  That statement of faith was drafted

18  to represent mainstream Christian beliefs.

19  Q.  Now, you're aware that there are many Christians--you're

20  aware that there are many Christians who don't agree with at

21  least some of what's in the statement of faith, are you not?

22  A.  I imagine there are some, yes.

23  Q.  But it's your opinion that the statement of faith sets forth

24  the mainstream Christian views?

25  A.  Yes.