IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In the matter of | * | |
| | * | 4:03-cv-90074 (lead), |
| AMERICANS UNITED FOR SEPARATION | * | 4:02-cv-90447 |
| OF CHURCH AND STATE, et al., | * | 4:03-cv-90101 |
| | * | |
| Plaintiffs, | * | |
| v. | * | |
| | * | |
| PRISON FELLOWSHIP MINISTRIES, et al. | * | MEMORANDUM OPINION |
| | * | AND |
| Defendants. | * | ORDER FOLLOWING TRIAL |
| | * | |

## I.  INTRODUCTION

The issue to be resolved in this case is whether the contractual relationship between the state of

Iowa Department of Corrections ("Dept. of Corrections") and InnerChange Freedom Initiative

("InnerChange" or "IFI") impermissibly advances religion in violation of the Establishment Clause of the

First Amendment.[1]   The Court conducted a bench trial on the matter over a fourteen-day period from

---

[1] The Plaintiffs also bring a state claim under a section of the Iowa Constitution that, in relevant part, mirrors the language found in the Establishment Clause of the Federal Constitution.  Iowa Const. art. 1, § 3.  The Plaintiffs' other state claim arises under Article 1, section 4, of the Iowa Constitution, which states:  "No religious test shall be required as a qualification to any office, or public trust, and no person shall be deprived of any of his rights, privileges, or capacities, or disqualified from the performance of any of his public or private duties . . . in consequence of his opinions on the subject of religion."  *Compare* U.S. Const. art. VI, § 1, cl. 3.

With no indication that Iowa state courts would treat the establishment clauses in the state and federal constitutions differently, the remaining state establishment of religion claim will be analyzed concomitantly under federal law.  *See, e.g., Kliebestein v. Iowa Conference of the United Methodist Church*, 663 N.W.2d 404, 406 (Iowa 2003) (analyzing the clauses simultaneously); *Rudd v. Ray*, 248 N.W.2d 125, 130 (Iowa 1976) (recognizing that the disestablishment provisions included in all the state constitutions "[have] a common original and parallel history with the First Amendment of the United States Constitution").

The Court granted summary judgment to Defendants Prison Fellowship and InnerChange on

October 24, 2005, to November 4, 2005, and then from November 28, 2005, to December 1, 2005.

The trial included a site visit to the Newton Correctional Facility ("Newton Facility") where the

InnerChange inmate rehabilitation program is located.

Post-trial, the parties filed their Proposed Findings of Fact and Conclusions of Law (Clerk's

Nos. 354 and 361), and subsequent Responses (Clerk's Nos. 362 and 363).  This Memorandum and

Order constitutes the Court's findings of fact and conclusions of law as required under Federal Rule of

Civil Procedure 52(a).[2]  A separate document entry of the judgment will also be filed.  Fed. R. Civ. P.

58(a)(1).  To the extent any motions made under Rule 52(c) were deferred by the Court and remain

outstanding, they are resolved by this Memorandum and Order.  The matter is fully submitted.

The Plaintiffs seek declaratory and injunctive relief as authorized under 42 U.S.C. §1983.[3]  At

---

the Plaintiffs' state employment discrimination claim for failure to show actual injury and, in the
alternative, failure to comply with state administrative filing requirements.  *See* Mem. and Order on
Cross Mot. for Summ. J. at 25–26 (Clerk's No. 212).

[2]  The Court notes the length of this memorandum and order.  In light of the lengthy trial and
large quantity of evidence in this case, the Court finds a substantial order necessary in order to give
thorough treatment to the complex factual and legal issues.

[3]  The named state Defendants, sued in their official capacities, fall under the auspices of the
Civil Rights Act.  The parties did not actively litigate, at any stage of the case, whether the Plaintiffs
established that, under § 1983, the challenged actions of the private corporate Defendants,
InnerChange and Prison Fellowship, were committed under the color of law.  Nevertheless, based on
the factual findings here, the Court concludes that InnerChange and Prison Fellowship, though private
parties, are persons acting under the color of law for the purposes of the Civil Rights Act of 1871.  28
U.S.C. § 1343(a); 42 U.S.C. § 1983.  "A corporation acting under color of state law will only be held
liable under § 1983 for its own unconstitutional policies."  *See Crumpley-Patterson v. Trinity
Lutheran Hosp*., 388 F.3d 588, 590 (8th Cir. 2004) (citing  *Monell v. Dep't of Soc. Servs.,* 436
U.S. 658, 690 (1978) and setting forth the test for defining a "policy, custom, or action by those who
represent official policy which inflicts an injury actionable under § 1983").
"'Private persons, jointly engaged with state officials in the prohibited action, are acting 'under
color' of law for purposes of the statute.  To act 'under the color' of law does not require the accused

-2-

the outset of this case, the Plaintiffs sought a judicial declaration that the state Defendants violated the United States and Iowa Constitutions by authorizing the operation of InnerChange in the Newton Facility and that InnerChange and Prison Fellowship Ministries ("Prison Fellowship") violated the United States and Iowa Constitutions, acting under the color of law, by discriminating against inmates based on their religious beliefs in the offering and providing of a values-based pre-release program and by discriminating in employment based on religion with respect to positions partly financed by government funds. As mentioned, *supra* note 1, the employment claim is now moot.

The injunctive relief sought by the Plaintiffs is a complete prohibition on InnerChange operating within the Iowa correctional system. Short of that, the Plaintiffs seek a prohibition on any state funding—direct or in-kind—to support the InnerChange program in any manner. In the alternative, the Plaintiffs urge that should InnerChange be allowed to continue in Iowa, then a similar type of values-based program should be made available to non-InnerChange inmates from a secular standpoint and from the standpoint of other faith traditions. The Plaintiffs also seek the reinstatement of Plaintiffs

---

be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.'" *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 941 (1982) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). The contractual agreement between InnerChange, Prison Fellowship, and the Iowa Dept. of Corrections, and the executing of its terms is sufficient to show that the Defendants engaged in a joint action for the purposes of § 1983. Additionally, the rehabilitative treatment provided by InnerChange is a function traditionally and exclusively reserved to the state, thereby qualifying InnerChange's rehabilitation treatment as a state action under the public function doctrine. *See West v. Atkins*, 487 U.S. 42, 54–55 (1988) (holding that a physician, under contract to provide medical treatment to prison inmates, is "a person who may fairly be said to be a state actor" because of the unique relationship between the prison, the inmates, and the physician). Here, the InnerChange employees—in addition to teaching in the treatment program—also provide counseling and security services within the confines of the Newton Facility, creating a relationship, from the perspective of the inmates, in which the differences between private and state actions by InnerChange and Prison Fellowship are nonexistent.

Chandler and McKeag to Unit E of the Newton Facility where they were housed before the implementation of the Dept. of Corrections–InnerChange contract.

The Plaintiffs seek the return of state funds used to pay InnerChange and the return of monies taken from the Inmate Telephone Rebate Fund ("Telephone Fund"), by way of a *pro rata* refund to each inmate account in an amount equal to that taken to fund the InnerChange program at the Newton Facility. The Plaintiffs dropped their request for nominal damages against the named individual state Defendants. *See* Stipulation of Dismissal of Req. for Nominal Damages (Clerk's No. 235).

A decision about whether the Establishment Clause is violated by the Defendants' actions does not entail a decision about the ultimate truthfulness of religion, nor the truthfulness of the theological underpinnings of the religious denominations and faith groups represented in this case. *See Lemon v. Kurtzman*, 403 U.S. 602, 625 (1971) (*Lemon I*) ("The merit and benefits of these [programs], however, are not the issue before us in these cases. The sole question is whether state aid . . . can be squared with the dictates of the Religion Clauses."). In what appears now to be a bit of theological irony, given that the doctrine of separation between church and state is often viewed as a secular product, Thomas Jefferson rooted his ideas about that doctrine in the *religious belief* "that Almighty God has created the mind free . . . [and, therefore] the Holy Author . . . chose not to propagate [religion] by coercion . . . as was in his Almighty power to do . . . ." *See* Virginia Religious Freedom Act, 1786, in *The Complete Bill of Rights: The Drafts, Debates, Sources, & Origins* 51 (Neil H. Cogan ed., 1997).[4] This Court makes no such assertions

_____

[4] Jefferson's words reflect the common theological assumption at the time that a divine hand set the course of human events. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 26 (2004)

about the ultimate source of the law it must interpret.  Just as the Court asserts no theological expertise

in this matter, the Court is also not an expert in the field of prisoner rehabilitation.  The central issue

presented before this Court, therefore, is not whether Iowa inmates can be helped in their rehabilitation

by religion, but whether the State of Iowa's contract with InnerChange shackles[5] the Plaintiff taxpayers

and inmates in a way that violates their rights under the United States and Iowa Constitutions.

## II.   JURISDICTION

A review of the Court's subject matter jurisdiction is always warranted, regardless of the stage

---

(retelling the story in which George Washington, at his fist inauguration, opened the Bible to Psalm 121:1:  "I raise my eyes toward the hills.  Whence shall my help come.").  The presence of an underlying "civic" religious belief is recognized as a part of our nation's heritage.  *See Marsh v. Chambers*, 463 U.S. 783, 792 (1983) (seeing no constitutional violation with a 200-year practice of legislative prayer, quoting Justice Douglas:  "We are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952)).

The recognition of a broadly defined civic religious belief did not take shape in a legal vacuum, but is the work of our Country's dynamic cultural evolution, driven by welcoming divergent peoples to our shores over time.  For an excellent analysis of the political history of the Establishment Clause, see John C. Jeffries & James E. Ryan, *A Political History of the Establishment Clause*, 100 Mich. L. Rev. 279 (2001) (locating federal establishment clause jurisprudence in the context of shifting political, religious, and racial coalitions).  Given the place accorded to religion in our constitutional jurisprudence, therefore, any judicial determination regarding the Establishment Clause is never a choice between secularism and faith, but can only be a decision based on the shape of the constitutional protections enunciated in the most recent, applicable, authorities available.

[5] On June 6, 1788, at the Virginia State Convention, James Madison famously stated:

> I confess to you, sir, were uniformity of religion to be introduced by this
> system, it would in my opinion, be ineligible; but I have no reason to conclude
> that uniformity of government will produce that of religion.  This subject is, for
> the honor of America, perfectly free and unshackled.  The government has no
> jurisdiction over it:  the least reflection will convince us there is no danger to
> be feared on this ground.

*The Complete Bill of Rights* 69.

of litigation.  *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level.").  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), as well as supplemental jurisdiction over the state claims under 28 U.S.C. § 1367(a).  Its authority to grant declaratory relief and further remedy is contained in 28 U.S.C. §§ 2201 and 2202.  Venue is proper under 28 U.S.C. § 1391(b).

Despite a previous ruling by this Court on the issue, the Defendants raised the matter of Plaintiffs' standing at trial.  At the close of the Plaintiffs' case-in-chief, though conceding that the inmate Plaintiffs had standing, Defendants argued that the Iowa taxpayer Plaintiffs and Americans United for Separation of Church and State ("Americans United") failed to offer sufficient evidence to meet the required constitutional standing elements.  Trial Tr. at 2038–40.  "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of subject matter, the court shall dismiss the action."  Fed. R. Civ. P. 12(h)(3).  Counsel for the Defendants stated:  "[T]hough Plaintiffs had declarations to get over the issue of standing for taxpayers [at the summary judgment stage], they have not put in a single instance of a person coming into court in any way, shape or form and stating that they are a taxpayer and that they pay funds to the State of Iowa."  Trial Tr. at 2038–40.

In an Order (Clerk's No. 327) dated November 17, 2005, the Court denied the Defendants' motion, made at trial, to dismiss the claims of the taxpayer Plaintiffs based on standing.  In doing so, the Court relied on its Order, filed on April 29, 2005, granting Plaintiffs' motion for summary judgment on the issue of standing.  *See* Mem. and Order on Cross Mot. for Summ. J. at 4–14 (Clerk's No. 212). The Court, rather than relying on its April 2005 Order to decide the Defendants' renewed motion

regarding standing, should have reconsidered the Defendants' Rule 12 motion, considering all the evidence received up to the time of the renewed motion.  *See Delorme v. United States*, 354 F.3d 810, 815 (8th Cir. 2004) ("The burden to show standing is not a mere pleading requirement, 'but rather an indispensable part of the plaintiff's case.'") (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)).  "Each and every element of the standing requirements 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'"  *See Delorme*, 354 F.3d at 815 (quoting *Lujan*, 504 U.S. at 561).  "Strict compliance with this jurisdictional standing requirement is mandated."  *See Delorme*, 354 F.3d at 815 (quoting *Johnson v. Missouri*, 142 F.3d 1087, 1088 (8th Cir. 1998) (internal citation omitted)).

Notwithstanding the rule to consider standing in the context of each stage of the litigation, the Court, in its April 2005 Order, did not simply rely on the "declarations" of the taxpayer Plaintiffs themselves regarding standing, but also relied on the Defendants' own Statement of Undisputed Material Facts (Clerk's No. 94).  Pls.' Ex. 479.  As their second undisputed fact in this case, the Defendants claimed that "Plaintiffs Carol Delp, Ardene McKeag, Dorothy Redd, and Sandra Sobotka (collectively "Taxpayer Plaintiffs") are residents of Iowa who pay taxes to the State of Iowa."  Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. Based Upon Lack of Subject Matter Jurisdiction (Clerk's No. 94) ¶ 2 (Pls.' Ex. 479).  Defendants' third undisputed fact is that "Plaintiff Americans United for Separation of Church and State ("AU") is a non-profit advocacy organization whose self-described purpose is to preserve the constitutional principle of church-state separation.  AU has members who reside in and pay taxes to the State of Iowa."  *Id.* ¶ 3. The

Plaintiffs' response to the Defendants' statement of facts clarified that Plaintiffs Ardene McKeag, Dorothy Redd, and Sandra Sobotka did not assert they were Iowa taxpayers—a fact that was then admitted by the Defendants—thereby leaving Carol Delp as the named Iowa taxpayer Plaintiff.  Defs.' Reply to Pls.' Resp. to Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. Based Upon Subject Matter Jurisdiction (Clerk's No. 131) ¶ 2 (Pls.' Ex. 481).  As for Americans United, the Plaintiffs made no further clarifications to the Defendants' undisputed claim that Americans United is an organization that advocates for the principle of church-state separation with members who reside in and pay taxes to the State of Iowa.  *Id.* ¶ 3.

The Defendants cannot argue, as they did when objecting to the inclusion of pretrial admissions as evidence, that these statements were simply made for the sake of summary judgment.  Rather, by making a statement of undisputed fact, the Defendants were telling the Court that it need not concern itself with these jurisdictional or otherwise material facts as they were admitted by the adverse party. "By presenting to the court . . . a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support. . . ."  Fed. R. Civ. P. 11(b)(3).  The Court takes the Defendants at their word.  Nothing changed regarding these facts at trial.  The Defendants did not withdraw their previous statements or notify the Court they wished to do so when making their Rule 12 motion.

The Defendants also did not argue that the taxpayer and organizational Plaintiffs failed to meet the other elements of constitutional and prudential standing.  Even if they had so argued, the evidence offered at trial shows that the taxpayer and organizational Plaintiffs suffered a concrete, imminent, and

particularized injury in fact, that the injury is traceable to the Defendants, and that the injury can be redressed through a remedy ordered by this Court. *Lujan*, 504 U.S. at 560–61; *see also Allen v. Wright*, 468 U.S. 737, 751 (1984) (affirming that a court should also assure prudential elements are met—that one litigant is not raising another's legal rights, that the grievance is particularized, and that the complaint falls within the zone of interests protected by the law invoked). Accordingly, after reviewing all the evidence entered at the close of the Plaintiffs' case-in-chief, the Court finds that it retains subject matter jurisdiction over the claims of the taxpayer and organizational Plaintiffs.

As stated above, the Plaintiffs clarified in their responses that Ardene McKeag, Dorothy Redd, and Sandra Sobotka are not Iowa taxpayers, or at least are not asserting that fact. Of course, given the reasons for, and the nature of, the remedy requested, the exclusion of these three Plaintiffs would not change the remedial outcome. Nevertheless, they have a right to bring their claims alongside the other Plaintiffs because they retain standing as contributors to the Telephone Fund.[6] *See* Amended Compl. (Clerk's No. 44) ¶¶ 14, 15a, 15b (setting forth their claims, describing in great detail their relationship with Dept. of Corrections inmates, and stating these plaintiffs contributed and continue to contribute to the Telephone Fund).

The Defendants argued that any standing based on contributions to the Telephone Fund[7] is

---

[6]  Because the Court found, in its November 2005 Order (Clerk's No. 212), that Plaintiffs met the standing requirements as taxpayers, inmates, or as an organization, it did not decide standing on two other grounds propounded by the Plaintiffs—as contributors to the Telephone Fund or as tobacco users. Mem. and Order on Cross Mot. for Summ. J. at 5 n.5.

[7]  In the Iowa Dept. of Corrections, inmate phone privileges are paid through individual inmate phone accounts. Inmates and those interested in them—family and friends—deposit money into the individual accounts. The Dept. of Corrections is authorized by statute to establish and maintain the Telephone Fund, and directed to use the fund "for the benefit of inmates." *See* Iowa Code §

without merit because "[n]o one came forward and said they were putting money into the telephone

fund and using the telephone fund."  Trial Tr. at 2039.  Again, based on the Defendants' own statement

of undisputed material facts, the Court relies on their assertion that "[all] the Plaintiffs have deposited

money into the telephone accounts of the Inmate Plaintiffs, and this money was spent by the Inmate

Plaintiffs to make telephone calls, thus resulting in profits that funded the Inmate Telephone Rebate

Fund."  Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. Based Upon

Lack of Subject Matter Jurisdiction ¶ 7 (Pls.' Ex. 479); *see also* Defs.' Reply to Pls.' Resp. to Defs.'

Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. Based Upon Subject

Matter Jurisdiction (Clerk's No. 131) ¶ 7 (Pls.' Ex. 481) (repeating the undisputed fact).  Accordingly,

no further evidence was necessary at trial to convince the Court that the Plaintiffs all contributed to the

Telephone Fund.   Contribution, however, is not enough.  To be conferred standing, the Telephone

Fund Plaintiffs must also show a concrete injury caused by the Defendants for which there is a remedy.

The Defendants argue that the Plaintiffs can show no actual injury—and, therefore, have no

standing to challenge the Dept. of Corrections' decision to allocate funds to InnerChange from the

Telephone Fund—because Iowa statutory and regulatory law gives the Dept. of Corrections discretion

to use the Telephone Fund "for the benefit of inmates."  *See* Iowa Code § 904.508A; Iowa Admin.

Code r. 201-20.20.   The Defendants argue that this case is analogous to *Arney v. Simmons*, where

---

904.580A (authorizing, as well, the director of the Dept. of Corrections to adopt rules providing for the
disbursement of moneys from the fund).  For each inmate telephone use, funds are withdrawn from
these individual accounts to pay for the telephone call.  The amount charged for each telephone call by
the Dept. of Corrections is more than the actual cost of the telephone usage.  The commission is placed
in the Telephone Fund and deposited into separate Dept. of Corrections institutional accounts based on
the report of the telephone vendor.  Iowa Admin. Code r. 201-20.20(2).

the court held that inmates lacked a protected property interest in the use of inmate telephone funds

because the authorizing state statute did not mandate that all expenditures from an inmate benefit fund

had to benefit inmates *directly*. *See* 923 F. Supp. 173, 177–78 (D. Kan. 1996). Because the

plaintiffs in *Arney* were alleging a § 1983 claim, the court specifically noted that for the claim to be

valid, "[the plaintiffs'] allegation of error in defendant's management of the DOC-IBF [Department of

Corrections Inmate Benefit Fund] . . . must be of constitutional dimension." *Arney*, 923 F. Supp. at

177. Since the court found that the state statute did not "substantively restrict the discretion of state

officials," no constitutionally protected property interest arose in the management of the DOC-IBF. *Id.*


        The language of the state statute and regulations in this case—providing that the Telephone

Fund be used for the benefit of prisoners—creates the legitimate expectation that the Telephone Fund

cannot be taken pursuant to an illegal state policy. The Plaintiffs have presented sufficient evidence, at

each respective stage in the litigation, that the state Defendants erred in administering the Telephone

Fund by using its proceeds to pay InnerChange and Prison Fellowship in violation of the Establishment

Clause, which specifically limits how state or federal government funds can be spent. *See, e.g., Flast*

*v. Cohen*, 392 U.S. 83, 103 (1968) ("Our history vividly illustrates that one of the specific evils feared

by those who drafted the Establishment Clause and fought for its adoption was that the taxing and

spending power would be used to favor one religion over another or to support religion in general.").

Regardless of the amount of discretion available to the Dept. of Corrections under Iowa law to

administer the Telephone Fund, that discretion does not extend to the violation of the establishment of

religion clauses contained in the state and federal constitutions. Accordingly, because the Telephone

Fund contributors have a protected interest in the funds being used legally for the benefit of prisoners, the Court retains jurisdiction over the former taxpayer Plaintiffs Ardene McKeag, Dorothy Redd, and Sandra Sobotka as the Telephone Fund Plaintiffs.

## III.  STATEMENT OF FACTS

### A.  *The Transformational Model*

The facts presented here encompass the entire history of the InnerChange program in Iowa. The Defendants have, throughout the litigation, taken the position that the Court should only consider evidence of current InnerChange policies and practices in its analysis, arguing that a focus on former contracts and circumstances is fruitless.  The Defendants cite *City of College Station v. City of Bryan*, 932 F. Supp. 877, 885 (S.D. Tex. 1996) for their proposition that a "[c]ourt must look to the facts in existence at the time an injunction issues. . . ."  *City of College Station* was an anti-trust and tort preliminary injunction case involving a dispute over electricity transmission fees.  This case, however, involves the Establishment Clause, which necessitates a review of the entire history of the challenged public funding.  *See Zelman v. Harris*, 536 U.S. 639, 655 (2002) (reminding courts that an Establishment Clause analysis takes place from the perspective of the "the reasonable observer" who must be "familiar with the full history and context" of the challenged program).   The historical practices in this case, even those that have been discontinued, shed considerable light on the state's purpose in implementing the InnerChange program, the actual effect of the state's funding, and whether the funding results in an improper entanglement with religion.  *Lemon I*, 403 U.S. at 612-13.

The InnerChange program was developed and is operated by Prison Fellowship, a 501(c)(3) Christian non-profit corporation incorporated in the District of Columbia, "whose mission is to exhort,

equip and assist the Church in its ministry to prisoners, ex-prisoners, victims, and their families, and in

its promotion of biblical standards of justice in the criminal justice system." Pls.' Ex. 73 (Field Guide at

2). In addition to Iowa, InnerChange operates treatment programs in Texas, Minnesota, Kansas,

Tennessee, Arkansas, and Missouri. Though InnerChange is treated as a subsidiary of Prison

Fellowship, InnerChange is also a separate 501(c)(3) non-profit corporation incorporated in Virginia.

Prison Fellowship works on a variety of fronts and collaborates with groups and individuals across the

political spectrum on issues related to prison reform and criminal justice.  Prison Fellowship's own

religious commitments can best be characterized as Evangelical Christian in nature.[8] This commitment is

most evident in the very specific Prison Fellowship Statement of Faith that all Prison Fellowship and

_____

[8] Throughout this Memorandum and Order, the Court will describe Prison Fellowship and InnerChange's theological position, as reflected in its public statements, curriculum, and in practice at the Newton Facility, as Evangelical Christian rather than simply Christian or Non-Denominational Christian. Absolutely no animus is intended by this nomenclature. As will be evident from the facts set forth, the religious nature of the InnerChange program is not only distinct from non-Christian religions (Hinduism, Buddhism, Islam, Native American practices, and Judaism, for example) as well as atheist or agnostic practices, it is also quite distinct from other self-described Christian faiths, such as Roman Catholicism, Mormonism, and Greek Orthodoxy. Evidence shows that the Evangelical Christian message is also distinct from the beliefs held by self-described Protestant Christian denominations such as Lutheran, United Methodist, Episcopalian, and Presbyterian, again, to name only a few.

This brew of religious and non-religious groups makes up the American culture and it is the genius of the First Amendment that allows each person to enjoy the freedom to express themselves religiously without fear that another religious group will predominate with the state's seal of approval. *See Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *School Dist. of Abingdon Twp., Pa. v. Schempp*, 374 U.S. 203, 319 (1963) ("What our Constitution indispensably protects is the freedom of each of us, be he Jew or Agnostic, Christian or Atheist, Buddhist or Freethinker, to believe or disbelieve, to worship or not worship, to pray or keep silent, according to his own conscience, uncoerced and unrestrained by government.") (Stewart, J., dissenting); *Teterud v. Burns*, 522 F.2d 357, 360 (8th Cir. 1975) ("It is not the province of government officials or court to determine religious orthodoxy.").

InnerChange employees are required to sign:

> We believe in one God, Creator and Lord of the Universe; the co-eternal Trinity:  Father, Son, and Holy Spirit.
>
> We believe that Jesus Christ, God's Son, was conceived by the Holy Spirit, born of the Virgin Mary, lived a sinless life, died a substitutionary atoning death on the cross, rose bodily from the dead, and ascended to heaven where, as truly God and truly man, He is the only mediator between God and man.
>
> We believe that the Bible is God's authoritative and inspired Word. It is without error in all its teachings, including creation, history, and its own origins, and salvation.  Christians must submit to its divine authority both individually and corporately, in all matters of belief and conduct, which is demonstrated by true righteous living.
>
> We believe that all people are lost sinners and cannot see the Kingdom of Heaven except through the new birth.  Justification is by grace through faith in Christ alone.  We believe in one holy, universal, and apostolic Church.  Its calling is to worship God and witness concerning its Head, Jesus Christ, preaching the Gospel among all nations and demonstrating its commitment by compassionate service to the needs of human beings and promoting righteousness and justice.
> We believe in the necessity of the work of the Holy Spirit for the individual's new birth and growth to maturity and for the Church's constant renewal in truth, wisdom, faith, holiness, love, power, and mission.
>
> We believe that Jesus Christ will personally and visibly return in glory to raise the dead and bring salvation and judgment to completion.  God will fully manifest His Kingdom when He establishes a new heaven and new earth, in which He will be glorified forever and exclude all evil, suffering, and death.

Pls.' Ex. 79.  While Prison Fellowship's Statement of Faith contains beliefs common to many types of

Christian groups, it is also significantly different in many respects.

As Dr. Winnifred Fallers Sullivan ("Dr. Sullivan")[9] explained at trial, Prison Fellowship

---

[9] Defendants maintain that the Court should not rely on Dr. Sullivan's testimony because she does meet the *Daubert* standards and, in considering her testimony, the Court improperly assesses value to the beliefs held by InnerChange and Prison Fellowship, as well as their employees and volunteers.  The Court disagrees.  First, Dr. Sullivan's academic credentials as an expert in the fields of comparative religion and the history of Christianity are impeccable and, second, her testimony is

considered by the Court only to situate, objectively, InnerChange and Prison Fellowship within the well-accepted context of religious tradition and practice as they exist now.

The Court, as stated above, makes absolutely no value judgment about the beliefs held by InnerChange, Prison Fellowship or their volunteers and employees. "The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *Watson v. Jones*, 80 U.S. 679, 728 (1871); *see also Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."); *United States. v. Lee* 455 U.S. 252, 263 n.2 (1982) (Stevens, J., concurring) ("The risk that governmental approval, [legislature or the courts], of some and disapproval of others will be perceived as favoring one religion over another is an important risk the Establishment Clause was designed to preclude.").

The theological views and practices of InnerChange and Prison Fellowship, however, are material to First Amendment analysis.  The state of Iowa's knowledge of InnerChange and Prison Fellowship's theological positions and practices, and the implementation of the InnerChange program at the Newton Facility—particularly InnerChange's claim to be open to persons of any religious persuasion—all go to show whether the State impermissibly sanctioned the evangelization of the inmates in its care into a particular form of the Christian faith.   The issue presented here is not the merits of InnerChange and Prison Fellowship's religious beliefs, *but the constitutionality of their actions*, along with that of the Dept. of Corrections.  *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 839 (1995) ("If there is to be assurance that the Establishment Clause retains its force in guarding against those governmental actions it was intended to prohibit, *we must in each case inquire first into the purpose and object of the governmental action in question and then into the practical details of the program's operation*.") (emphasis added).  This is especially true if evidence exists to show that one religious group is being favored over others.  *See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 714–15 (1994) (O'Connor, J., concurring) ("[T]he Establishment Clause prohibits government from abandoning secular purposes . . . to favor the adherents of any sect or religious organization.") (quoting *Gillette v. United States*, 401 U.S. 437, 450 (1971)).

The Court has no interest, whatsoever, in engaging in comparative theology in order to find an acceptable version of  "values-based" programming "ecumenical enough to pass Establishment Clause muster," agreeing that one could hardly "imagine a subject less amenable to the competence of the federal judiciary." *Lee v. Weisman*, 505 U.S. 577, 616 (1992) (Souter, J., concurring).  What Dr. Sullivan's insights do help with is understanding, in what sense, those who do not share InnerChange's theological position may face discrimination.  One author sums up well the Court's position:

> [N]either the institutional competence of the courts nor the separationist
> principle embodied in the Establishment Clause bars judicial resolution of
> positive religious questions, such as assessments of the content of religious
> doctrine, or determinations of the centrality or importance of a religious

is not an organized church, but a para-church organization focused on being in ministry to prisoners and their families.  Over the past two centuries, para-church mission-minded agencies have been common; examples include the American Bible Society, the American Sunday School Society and various missionary agencies.  Contemporary Evangelical Christians do not form a religious denomination, but rather comprise a group characterized by a set of beliefs and a culture that extends across Protestant Christian denominational boundaries.  Accordingly, members of different, formally-structured Christian denominations could consider themselves also to be Evangelical Christians.[10]  As an Evangelical Christian organization, Prison Fellowship shares the predominate characteristics common to Evangelical Christianity.

As Dr. Sullivan explained, though no formal membership requirements exist to identify an Evangelical Christian, historians and sociologists have identified several strong, associated characteristics.  Foremost, Evangelical Christians place great emphasis on the Bible as the inerrant, sole source of authority for Christian teaching and personal morality.  Evangelical Christians also believe that true conversion is an adult religious experience, most commonly referred to as being "born again."  Not

---

practice within the context of a religion. In other words, on religious matters, courts may not tell people what they should do or believe, but they may determine, in the sense of making factual findings, what beliefs people hold and what practices they engage in.

Jared A. Goldstein, *Is There A "Religious Question" Doctrine? Judicial Authority To Examine Religious Practices and Beliefs*, Cath. U. L. Rev. 497, 501 (2005).

[10]  Evangelical Christians, of course, do not have a monopoly on the word "evangelical."  In some sense, all self-described Christian groups would consider themselves evangelical, in that they attempt to share the story written in the first four books of the New Testament and attributed to the evangelists—Matthew, Mark, Luke, and John.

only is this experience paramount, so is the duty of every Evangelical Christian to evangelize—that is, to spread the good news of their faith and invite others to share the same adult conversion experience.

Evangelical Christianity tends to be anti-sacramental, which means it downplays the traditional sacramental Christian events—baptism, holy communion or Eucharist, marriage, ordination, etc.—as appropriate ways to interact or meet with God.  Along with initial adult conversion, contemporary Evangelical Christianity emphasizes religious experience—the actual  experience of God in the believer's life.  Evangelical Christians, therefore, are receptive to overt, actual displays of this experience much like those manifested in Pentecostal Christianity.  Additionally, for Evangelical Christians, everything that happens in the world is understood through and interpreted by religious language.  For many Evangelical Christians, the belief in creationism and suspicion of evolutionary theory is also present.  Finally, the Evangelical Christian stance toward religious institutions is one of suspicion.  This is most obviously seen in the worship style.  Whereas traditional, organized religious groups, such as Roman Catholics, the Greek Orthodox, and Lutherans, employ a structured, highly liturgical style of worship, Evangelical Christian worship is free form with individual pastors given authority to determine how services are planned.  For instance, Evangelical Christians have embraced contemporary music forms and multi-media presentations.

These characteristics, along with the theological commitments in the Prison Fellowship and InnerChange Statement of Faith, place the Evangelical Christianity of Prison Fellowship and InnerChange at odds with members of Christian groups who would not consider themselves to be part

of the Evangelical Christian camp.[11]  For instance, the anti-sacramental beliefs contained in the Prison

Fellowship and InnerChange religious views run counter to the core doctrinal beliefs of several Christian

groups in which the celebration of the Mass or Eucharist is a central, necessary part of the Christian life.

The Prison Fellowship and InnerChange theological position would be suspicious, if not contemptuous,

of Roman Catholic reliance on papal authority, Marian devotion, and the veneration of saints.  The

Prison Fellowship and InnerChange belief in the substitutionary and atoning death of Jesus, which

reflects a legalistic understanding of the sacrifice of Jesus, likewise, is not shared by many Christians.

The Prison Fellowship and InnerChange belief in the literal, bodily resurrection of Jesus is also not

shared by many other, non-Evangelical Christians.  Similarly, belief in an imminent, personal, and visible

second coming of Jesus Christ, as held by Prison Fellowship and InnerChange, does not comport with

the belief held by other non-Evangelical Christians that, if a second coming of Christ occurs, its nature is

unknown, or is more spiritualized.

     InnerChange was created to meet the needs of state or federal prisons for a private provider

who could deliver a values-based[12] prisoner rehabilitation program.  InnerChange's religious

---

[11]  In one sense, the InnerChange program can be considered "non-denominational" in nature in that it does not consider itself a formal denomination or church.  Given the major doctrinal differences between it and other Christian groups, however, it cannot consider itself "non-denominational" in the sense that its program or belief statements would be acceptable to inmates and employees who consider themselves Christian but not Evangelical Christian.  The Court relies on Dr. Sullivan's testimony for this distinction as it does for the characterization of the faith groups and beliefs discussed in the Memorandum and Order as a whole.

[12] The term "values-based" is not, the Court finds, simply a pretextual term in all cases for a "religion-based" program.  The teaching of moral values, and creating a comprehensive rehabilitation program intentionally focused on moral values and character development, need not imply indoctrination into a religious faith.  As the free speech viewpoint discrimination cases bear out, moral education and character development can be offered from a religious, as well as a non-religious

commitments mirror those of Prison Fellowship—the parties stipulated, in fact, that what is taught in the

InnerChange inmate program does not contradict the Prison Fellowship Statement of Faith.  The

InnerChange program is a faith-based program designed to transform prisoners into good citizens, to

reduce the recidivism rate of current inmates, and to prepare inmates for their return to society by

providing educational, ethical, and religious instruction.   In its own words:

> This mission of InnerChange is to create and maintain a prison environment
> that fosters respect for God's law and rights of others, and to encourage the
> spiritual and moral regeneration of prisoners.  Therefore, they may develop
> responsible and productive relationships with their Creator, families and
> communities.

Pls.' Ex. 35 (InnerChange website, Sept. 9, 2005).  The InnerChange program meshes the Evangelical

Christian religious message of its parent organization, Prison Fellowship, with a pre-release correctional

model.  This produces a unique approach to pre-release prison programming specific to InnerChange,

which InnerChange refers to as a transformational, rather than a therapeutic, model.  Rather than

exclusively relying on and utilizing scientific and medical theories to address criminal behavior,

---

standpoint. *See, e.g., Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111–12 (2001)
(refusing to accept the proposition that "any time religious instruction and prayer are used to discuss
morals and character, the discussion is simply not a 'pure' discussion of those issues"); *see also* Trial
Tr. at 2139–42 (discussing the benefits of the community resocialization model, thought by many
experts in the correctional field to be the best way to address attributes associated with criminal
behavior).

   The Free Speech inquiry, of course, is separate from the Establishment Clause inquiry.  *See
Good News Club*, 533 U.S. at 113 (holding Establishment Clause was not implicated where there was
"no realistic danger that the community would think that the District was endorsing religion or any
particular creed").  The issue presented here is not whether a "standard moral code," as the Defendants
describe it, can be taught from different religious or non-religious vantage points, but whether the moral
code presented by InnerChange, as financed by the state at the Newton Facility, can be separated from
the religious vehicle in which it is presented.

InnerChange incorporates a supernatural approach to an inmate's recidivist behavior by locating that inmate's problems in disobedience to God, or sin. The only remedy to the problem of sin, InnerChange maintains, is through a miraculous delivery by God—specifically, God in Christ.[13]

InnerChange's own explanation, contained in a document entitled "InnerChange Freedom Initiative White Paper" ("White Paper"), published on the InnerChange website, sums up well the testimony and evidence—including curriculum materials—offered at trial regarding InnerChange's unique approach as it is practiced at the Newton Facility:

> On the surface, IFI may look like a type of therapeutic community. Both therapeutic and transformational prison programs operate through small groups and seek to equip members for life after prison. A therapeutic model is dependent on the interpretation of life through man's eyes and is based upon understandings of the social sciences.
>
> Therapeutic communities seek to equip prisoners for life after prison by learning to manage behavior. Support groups and classes connect prisoners with a loving community of like-minded people who can encourage them and give affirmation. Healing one's relationship with others is the primary focus.
>
> The IFI model seeks to "cure" prisoners by identifying sin as the root of their problems. Inmates learn how God can heal them permanently, if they turn from their sinful past, are willing to see the world through God's eyes, and surrender themselves to God's will. IFI relies and directs members to God as the source of love and inner healing. Members then build on this new relationship to recast human relationships based on Biblical insights.
>
> In summary, IFI and therapeutic models have some similar methodologies, but very different goals, and are rooted in entirely different philosophies. The

---

[13] The Defendants argue that the transformational model outlined here could be used by any faith group—Muslim, Jewish, Hindu, Buddhist, Native American, etc.— to good use because the civic virtues contained therein are universal. It just so happens, the Defendants maintain, that InnerChange is Evangelical Christian. It follows, the Defendants state, that InnerChange should not be slighted for being the only real option in the marketplace for values-based rehabilitation providers in prisons.

therapeutic model seeks first to reconcile the relationship of a prisoner to other human beings.  The IFI model, in contrast, seeks to reconcile people through changing their relationship to God.

A key concept in Chuck Colson's[14] writings is that you must be born again. As inmates are transformed by the power of God, they learn to turn from a sinful past, recognizing that *"sin is not simply the wrong we do our neighbor when we cheat him, or the wrong we do ourselves when we abuse our bodies.  Sin, all sin, is a root rebellion and offense against God* ["](Colson 166 - All references are to Chuck Colson's Loving God). Admitting our sinfulness and asking God's forgiveness is the first step.  *"We have the capacity to change anything about our lives . . . but we cannot change our own sinful nature."* (144).  Repentance is a change of mind and heart away from sin and toward God. . . .

Repentance and reconciliation are an ongoing state of mind and do not simply exist in one moment in time.  IFI emphasizes this realization, and fosters humility and a teachable attitude, that in turn, creates opportunities for prisoners to break free from old habits.  They learn new life skills, rooted in Biblical principles and God turns their lives around.
*"Repentance is an inescapable consequence of regeneration, an indispensible part of the conversion process that takes place under the convicting power of the Holy Spirit.  But repentance is also a continuing state of mind.  We are warned, for example, to repent before partaking of communion.  Also, believers prove their repentance by their deeds. Without a continuing repentant attitude—a persistent desire to turn from our own nature and seek God's nature Christian growth is impossible.  Loving God is impossible."*  (Colson 109).

Pls.' Ex. 35 at 5–6 (emphasis in original).[15]  InnerChange is considered a unit-based residential

treatment program by the Dept. of Corrections.  Unit-based residential treatment programs are also

---

[14]  Charles "Chuck" Colson is the well-known former special counsel to President Richard M. Nixon and founder, with others, of Prison Fellowship in 1976.

[15]  With each exhibit reference the Court will attempt to only refer to the page, as counted from the beginning of the exhibit, as a pinpoint citation for ease of use, avoiding the multiple Bates or other types of organization stamping numbers that often appear on the same exhibit page.  In a few instances, the Bates reference will be used out of necessity.

referred to as "therapeutic communities" or "quasi-therapeutic communities."

The InnerChange Field Guide is the foundational document distributed to Dept. of Corrections inmates who are interested in the program and attend Introductory and Orientation sessions.  Upon acceptance into the program, each InnerChange inmate at the Newton Facility is given a copy of the Field Guide.  The opening paragraph is entitled "An Overview of IFI" and states:

> The InnerChange Freedom Initiative (IFI) is an intensive, voluntary, faith-based program of work and study within a loving community that promotes transformation from the inside out through the miraculous power of God's love.  IFI is committed to Christ and the Bible.  We try to base everything we do on biblical truth.  In other words, IFI is Christ-centered and Bible-based.

Pls.' Ex. 73 at 2.  The Field Guide goes on to define InnerChange's purpose:

> The purpose of IFI is to
>   #   Reduce the rate of re-offense and the resulting social costs
>   #   Provide a positive influence in prison
> **Our ultimate goal is to see ex-prisoners become contributing members of society, by becoming responsible leaders in their family, church and community.**

*Id.* (emphasis in original).  The contrast between what InnerChange would consider a traditional, therapeutic prisoner rehabilitation model based in current, secular approaches and InnerChange's own self-described tranformational model runs throughout InnerChange's curriculum and practice at the Newton Facility.  This is especially true, as will be seen below, in InnerChange's application of the transformational model to drug abuse rehabilitation and treatment.   Contained within the InnerChange White Paper and InnerChange curriculum materials is a chart that sets out eleven major distinctions between the therapeutic model and InnerChange's transformational model, as understood by InnerChange and Prison Fellowship:

-22-

Transformation Model:

- Transformed persons seek to appropriate God's ways as revealed through Biblical truth.

- Criminal Behavior is a manifestation of an alienation between the self and God.

- Transformation enables prisoners to see the world and others as God sees them.

- Acceptance of God and Biblical principles results in cure through the power of the Holy Spirit.

- Tranformation emphasizes the change in behavior as a result of encountering Jesus Christ.

- Insight into one's problems is gained from reading, understanding, and applying Biblical principles.

- All problems in life arise from a condition of sin.

- Focuses on honesty with self and God first; honesty with others will follow.

- Focuses on the power of the Creator. It holds up Christ as the source of that power and work of the Holy Spirit as the way to true change.

- The quality of our relationships to each other is conditioned by the quality of our relationship to Jesus Christ and his love as reflected in others.

Therapeutic Model:

- Therapy seeks to manage symptoms according to human understanding.

- Criminal behavior is a result of an alienation of self from society.

- Therapy seeks to help prisoners see how the world can meet their needs.

- Relief of symptoms is dependent on the power of human love and commitment through support groups and community.

- Therapy emphasizes the management of behavior as it impacts on others.

- Insight into one's problems is gained through group and individual interaction.

- Problems in life arise may arise from past inability to have one's needs met.

- Focuses on honesty with self and others.

- Focuses on the power of Creation. Therapy may or may not point to some higher power.

- Mental health and healthy relationships are dependent on the expression and affirmation of our needs.

- Transformation happens through an instantaneous miracle; it then builds the prisoner up with familiarity of the Bible.

- Therapy seeks gradual change of self as one interacts with one's environment.

Pls.' Ex. 35 at 5–6.

InnerChange posits that an inmate's anti-social attitude and self-destructive behavior can only be overcome through an intensive religion-based program that is able to "rewire" that inmate's most basic emotional and mental structures. In the InnerChange model, an authentic religious experience is the means by which society's civic, or secular, goal—a rehabilitated, pro-social, and productive ex-inmate—is met. A suitable analogy is that InnerChange's intensive religious indoctrination of inmates is like an emotional or volitional chemical therapy treatment. The InnerChange experience roots out the cancerous, harmful attitudes and disorders that keep an inmate from knowing and experiencing his authentic self. All analogies fall short, of course. InnerChange does not consider its treatment only a means—like chemical treatments—that fade away leaving the healthy organism, but also an end in itself. At the conclusion of the Field Guide's orientation materials, InnerChange includes a blessing: "May God bless you for the time you have spent with us reading this material. . . .   Remember God loves you wherever you are. We pray that you will be aware of God's presence and power at all times." Pls.' Ex. 73 at 10. This blessing is consistent with the hope contained just a few lines before: "Above else, we pray that you will discover the transforming love of Jesus Christ." *Id.*

B. *Choosing a Pre-release Rehabilitation Program*

Walter "Kip" Kautzky ("Kautzky") directed the Dept. of Corrections from July 1997 until December 31, 2002, the period in which the Dept. of Corrections chose to contract with InnerChange. Kautzky has known Charles Colson for over twenty years and maintained a close working relationship with Prison Fellowship over the course of his career directing correctional state agencies, including making personal donations to Prison Fellowship. When he worked for the state of North Carolina in the early 1980s, Kautzky facilitated Colson's mission to set up a state-wide prison outreach team of volunteers. Kautzky testified in positive terms about the important role Prison Fellowship played in developing post-release transitional services for North Carolina inmates. Kautzky also worked with Colson in the state of Washington, where Kautzky was subsequently employed. Amos Reed, director of the Washington agency that oversaw correctional institutions, invited Colson to Washington state to help during a transition within the state correctional institutions. Kautzky and Colson consulted on the problems facing the Walla Walla State Penitentiary with Prison Fellowship strategies in mind. Together, Kautzky and Colson visited prisoners on death row and in other parts of the Walla Walla, Washington, prison for several days, going from cell to cell to talk and sometimes pray with inmates. Colson was interested in establishing a volunteer network of church communities to connect with Washington inmates. Kautzky admits that, during his career, "I've tried to help Prison Fellowship along the way." Trial Tr. at 939. Again, when employed in the Colorado correctional system, Kautzky offered continuing support to the already established Prison Fellowship program by consulting with the Prison Fellowship regional director.

Coming to Iowa, Kautzky testified he was not interested in establishing a connection between Prison Fellowship and the Dept. of Corrections institutions. Nonetheless, Prison Fellowship and

InnerChange clearly identified Kautzky as an ally.  Thomas Pratt, President of Prison Fellowship, sent

Kautzky a letter, dated December 7, 1999, in which Pratt attached his "Monday Morning Message"

created for Prison Fellowship-wide dissemination.  Pls.' Ex. 186.  In that attachment, which extolls the

way the "Lord's hand" brought InnerChange to Iowa, Pratt characterizes Kautzky as:

> [T]he very same man who had facilitated Chuck's [Colson] visits to Walla
> Walla, Washington, in the early '80s.  He is the man who enabled our work
> in Colorado.  The same man who had appeared, unbeknownst to us in a very
> crucial meeting early in the North Carolina experience and stood in our
> corner against a very hostile state chaplain when things looked their darkest
> for the project.

*Id.* at 2.  In addition to his prior knowledge about Prison Fellowship's volunteer-based programs

focusing on post-release services and prisoner visitation, Kautzky was also aware of the current

InnerChange in-prison treatment program operating in Texas.  Kautzky learned about the program

from his Texan counterpart, Wayne Scott, who Kautzky met frequently through the American

Association of State Correctional Administrators.   Other persons within the state of Iowa also

contacted Kautzky about InnerChange and, in particular, about bringing the program to the state.   A

key Iowa proponent of InnerChange was ex-state legislator and, at the time, Iowa Parole Board

Member Chuck Hurley.  In his 1999 letter to Kautzky, Pratt described Hurley as:

> [T]he same person who after reading a brochure on IFI Houston and
> Humaita Prison, Brazil,[16] contacted Jerry Wilger[17] and inquired about bringing

---

[16]  The Christian-based Brazil rehabilitation program, started by Brazilian businessman Mario
Ottoboni, is considered by Prison Fellowship to be the forerunner of the InnerChange program in the
United States.  A U.S. version of InnerChange began in the Jester II prison in Houston, Texas, in 1997.

[17] Jerry Wilger was National Director of InnerChange from October 1997 to March 1, 2004.
Before becoming the National Director, Wilger served as a Prison Fellowship volunteer and board
member.  Wilger oversaw the development and design of the InnerChange program in four states.

IFI to Iowa.  He is the same man who asked Jerry to pray with him about an
IFI in Iowa and proceeded to carry on a time of prayer and discussion over
the phone for a month and a half every Tuesday morning.  He is the same
man who went to the Governor about IFI and within a week obtained his
agreement.  Next he went to the Secretary [sic] of Corrections who also
agreed in short order.  And who was the that Secretary [sic]?  None other
than Mr. Kip Kautzky.

*Id.*  Kautzky testified that Hurley's promotion of InnerChange arose from Hurley's interest in a faith-

based, Christian rehabilitation program, which Kautzky described in contrast to his own interest in a

merely "values-based" inmate rehabilitation program.  Trial Tr. at 957.

Kautzky's arrival in Iowa coincided with the completion of the Iowa Dept. of Correction's

newest facility, the medium-security campus just outside of Newton, Iowa—the Newton Facility.  The

Newton Facility started receiving inmates around August 1997.  By all accounts, when Kautzky took

over the Dept. of Corrections, prison overcrowding was the primary state-wide institutional concern.

The Newton Facility provided an important safety valve function, primarily because it relieved the

enormous overcrowding pressure at the Anamosa State Penitentiary.  The pressure was so acute that

low-risk security inmates were moved to the Newton Facility even before construction was complete.

The need to move inmates quickly under tight budgetary constraints affected construction at

the Newton Facility.  The structure of  Living Unit E, originally designed to mirror Units C and D at the

Newton Facility, was changed to reduce costs.  Unit E's wooden doors and "dry cells," discussed in

more detail below, were not originally constructed to provide an honor unit setting to reward good

behavior, but rather as a result of budgetary constraints.   As is regular practice, the new Newton

Facility inmates helped construct fencing and sidewalks to save costs and keep them busy.

The accelerated inmate transfer to the Newton Facility from other institutions, especially

Anamosa, meant that a full menu of treatment programs and classes were not yet in place for the arriving inmates.   Prison administrators rank effective programming a close second to overcrowding when addressing prisoner security and safety concerns.  Besides in-prison jobs, treatment programming and classes serve the invaluable purpose of providing activities and stimulation for inmates.  This is in addition to the Iowa Dept. of Corrections' responsibility to ensure that inmates have access to classes necessary for early release determinations by the Iowa Parole Board.

Inmate programming can be a chronic problem.  On July 12, 2002, after the implementation of InnerChange, Kautzky reported to the Iowa Board of Corrections that 400 offenders, department-wide, were still serving sentences longer than necessary because of the lack of substance abuse programming.  There is no question that in the period the Newton Facility came on line, the Iowa Dept. of Corrections faced a severe budget crisis, which meant limited funding for prisoner space[18] and all-important programming.

Facing difficult budgetary constraints, prison overcrowding, and lack of appropriate programming, Kautzky and his leadership team set about searching for innovative ways to meet the programming challenges at the Newton Facility.  As part of that process, Kautzky directed Kenneth Burger ("Burger"), the Coordinator for Offender Services at the time, to gather information about the InnerChange program in Texas and to determine whether a similar program could work in Iowa. Kautzky ordered the inquiry into InnerChange despite being aware of significant constitutional issues

---

[18]   Due to a state-wide prison population increase, the Dept. of Corrections was forced to add extra bunks to cells designed to hold two persons at the relatively new Newton Facility, making most general population living unit cells in the Newton Facility three-person cells.

that could arise from a joint venture with Prison Fellowship and InnerChange.  Additionally, Kautzky

ordered a search for any other organization that could deliver the same type of services.  Burger and

others stated they either could not or did not locate any genuine competitors for the InnerChange

program in 1998 and 1999.  This is in spite of the testimony offered by Norman Cox, a vice-president

of Prison Fellowship and the National Director of InnerChange, who stated that, by the late nineties,

there were eight different service providers—at least two providing values-based programming—in

operation.  Trial Tr. 2205–07.   Several years later, one of those providers, Emerald Correctional

Management ("Emerald"), emerged several years later and submitted a response to the Request for

Proposal ("RFP") sent out by the Dept. of Corrections on June 8, 2005.  The only organization

corrections officials found in 1998 that offered a long-term, values-based, residential program with

excellent post-release aftercare services was InnerChange.

Identifying InnerChange as a possible vendor, however, did not mean that every Iowa

corrections official preferred a values-based program built on a religious model.  The Court finds

credible the testimony of Burger, who was part of the team that visited the Texas InnerChange

program.  Initially, Burger hoped to design a program in Iowa based on the InnerChange model

without the overtly religious instruction included in InnerChange's transformational approach.  Burger

was especially intrigued by the idea of placing under one program umbrella, in the same shared

physical setting, all the required inmate treatment classes and counseling experiences that could be

completed over a period of several months.  What the InnerChange model also contained was a

superb post-release aftercare program that, according to Burger and the other correctional officials, is

essential to reducing recidivism.

After adding up the cost of initiating a similar program in Iowa, however, Burger quickly came to the conclusion that the cost for the state of Iowa would preclude setting up a similar, but independent program.  With its donor-supported cost structure, the InnerChange program could offer the same in-prison and post-release components for much less money.  Given the state's budgetary constraints, Burger and others concluded that the InnerChange program was really the only way to provide a complete menu of programming at the Newton Facility.

The correctional officials looking for a values-based program genuinely believed that universal, secular values could be instilled in offenders, regardless of any religious context in which they might be offered.  Warden Terry Mapes ("Warden Mapes"), eventually the Warden at the Newton Facility, stated that the religious elements of InnerChange did not bother him.  Mapes testified that the "Christ-centered biblical teaching . . . is a mechanism to the values-based instruction, just as if they done the Dr. Suess education program.  That is another method of reaching and achieving the same goals."  Trial Tr. at 1457.  Dept. of Corrections officials credibly testified that they would be delighted to offer a broad spectrum of values-based programming utilizing various religious and secular contexts if the budget allowed them to do so.

The pragmatic concerns of on-site correctional administrators at the Newton Facility and the Dept. of Corrections director's office, who needed to provide inmate programming at a cost within their budget, combined with Kautzky's own positive view of Prison Fellowship's role in rehabilitating prisoners through spiritual transformation, meant that the selection of InnerChange as a pre-release

service provider was a foregone conclusion by the time an official RFP[19] from the Dept. of

Corrections went out in August 1998.  In February of 1999, Burger presented a report to the Iowa

Dept. of Corrections Board ("Corrections Board"), explaining that InnerChange's religious nature and

bible-based curriculum were components of the program.  The Corrections Board approved the

concept and encouraged the Dept. of Corrections to move forward with the program.   Burger did not

consider the InnerChange venture a major department initiative, but an experimental program

consistent with the Iowa Dept. of Corrections continuing search for innovative solutions to inmate

rehabilitation.  Supporting Burger's assessment is that the annual expenditure under the InnerChange

contract is a small fraction of the $292 million Dept. of Corrections annual budget from general state

funds, and an additional $35 million coming in the form of non-general funds.  Trial Tr. at 1866.

Before the RFP release on April 9, 1998, the Area Director of Prison Fellowship, Terri Hout,

sent a packet to John Mathes, the Newton Facility Warden from 1978 to December 2000 ("Warden

Mathes"), at Kautzky's request.   The packet contained information about the Texas InnerChange

program.  Pls.' Ex. 187.  The cover letter's last sentence wishes Warden Mathes a "blessed Easter

---

[19]  An RFP is part of the process any state agency must undergo to advertise publically and
request services that a state agency may require from a private vendor.  Though the services are
requested by a specific agency, the Iowa Department of General Services ("General Services")
manages the selection of the vendor and eventual procurement of services.  The RFP, then, is a
standardized advertisement for services designed to ensure fair competition that is made through trade
publications, newspapers, and any other avenue that would reasonably reach potential private bidders.
Even though an RFP originates in a state department, the RFP is actually put out by General Services.
An agency that has gained charter status has the authority, however, to govern its own RFP process.
The Dept. of Corrections recently gained charter status and, thus, analyzed and processed by itself the
proposals submitted by InnerChange and Emerald in the past year.
Sometimes, General Services approves a sole source bid in emergency situations.  A sole
source bid bypasses the RFP process.  The sole source bidding process was not involved here.

holiday" and is signed, "In Christ's Service, Terri Hout."  *Id.*   In a letter dated April 27, 1998, some

local Newton Area ministers received an invitation from Terri Hout to attend an informational event at

two local churches—First United Methodist Church and First Assembly of God—where InnerChange

staff from Houston, Texas, "will share the vision, outline the program, and discuss the role of the local

church and volunteers in Iowa's Inner-Change prison unit."  Pls.' Ex. 188.  The letter celebrates the

pre-RFP negotiations already taking place:

> During the past few weeks there have been serious discussions between
> Prison Fellowship's Inner-Change staff and Governor Branstad's office,
> members of the Iowa legislature, the head of the Iowa Corrections, and
> representatives of the Iowa Parole Board about bringing Inner-Change to a
> prison in Iowa.  As a result of these discussions, we are pleased to announce
> that Inner-Change staff will be coming to Iowa the week of May 11 to make
> a determination about Iowa being the new Inner-Change site.

*Id.*  In a memo dated the same day, Kautzky described the same event to Dept. of Corrections

Deputy Directors, Wardens, and Superintendents, requesting they attend a May 14, 1998, luncheon in

order to learn more about the InnerChange program and ask questions about its mission and

organization.   Pls.' Ex. 189.   On May 15, 1998, Wilger sent Kautzky a thank you letter regarding the

InnerChange trip and enclosed a copy of the Texas RFP for Kautzky's review.  Pls.' Ex. 190.

Kautzky also received from Wayne Scott the Texas version of an RPF from InnerChange to use as

template for Iowa's own RFP form.

Kautzky, and the Defendants generally, characterized the exchange of letters, memos,

telephone calls, and meetings between the Dept. of Corrections, InnerChange, Prison Fellowship,

state legislators, and parole board members as reasonable discussions attendant to any RFP process.

These discussions, the Defendants maintain, are necessary to discover more about the provider being

considered, to clarify the state's own correctional rehabilitation needs, and to identify possible sources

of funding.   Not all the correctional officials were completely on board with the InnerChange program.

Warden Mathes was interested in a values-based, rather than a purely cognitive, rehabilitation

program, but worried about what he viewed as the inherent conflict in the different missions of the

Dept. of Corrections and Prison Fellowship.

Evidence shows that InnerChange teams visited Iowa at other times and did much more than

simply discuss the program with Dept. of Corrections and other state officials.   Before the August

1998 RFP went out, as well as before a contractual agreement was reached, the Dept. of Corrections

allowed InnerChange direct access to Iowa inmates at several Dept. of Corrections institutions to

conduct InnerChange orientation classes that included, among other things, bible studies and Christian

worship services.   Straining credibility, Kautzky described the pre-RFP orientation classes by

InnerChange as mere volunteer religious exercises similar to those provided by any other volunteer

religious group that inmates were free to attend.   The distinction between a local church led by a

minister and lay volunteers providing a worship service in a prison, and a potential private vendor who

is in the midst of pre-negotiating contractual terms with the state for a contract valued in the hundreds

of thousands of dollars is, of course, substantial.   Presenting the InnerChange program for inmates to

consider supports the Plaintiffs' claim that the RFP process was merely a formality and that the Dept.

of Corrections intended InnerChange to be the pre-release rehabilitation services provider from the

time InnerChange was initially contacted.

More evidence that, even before the RFP release, the InnerChange program was the only real

competitor in the search for a values-based provider is a letter, dated July 4, 1998, from Kautzky to

Rick Nelson, President of Blueprint for Life, Inc., requesting Nelson's help to secure volunteers for the program.   The subject heading reads:   "Prison Fellowship – Inner Change Program."  Pls.' Ex. 196. Kautzky makes clear that, though the RFP process must be completed "to meet state procurement requirments," the Inner Change program was coming to Iowa and informs Nelson that "when the program is implemented there will be a significant need for volunteers."  *Id.*   According to Warden Mathes, he had no doubt that by the date of the letter to Nelson, Kautzky had decided to go ahead with the InnerChange program.  Trial Tr. 1695–96.

Finally, in August 1998, the Dept. of Corrections issued a "Request for Proposal for Non-compensated Services, Values Based Pre-Release Program."  Pls.' Ex. 197.  The RFP was made available to the general public and expressed the state of Iowa's intent to establish a "values based" pre-release program at the Newton Facility in Iowa.  As stated in the title of the RFP, the initial idea was that a values-based program would be established within the Newton Facility, but be "non-compensated."   Prison Fellowship and InnerChange submitted a proposal to Iowa on September 16, 1998, and an amended proposal on December 23, 1998.  The proposal sent by Prison Fellowship and InnerChange was the only response to the August 1998 RFP.  Prison Fellowship and InnerChange made it clear to in those proposals that they had no intention of providing programming without cost.  The record is unclear about why the Dept. of Corrections initially called for a "non-compensated" program, except possibly to avoid state funding of a religious program.  Whatever the reason, the Dept. of Corrections quickly abandoned the "non-compensated" term of the RFP once it received the proposals from InnerChange and Prison Fellowship.

On March 24, 1999, Prison Fellowship–InnerChange and the Dept. of Corrections entered

into a contract providing for the operation of InnerChange at the Newton Facility.  From the first year

of the contract, beginning in September 1999, until the end of the contract term in June 2002, the

Dept. of Corrections contracted with both Prison Fellowship and InnerChange.  The contract was

renewable annually.  Beginning in July 2002 until the present, the contract parties have been limited to

just the Dept. of Corrections and InnerChange.  In the first year of the program—September 1, 1999

through August 31, 2000—the Dept. of Corrections paid Prison Fellowship–InnerChange up to

$229,950[20] "for non-sectarian costs and expenses of the InnerChange" program.  The money came

from the Telephone Fund.

### C.  *Subsequent Funding of InnerChange*

1.  *Contractual funding.*

In the first year of InnerChange's operation at the Newton Facility, instead of Telephone Fund

money going to pay for items such as library books or recreational equipment, for example, it was

used to pay InnerChange expenses.[21]   Telephone Fund commissions amounting to $294,017 at the

---

[20]  The phrase "up to" takes into account the inexact nature of non-sectarian expenses, e.g.,
copies and phone bills.  The contract amount is the money allocated to be spent on the InnerChange
program by the Iowa legislature.

[21]  The rules promulgated by the Dept. of Corrections state that, based upon written requests
by each warden or superintendent of an institution:

> The director shall advance to the corrections board for approval only
> projects that benefit offenders.  Expenditures may include, but are not limited
> to, projects that provide educational, vocational or recreational services or
> projects, or work or treatment programs for offenders. Expenditures may
> also be used to initiate new programs, services, or projects. Institutions shall
> give spending priority to programs, services, and projects that promote the
> health and welfare of offenders.

Newton Facility were also used to pay for the cost of installing, leasing, and then purchasing Newton

Facility Building M—$56,944 for installation, $175,000 to lease the building for about twenty-one

months (at a rate of $8,357 per month), and $61,576 to purchase Building M at the conclusion of the

lease period in or about February 2002.

The next contract—from September 1, 2000 through June 30, 2001—required the Dept. of

Corrections to pay Prison Fellowship and InnerChange up to $191,625, to be paid from the

Telephone Fund "for approved non-sectarian costs" of the InnerChange program.  The total direct

operating costs for the Iowa InnerChange program were $506,181.  This operating amount does not

include the cost incurred for the Iowa program in the InnerChange national program budget center, nor

the costs incurred for the Iowa program within the Prison Fellowship national office.[22]

The next RFP came three years after the first, in May 2002.  The Dept. of Corrections

publically issued an RFP for a "Values Based Pre-Release Program" to be continued at the Newton

Facility.  InnerChange made the only response, which it made in the same month—May 2002.  In

September 2002, the Dept. of Corrections and InnerChange signed a contract providing for continued

operation of the InnerChange program for the period from July 1, 2002, through June 30, 2003,

renewable for two one-year terms.  That year, the Dept. of Corrections paid InnerChange up to

---

Iowa Admin. Code r. 201-20.20(5).

[22]   The national administrative department of InnerChange supports the entire InnerChange
program delivered in several states, including its sectarian components.  The national administrative
department performs budgeting duties, negotiates contracts with the state, works on security issues
requiring resolution with the state, reviews InnerChange curriculum and policies, and prepares bills to
the state.  In some instances, these costs incurred by the national administrative department of
InnerChange were billed to the state of Iowa.

$191,625 for the "non sectarian portion of [InnerChange's] program costs," again to be taken from the Telephone Fund.  That year, in addition to the Telephone Fund funds, the Iowa legislature also appropriated $172,591 from the Healthy Iowans Tobacco Trust ("Tobacco Trust")[23] to the Dept. of Corrections "for a values-based treatment program at the Newton correctional facility."  This extra amount was paid to InnerChange on or about February 18, 2003, for the expansion of the InnerChange program to the Newton Release Center at the Newton Facility.[24]  The contract provided that the funds were to be spent for "the non-religious aspects" of the program.  In that year, total local InnerChange operating expenses were $603,063, with $495,033 for the in-prison program and

---

[23]  Money comes to the Healthy Iowans Tobacco Trust fund, created in the office of the Iowa State Treasurer, from the master tobacco settlement entered into by most states with tobacco manufacturers.  Iowa law provides:

> Moneys deposited in the healthy Iowans tobacco trust shall be used only in accordance with appropriations from the healthy Iowans tobacco trust for purposes related to health care, substance abuse treatment and enforcement, tobacco use prevention and control, and other purposes related to the needs of children, adults, and families in the state. . . .

> Moneys in the healthy Iowans tobacco trust shall be considered part of the general fund of the state for cash flow purposes only, provided any moneys used for cash flow purposes are returned to the trust by the close of each fiscal year.

Iowa Code § 12.65 (2005).

[24]  After the Dept. of Corrections made the February 2003, $172,591 payment related to InnerChange's expansion to the Newton Correctional Release Center ("Newton Release Center"), InnerChange periodically sent invoices to the Dept. of Corrections, which by July 29, 2005, totaled $172,000, for expenses that InnerChange coded as non-sectarian that were incurred for InnerChange's program at the Newton Release Center in 2003, 2004, and the first half of 2005.  These invoices were for the funds that had already been paid, and InnerChange did not ask for or receive additional payments in connection with these invoices.

$108,030 for the InnerChange aftercare program.  Again, these costs do not reflect InnerChange and Prison Fellowship national expenses related to the Iowa program.

The July 1, 2001, through June 30, 2002, contract also called for up to $191,625 to be spent from the Telephone Fund "for approved non-sectarian costs" of the InnerChange program.  That year the total operating cost for the Iowa InnerChange program was $578,995.  $577,350 of this amount was spent on the in-prison program and $1,645 was spent on the InnerChange aftercare program. Again, the local operating costs do not reflect the national office expenditures of InnerChange and Prison Fellowship related to the Iowa program.

The next year, funding for InnerChange came only from the Tobacco Trust.  For the fiscal year from July 1, 2003 through June 30, 2004, the Iowa legislature appropriated $310,000 from the Tobacco Trust to the Newton Facility for "a values-based treatment program."   Using that appropriated amount, the Dept. of Corrections contracted to pay InnerChange up to $310,000 "for the non-sectarian portion of [InnerChange's] costs" for the same year.  Out of the $310,000, the Dept. of Corrections actually paid $276,909.15 to InnerChange for the program year.  The actual local InnerChange operating expenses during this year were $670,382, with $512,089 for the in-prison program and $158,293 for the InnerChange aftercare program.  Again, national InnerChange and Prison Fellowship costs are not included in these amounts.

In the contract for the next year—July 1, 2004 through June 30, 2005—the financial arrangement changed from a lump sum payment, conditioned on the actual "non-sectarian" expenses incurred, to a per diem arrangement.  The amount appropriated by the Iowa legislature from the Tobacco Trust for a values-based program was the same—$310,000.  However, the contract now

called for a payment from the Dept. of Corrections to InnerChange for "the non-sectarian portion of [InnerChange's] program at the per diem rate of $3.47 for each InnerChange in-prison participant." InnerChange and Prison Fellowship do not bill aftercare services at a per diem rate. These are services provided after an inmate has completed the first two phases of the InnerChange program, which last eighteen months. The aftercare program lasts twelve months. Though a per-diem payment, no physical voucher system is in place at the Newton Facility. That year, the Dept. of Corrections paid $236,532.55 out of the $310,000 appropriation at the per diem rate. The actual local InnerChange operating costs were $687,655, with $507,747 going for the in-prison program and $179,908 for the InnerChange aftercare program.

In April 2005, the Dept. of Corrections again issued an RFP for a "Values Based Pre-Release Program." Also, in 2005, oversight for the RFP process shifted from General Services to the Dept. of Corrections itself. InnerChange submitted its proposal to the Dept. of Corrections on June 8, 2005. As stated above, Emerald, a non-religious rehabilitation services provider, submitted a proposal to the Dept. of Corrections on June 10, 2005. By July 14, 2005, the Dept. of Corrections sent both InnerChange and Emerald its notice of intent to award the contract to InnerChange. As of September 23, 2005, Emerald had not challenged the award.

Warden Mapes took part in evaluating the submissions by InnerChange and Emerald. Mapes was fully aware of the religious nature of the InnerChange program, but his motivation in selecting InnerChange was basic: cost. InnerChange was able to offer a full array of services at a price, $310,000, less than Emerald's bid at just over $562,000, and much less than the approximately $1,000,000 that Warden Mapes and other correctional officials estimate a similar program would cost

the state of Iowa to run.   InnerChange met Mapes' preference for a licensed substance abuse

program.  Mapes' also preferred InnerChange's inmate assessment tool over that used by Emerald.

Mapes' partner in the 2005 RFP submissions evaluation, Jeanette Bucklew, Deputy Director of the

Dept. of Corrections, was not so sanguine about the ability of an inmate to differentiate between the

religious teachings of InnerChange and the universal values contained therein.  Bucklew entered on her

evaluation for the InnerChange program that an inmate interested in joining the InnerChange program

"must adhere to Christian ideology."  Pls.' Ex. 209 at 2 (010912).  Though knowing about the

religious content of InnerChange, Bucklew also recommended InnerChange over Emerald because

InnerChange cost less and offered the required, licensed substance abuse program, and had

established a well-documented mentoring network that Bucklew did not want to see end.  Quite

specifically, Bucklew held it against Emerald that they were a first-time bidder from out-of-state:

"They were from Louisiana.  They didn't demonstrate any resource connections into this state.

Whereas the IFI proposal clearly demonstrated that a large network was already established, already

coming into the institution, and already supporting offenders as they transition back to the community."

Trial Tr. at 1848.   Unlike the early stages in the relationship with InnerChange, no "pre-negotiation"

conversations occurred between state officials and Emerald, and no visits were made to sites where

Emerald provided programming.

In total, the Dept. of Corrections has made direct payments of $1,529,182.70 to

InnerChange.  $843,150 came from the Telephone Fund and $686,032.70 from the Tobacco Fund.

This fiscal year—July 1, 2005 through June 30, 2006—the Iowa legislature again appropriated

$310,000 from the Tobacco Trust to be allocated to the Newton Facility for a values based treatment

program.  At the time of trial, a final copy of the latest Dept. of Corrections–InnerChange contract, with all requisite signatures, was not available, but the same per diem arrangement was included. Norman Cox, the National Director of InnerChange, estimated that the state of Iowa pays thirty-five to forty percent of the cost of operating the Iowa InnerChange program.

As mentioned above, InnerChange is a subsidiary of Prison Fellowship.  The National Director of InnerChange is an employee and a Vice-President of Prison Fellowship.  Prison Fellowship appoints the InnerChange Board of Directors.   Prison Fellowship has final authority over the hiring and firing of all InnerChange staff.  InnerChange employees are also considered employees of Prison Fellowship and receive their checks from Prison Fellowship.  As seen below, InnerChange operating expenses in Iowa are paid with Prison Fellowship funds, a substantial part of which are reimbursed as non-sectarian expenses with state funds.

2. *Sectarian versus non-sectarian funding.*

All of the operating expenses incurred by the InnerChange program in Iowa are initially paid out of a Prison Fellowship account or out of a local "Gelco" expense account in Iowa, composed of money received from Prison Fellowship.  InnerChange initially places payments from state governments into a separate account.  InnerChange's bills are not paid out of that account.  Instead, the funds are periodically transferred from that account to Prison Fellowship, to reimburse Prison Fellowship for the payment of operating expenses of the InnerChange program.  When funds are transferred to Prison Fellowship, they go into Prison Fellowship's general bank accounts—which also contain funds from private sources—not into a separate Prison Fellowship bank account.

According to the Director for Offender Services in the Dept. of Corrections, Lowell Brandt

("Brandt"), who was responsible for the general oversight of the state contract with InnerChange from 1999 to 2004, there was no regular, on-site monitoring of the InnerChange program to make sure state funds were being used only for non-sectarian purposes.  Brandt relied on conversations with InnerChange employees, the contract language itself, and the nature of the billings received by the state to monitor whether funds were improperly used for sectarian costs of the InnerChange program.  Staff salaries based on time devoted to sectarian or non-sectarian activities was based on InnerChange's representations to the state about how each InnerChange employee's time was utilized.   No hour by hour calculation ever occurred, rather "it was more of a general understanding of how the time would be spent."  Trial Tr. at 1307.

Overall, Brandt relied on Newton Facility employees and staff to raise any concerns they might have about funding.  No management-level Dept. of Corrections employee ever received notice from Newton Facility staff with concerns about InnerChange funding.  The Newton Facility Warden has no involvement in overseeing sectarian versus non-sectarian expenses.

By April of 2001, in anticipation of renewing the InnerChange contract, Director Kautzky was not entirely assured that a clear enough distinction between sectarian and non-sectarian funding of the InnerChange program was in place.  In response to a memorandum written by Brandt asking that Dept. of Corrections executives review the annual agreement, Kautzky wrote:  "Please ensure that we resolve definition of non sectarian v. sectarian costs.  Per AG we need a clear definition, base amount, and quarterly payments equal to four installments of the base amounts.   Eliminate any need for DOC quality control over what is or isn't. . . ."  Pls.' Ex. 171.   At trial, Brandt agreed that a precise definition of what could be considered sectarian or non-sectarian was not finally resolved.

InnerChange defined sectarian as "[p]ertaining to the religious aspect of the IFI program" and non-sectarian as "not specifically pertaining to religion or a religious organization." Pls.' Ex. 192 at 1. How these definitions are related to costs is still ambiguous. Warden Mapes testified he did not keep a copy of the contract with InnerChange close at hand and conceded that, though he defined the difference between sectarian and non-sectarian as that between religious and non-religious, "[i]t's a very difficult line." Trial Tr. at 1518. In the end, InnerChange and the Dept. of Corrections did not develop a systematic way of monitoring or assessing what the Dept. of Corrections funded in the InnerChange program. For Warden Mapes, the real bottom line was: "[A]m I getting $310,000 worth of nonreligious programs out of the IFI contract? And my answer to that would be yes, it is my belief I do." Trial Tr. at 1520.

InnerChange bills the state of Iowa only for those portions of the InnerChange program costs and expenses that InnerChange codes or designates as "non-sectarian." InnerChange, on its bills to Iowa, has assigned a "sectarian" percentage and a "non-sectarian" percentage to the time of each of its staff members and, subject to the appropriate limits allowed for each fiscal year, bills the Dept. of Corrections for what InnerChange has designated as the "non-sectarian" percentage. InnerChange staff, however, do not divide class or counseling time into non-sectarian and sectarian portions, and do not record time they believe is sectarian separately from time they believe is non-sectarian. They also do not record time they spend on each individual task, nor create any other records accounting for time in sectarian and non-sectarian categories.

The expense records kept by the local InnerChange Office Administrator as sectarian or non-sectarian are incorporated by Prison Fellowship and InnerChange into quarterly general ledger reports

listing individual expenses into categories.  Each expense category—i.e., materials and supplies,

printing, telephone—is further delineated as a sectarian or non-sectarian expense.   The general

ledgers are used to bill the state of Iowa.  In general, the total shown on a general ledger report for

"non-sectarian" expenses in each expense category is billed to the state of Iowa.

InnerChange has one copy machine in the Newton Facility Building M.  Secular materials and

materials with biblical content—including Bible study curriculum—are copied on this machine.  Some

of the non-sectarian billing to the state of Iowa includes copying costs.  Every copy up and until

40,000 per month is charged to the state of Iowa as non-sectarian.

Each additional copy above 40,000 is coded as sectarian.

InnerChange codes the entirety of its regular monthly land and cell phone bills to the state of

Iowa as non-sectarian.  InnerChange also codes computer repair fees as non-sectarian.  InnerChange

computers are used by InnerChange staff in the InnerChange offices in Newton Facility Building M.

InnerChange bills its payments for computer hardware and software to the state of Iowa as non-

sectarian costs.  InnerChange's single internet account is billed as non-sectarian to the state of Iowa.

Likewise, InnerChange's single postage meter and its thermal postage tape are both coded as non-

sectarian costs to the state.  InnerChange letterhead, envelopes, and standard office supplies (paper,

pens, pencils, ink cartridges, paper clips, staplers, staples, binders, printer toner, copier toner, and

standard envelopes) are coded as non-sectarian and billed to the state.  InnerChange's purchase of

blank videotapes used in its audio equipment is coded non-sectarian.

InnerChange's 2002 brochure, "A Prison Like No Other," was printed and copied completely

through state funding.  Pls.' Ex. 42.  The brochure is an InnerChange volunteer recruiting tool,

provided to church groups and other interested individuals.   Among other things, the brochure

announces:

> You can help!  The power of the Gospel—shared through the living witness
> of committed Christians—will transform criminals *and* change society for the
> better.  Men and women of God who share their faith, their time, and their
> talents with prisoners today will help to restore peace and security in our
> communities tomorrow.

*Id*. Charles Colson adds a personal statement:  "The InnerChange Freedom Initiative is our chance to

demonstrate, in a way secular people will never be able to doubt, that Christ changes lives, and that

changing prisoners from the inside out is the *only* crime-prevention program that really works."  *Id.*

The parties stipulated that the state of Iowa is billed for what InnerChange describes as non-

sectarian aspects of InnerChange employee salaries.  For example, the Assistant Program Director's

salary is billed at 31% non-sectarian and 69% sectarian.   Much of his time is spent on oversight of the

InnerChange Re-entry program and counseling fifty to seventy inmates.  Seventy-seven percent of the

InnerChange Office Administrator's salary is billed to the state of Iowa and is designated as non-

sectarian. The Office Administrator pays the office bills, records expenses, determines coding of

expenses as either "sectarian" or "non-sectarian," deals with volunteers, keeps records, coordinates

events, processes staff time sheets and leave records, and assists InnerChange staff with clerical and

administrative needs.  The work the Administrator does relating to volunteers—processing and

keeping files of applications, maintaining a computer database of volunteer information—relates to all

InnerChange full-time volunteers, including volunteers who present, teach, or lead Bible studies and

Bible-based classes.

Eighty-two percent of InnerChange Local Director Dan Kingery's salary is designated and

billed to the state of Iowa as "non-sectarian." His main duties include oversight of the InnerChange program in Iowa, hiring employees, recruiting inmates for the InnerChange program across the Dept. of Corrections institutions, local budget oversight, and communicating with the Newton Facility Warden, Terry Mapes, about InnerChange issues. Kingery spends about 25% of his time recruiting inmates for the InnerChange program. He personally leads the introductory program at the Newton Facility, as well as at Dept. of Corrections facilities located in Fort Dodge, Iowa, and Clarinda, Iowa. During the introductory program, Kingery uses biblical references and discusses what he considers to be biblical principles. Kingery spends five percent of his time on budget oversight, overseeing coding for sectarian and non-sectarian expenses. Kingery spends another ten percent of his time communicating with Warden Mapes.

Ninety-three percent of the Aftercare Manager's salary is billed to the state of Iowa as non-sectarian. Sixteen percent of each InnerChange Biblical Counselor's salary is billed to the state of Iowa as "non-sectarian." InnerChange Biblical Counselors are referred to as "Case Workers" on the bills. The primary duty of Biblical Counselors is to teach InnerChange classes and provide one-on-one counseling to inmates. The allocation of sectarian and non-sectarian percentages to staff salaries has remained constant since the beginning of the Iowa program. No Dept. of Corrections, Prison Fellowship, or InnerChange employee has ever followed or otherwise scrutinized the current InnerChange staff for even one day to record the amount of time spent on individualized tasks.

As mentioned, trial testimony revealed that a well-defined system for the coding of sectarian versus non-sectarian expenses, other than salaries, at the Newton InnerChange program was not in place. For instance, "Jesus is Lord" and "Psalm 23" key rings—used as InnerChange graduation

gifts—were coded as non-sectarian items.  Religious bookmarks, used as gifts to InnerChange

volunteers and presented at the volunteer banquet, were coded as non-sectarian.  In 2002, three years

after the start of InnerChange in Iowa, the Office Administrator coded as non-sectarian InnerChange's

"Church Copyright License," a license required to copy religious music and songs for use in worship

and other settings.  Though billed as sectarian now, InnerChange billed to the state the cost of its

subscription to *The Upper Room*, a monthly Christian devotional booklet, as late as February 2004.

InnerChange holds a regular appreciation dinner for its volunteers, including those who lead Bible

studies.  These meals are also coded as non-sectarian and billed to the state.  No Dept. of Corrections

employee has ever monitored InnerChange's use of office equipment or office supplies to see to what

extent their use was being allocated as sectarian or non-sectarian.

InnerChange inmates do not have to pay for materials used in InnerChange worship

experiences such as juice, bread, or song books as do Native American inmates for sweat lodge

items, or Jewish inmates for food and items necessary to remain kosher.  InnerChange argues that

supplies for Friday night revivals and Sunday church are not worship supplies like those needed for

Native American or Jewish inmates, but "treatment supplies," required for the InnerChange program.

### D.  *The  InnerChange Program at the Newton Facility*

1.  *Security and physical setting*.

As mentioned, InnerChange operates at the Newton Facility, which is located near Newton,

Iowa,  approximately thirty-five miles east of Des Moines.  The Newton Facility houses nearly 875

inmates in a medium-security setting.  Also located at the Newton Facility is the Newton Release

Center, a minium security facility located one mile away from the main prison facility.  Newton Facility

inmates are classified according to risk assessment, Level One through Level Five.  Level Five, the

highest assessment, represents those inmates with the lowest associated security risks.  Those inmates

with higher classifications enjoy fewer restrictions, generally, than those inmates with lower

classifications.[25]  The Newton Facility is considered to have a relatively well-behaved inmate

population in comparison with other Dept. of Corrections facilities and, as a result, is considered to be

a safe prison environment.  The Newton Facility, opened in 1997, and the Fort Dodge Correctional

Facility ("Ft. Dodge"), opened in 1998, are the two newest prisons in the Dept. of Corrections—the

next newest facility opened in 1982.

---

[25]  These Newton Facility risk assessment levels are different than an inmate's overall custody
score, which is applied across the Dept. of Corrections.  A custody score is a score an inmate receives
based on the type of crime committed before incarceration, and on his behavior.  The custody score is
one criterion considered by the Dept. of Corrections when deciding whether to place an inmate in a
maximum, medium, or minimum security prison.  A custody score of 0–5 signifies that an inmate may be
appropriate for minimum security housing.  A score of 6–10 usually results in medium security housing,
and a score of 11 or above usually indicates an inmate should be placed in a maximum security setting.
What can become confusing is that, when discussing custody score, the risk associated with the inmate
is directly proportionate to his custody score, while the internal Newton Facility risk assessment level is
based on an inverse scale—the higher the Level, the lower the considered risk.  Accordingly, and in
general terms only, a person may have a custody score of 7, but be considered a Newton Facility Level
5—that is, he may be placed in a medium security facility but be considered one of the safest types of
inmates on the Newton Facility campus.  Again, this is a generalized statement.  Placement at the
various Dept. of Corrections institutions is based on a multitude of factors including, but not limited to,
the inmate's preference, proximity to family, and availability of treatment programs.

   In general, inmates cannot be placed in the Newton Facility if they have a custody score greater
than 10, unless a special waiver or exception is made based on exceptional custody considerations.
Likewise, in general, inmates cannot be placed in the Newton Release Center if they have a custody
score greater than 5, unless a special waiver or exception is made based on exceptional custody
considerations.

   At trial, the Court was struck by the high level of professionalism displayed by Dept. of
Corrections personnel, who work extremely hard under difficult budgetary constraints to provide not
just a punitive environment, but a truly rehabilitative atmosphere conducive to lowering recidivism and
rehabilitating the inmates in their care.

The Newton Facility's five living units are lettered A, B, C, D, and E.  Unit A is a "lockdown" unit used to house inmates in disciplinary detention, administrative segregation, or protective custody.  Unit A is the most restrictive of the five units.  Unit B is a close management unit that houses inmates who are classified as Level Two, Level Three Restricted, Level Four, Protective Custody, Federal Detainees, SafeKeepers (sex offenders awaiting civil commitment trials), and Polk County, Iowa, parole or probation violators.  Unit B is also used as an intermediate, general processing unit for inmates being transferred or placed in the general population.  Unit B inmates enjoy fewer restrictions than those housed in Unit A, but are more restricted than inmates housed in Units C, D, or E.  Units C and D are used to house general population ("GP") inmates.  GP inmates are generally classified at Level Four or Five.  Units C, D, and E each have the same capacity—each of the units has the same number of two-man cells and the same number of three-man cells.  There are no one-man cells.  Each unit can house approximately 242 inmates.  The InnerChange program is housed in Unit E.

Building M on the Newton Facility campus is a 4,608 square foot modular building used only by InnerChange.  It contains InnerChange offices, classrooms, a computer room, a library, and a multi-purpose room.  The multi-purpose room is used by InnerChange inmates to practice music, including Christian music for InnerChange events such as Friday night revivals.  The Newton Facility Building M was built pursuant to a Dept. of Corrections contract with Prison Fellowship and InnerChange for InnerChange's programming needs.  Building M will remain the property of the Dept. of Corrections if InnerChange ceases to provide treatment programming.  The Dept. of Corrections provides the electricity and water for Building M, including utilities used for heating and cooling.  The electricity and water costs are paid through the state of Iowa general fund as a regular part of prison

costs.  The Dept. of Corrections provides maintenance for Building M, performed by Dept. of

Corrections employees.  The Dept. of Corrections provides the furniture for InnerChange offices, as

well as tables and chairs for InnerChange events.  Some InnerChange inmates are given regular, paid

prison jobs to provide services to InnerChange, such as assisting InnerChange staff with clerical

support.

Building H on the Newton Facility campus is a large, central structure, which serves the entire

Newton Facility prison population and staff.  The Newton Facility Building H contains the prison

chapel, health services, gymnasium, classrooms, laundry services, dietary, maintenance, library, and

other Newton Facility offices.  InnerChange holds its community meetings, revivals, church services,

and graduations in the Newton Facility gymnasium located in Building H.  Often for its revivals and

graduations, and sometimes for community meetings, InnerChange brings electronic music equipment

into the gymnasium for musical performances.  There are security cameras at the Newton Facility in

the living units, inmate day areas, the yard, and parts of Building H.  There are no security cameras in

Building M or in the classrooms used by GP inmates in Building H.

In 2003, the InnerChange program extended to the Newton Release Center, located just a

mile away from the main Newton Facility campus.  The Newton Release Center has five living units

identified as Dorms 1, 2, 3, 4, and 5.  Inmates at the Newton Release Center enrolled in InnerChange

are principally housed in Dorm 3.  Dorms 3, 4, and 5 are in the new addition to the Newton Release

Center, while Dorms 1 and 2 are located in the older section.  Dorms 1 and 2 do not have air

conditioning, while Dorms 3, 4, and 5 have air conditioning.  The shower facilities in Dorms 3, 4, and

5 have dividers between the showers and opaque shower curtains.  The showers in Dorms 1 and 2

are simply set up side by side, without dividers, in an open shower area.  The beds in Dorms 1 and 2

are arranged army-barracks style, with no dividers between them other than an approximately four-

foot high dividing wall that extends down the middle of each dorm.  Dorms 3, 4, and 5 have true (full

height), concrete dividing walls that extend from the main walls and divide some of the bunks in those

dorms into groupings of four.

Before the advent of InnerChange, Unit E was formally and informally referenced by inmates

and staff alike as the prison's "honor unit," and was used to house those inmates awarded with the

highest security or privilege levels associated with low risk behavior.  Unit E inmates were those

inmates who stayed out of trouble, garnered no reports, and worked in full-time jobs.   One Newton

Facility inmate characterized Unit E as a place where one could be surrounded by like-minded inmates

and that, overall, it was less of a madhouse than other living units.  In fact, all Newton Facility inmates

classified at Level 5 (the highest classification level at the Newton Facility) were placed in Unit E.  Unit

E, along with Newton Facility Building M, also contains some InnerChange staff offices. When

InnerChange moved into Unit E, inmates already residing there were moved to other GP living units if

they did not join the InnerChange program.

The cells in Units C, D, and E are all two-man or three-man cells.  The toilets and sinks in all

Newton Facility cells other than Unit E cells are located in the cells, themselves, and no door, partition,

curtain, or other divider separates a toilet in a non-Unit E cell from the rest of the cell.  The cells in Unit

E are called "dry cells," meaning that toilet and sink facilities are not in the cells, but are in separate

community bathrooms.  The toilet stalls in the Unit E community bathrooms are separated by dividers

and have doors with sliding locks.   The sinks and toilets in the community bathrooms in Unit E are

made of porcelain, whereas the sinks and toilets in Units A, B, C, and D (the non-Unit E cells) are constructed out of stainless steel, with the toilet connected directly to the sink pedestal to form one structure.

The dimensions of the cells in Units C, D, and E are identical. The lack of toilet and sink facilities, however, results in a larger aggregate space in Unit E cells. Inmates living in Newton Facility units other than Unit E are not given keys to their cell doors, and the locks on their cell doors are controlled by correctional officers through a remote locking system. The wooden cell doors in Unit E do not have food slots as do the steel cell doors used in Units A, B, C, and D. The wooden Unit E cell doors have knobs that can be turned, while the cell doors in Units B, C, and D have fixed handles that cannot be turned.

Normally, inmates who are transferred to the Newton Facility for a reason other than to participate in InnerChange are initially placed in Unit B of the Newton Facility. Inmates transferred to the Newton Facility in order to participate in InnerChange, however, are placed directly in Unit E. Some inmates who have graduated from the in-prison component of InnerChange are allowed to continue living in Unit E for some time after they graduate.

The Dept. of Corrections provides necessary inmate transportation between correctional facilities for the InnerChange program, as it does for any Dept. of Corrections inmate participating in non-InnerChange treatment programs. The Dept. of Corrections also provides the necessary correctional staff, food, clothing, and medical care for InnerChange inmates. The Dept. of Corrections further supplies a sufficient number of academic teachers and air-conditioned classrooms to ensure that all InnerChange inmates have the opportunity to obtain their high school equivalency diploma,

commonly known as the General Equivalency Diploma ("GED"), prior to their release from the in-prison phases of the program.

2. *Inmate Orientation and Introduction.*

Inmates are not required to participate in the InnerChange program.  However, inmates who do take part in InnerChange must be willing to productively participate in a program that is Christian-based.  The admission requirements imposed by InnerChange are that an inmate wants to be in the program and expresses a desire to change.  InnerChange's stated policy is that it does not require inmates "to accept Jesus Christ as their Savior."  Inmates are formally made aware of InnerChange expectations during the Introduction program.  Each inmate who testified at trial explicitly stated that no one from the Dept. of Corrections or InnerChange threatened to punish them, take away their privileges, or otherwise pressure them if they did not join InnerChange.  Likewise, none of these inmates stated they were promised a reduced sentence or an earlier parole for their participation.[26]

---

[26]  Each potential InnerChange candidate is handed a consent form explaining the voluntary nature of the program.  In order to enter InnerChange, an inmate must sign the consent form, called the Participation & Release of Information Form, that states, in relevant part:

> I, the above mentioned member of the InnerChange Freedom Initiative agree to voluntarily participate in the Values Bases Pre-Release Program (the "Program") conduct [sic] by Prison Fellowship Ministries at the  Newton, Iowa [sic] .
> I understand the following:
> •     That my decision to participate in the Program is of my own free will;
> •     That my decision to participate in the Program will not affect my consideration for parole;
> •     That my good time will not be increased because I participated in the Program;
> •     That the Program contains religious content and is based upon Christian values and principles;

When a Dept. of Corrections inmate becomes eligible for the InnerChange program, that inmate is not

provided information about other available Dept. of Corrections classes and treatment programs

taught from a non-sectarian perspective.

The InnerChange Introduction program is designed to give a detailed overview of the

InnerChange program.  It is held periodically at the various institutions throughout the Dept. of

Corrections.  The Dept. of Corrections posts notices in inmate living units, and at its inmate intake

facility at the Iowa Medical and Classification Center ("IMCC") in Oakdale, Iowa, informing inmates

that InnerChange will conduct recruiting presentations or interviews.  Inmates are allowed to attend the

Introduction program when it is presented at the institution where they are incarcerated.[27]  During the

---

- • That I do not have to be of the Christian faith to participate in the Program;
- • That I will be assigned inmate work as well as treatment;
- • That my activities and schedule will be different from those to which I have been accustomed . . .
- • That I can discontinue my participation in the Program.  I also understand that Prison Fellowship Ministries has the right to dismiss me from the Program if it so chooses.
- • That I will not be penalized in any way if I withdraw from the Program.

The form then provides spaces for the signed and printed name of the inmate, his Dept. of Corrections number, a witness signature, and the date.  *See, e.g.*, Defs.' Ex. Gilbert 1.

[27]

Inmates in the following Iowa prisons are eligible to enroll in InnerChange: Fort Dodge Correctional Facility ("Ft. Dodge") in Fort Dodge, Iowa; the Mt. Pleasant Correctional Facility ("Mt. Pleasant") in Mt. Pleasant, Iowa; the Clarinda Correctional Facility ("Clarinda") in Clarinda, Iowa; the North Central Correctional Facility ("NCCF") in Rockwell City, Iowa; the Iowa State Penitentiary ("ISP"), the John Bennett Correctional Facility ("John Bennett"), Farm 1 and Farm 3 in Fort Madison, Iowa; the Iowa Medical and Classification Center ("IMCC") in Oakdale, Iowa; the Anamosa State Penitentiary ("Anamosa") in Anamosa, Iowa; Luster Heights in Harpers Ferry, Iowa; and the Newton Facility and Newton Release Center in Newton, Iowa.

Introduction program, inmates considering enrolling in InnerChange are told that InnerChange is a

faith-based program taught from a Christian-based perspective.  The InnerChange Field Guide is

made available to inmates who are considering enrolling in InnerChange.  As of October 2003, the

waiting list for InnerChange was 146 inmates, that is, about 146 inmates had completed the

InnerChange Introduction and were eligible to enroll in the main portion of the program, starting with

Phase I, but were waiting for spaces to become available.  As of July 31, 2005, 977 Iowa inmates had

enrolled in the InnerChange program.  Pls.' Ex. 383 at 00284.  Of those, 231 were removed or

withdrew from the in-prison phases of the program.

Following the Introduction program, prospective InnerChange inmates participate in the four-

week long Orientation program, which is held in Newton Facility Unit E.  When inmates residing at

prisons other than the Newton Facility are approved for entry into InnerChange, they are transferred

to the Newton Facility for the purposes of participating in the InnerChange program.  As of November

2003, of 238 inmates at the Newton Facility participating in InnerChange, 76 were transferred from

Ft. Dodge, 56 were transferred from Oakdale, 51 were transferred from Clarinda, 36 were already

incarcerated at the Newton Facility, fourteen were transferred from Anamosa, four were transferred

from Ft. Madison, and one inmate was transferred from Rockwell City.  Again, inmates must request

transfer and can only be transferred at the discretion of Dept. of Corrections officials—inmates are

transferred as a matter of privilege, not right.

The Orientation program is designed to give the candidates more knowledge about the

InnerChange program so they can decide whether to enter the main InnerChange program, and to

allow InnerChange staff to assess the candidates and make sure that the candidates are able to meet

the minimum behavioral requirements for the program.  The admission requirements imposed by the

Dept. of Corrections are that the offender must express a commitment to complete the InnerChange

program, meet the criteria for medium or minimum custody, and must be suitable for housing in multi-

person dry cells.  However, testimony revealed that inmates in maximum security facilities with

attendant high custody scores, who otherwise would not be allowed into the Newton Facility, were

able to participate in the InnerChange program based in Unit E.  Evidence also shows that inmates

with custody scores that would otherwise keep them from being allowed into other treatment

programs, were allowed to participate in InnerChange.[28]  Inmates who are recommended to take the

Sexual Offender Treatment Program ("SOTP"), however, may be required to complete that program

before participating in InnerChange, even though they meet all other entrance requirements.  Despite

these requirements, inmates with a considerable length of time left on their sentences, including those

serving life sentences, may be eligible for InnerChange.  In fact, inmates serving life sentences have

been enrolled in InnerChange.

The Orientation includes, among other things, evening Bible study classes led by InnerChange

peer facilitators.  Upon completion of the Orientation, and in order to proceed into the InnerChange

main program, all InnerChange inmates are required to sign a document entitled "Accountability

Covenant."  Pls.' Ex. 85.  The signatory of the Accountability Covenant agrees to, among other things:

> [U]nderstand that the principles in Matthew 18:12-35 will be applied in my

---

[28]  Custody scores are one factor used to determine whether an inmate is allowed to participate in a treatment program.  Corrections personnel, in their discretion, may allow an inmate with a high custody score to participate in a program simply to give that inmate a chance to succeed.  This appeared to be the case for several inmates allowed into InnerChange.

life within the IFI community.

Those principles are

1. Error leads us to danger (vs. 12)
2. The heart of correction is to restore (vs. 13, 14)
3. It is the responsibility for those involved to reconcile on an interpersonal level (vs. 15)
4. Peer mediation is to be utilized if necessary (vs. 16)
5. Removal from the community is a last resort (vs. 17)
6. Conflict resolution builds a stronger community (vs. 18-20)
7. Interpersonal forgiveness of others is a condition of personal forgiveness from God. (vs. 21-35)

*Id.* This document is also an example of the all-pervasive use of the biblical text, primarily that portion of the text that Christians refer to as the New Testament, when InnerChange leaders wish to underscore or explain almost any facet of the InnerChange program's policies, principles, or instructions.

InnerChange makes clear to any Dept. of Corrections inmate contemplating becoming an InnerChange member that the InnerChange program is not for everyone, even those who otherwise meet Dept. of Corrections and InnerChange criteria. The "Closing Comments" section of the InnerChange Field Guide orientation material makes this plain:

When prisoners are screened for IFI, there is no discrimination based on ethnicity, race or religion. In other words, IFI does not choose or refuse prisoners based on their race or religion. Suppose you are not a Christian, or you are a person of another faith, such as a Jew or a Muslim.[29] You are still

---

[29] The InnerChange claim that it is inclusive of, at least, all other Christian faiths has not always been so clearly defined. In an earlier Field Guide edition, a "What is IFI Like" section, written from the first-person perspective of a fictionalized InnerChange inmate, discusses the requirement that every InnerChange inmate must attend Sunday morning worship services. Yet, the author assures those of a "*different religion* . . . like Catholic and Muslim" that they may be allowed to attend separate worship

considered for IFI on an equal basis with those who are Christians.  If you are of a religion other than Christianity, you may have special requests that relate to that religion.  Those are handled according to [I]DOC policies and procedures.  We will try to grant those requests.  But they will not be granted if they keep you from fully taking part in the IFI program or if they prevent you from meeting every program requirement.  Suppose you see that you cannot fully practice your religion in IFI, then you may choose not to join the program.  These decisions should be made before you join IFI.

Pls.' Ex. 73 at 9.

In the Introductory and Orientation sessions to InnerChange, inmates are introduced to the six main values contained throughout the InnerChange curriculum:

> #   Integrity – being honest with yourself and others, doing the right thing whether or not people are watching
> #   Restoration – repairing broken relationships
> #   Responsibility – doing what is expected, being accountable, accepting the consequences of failure without blaming others
> #   Fellowship – working together with others to build community, bearing each other's burdens
> #   Affirmation – giving honest encouragement to others, bringing out the best in others
> #   Productivity – making important contributions, stewarding time and other resources well

Pls.' Ex. 73 at 2.  Throughout trial, every non-Evangelical Christian inmate witness conceded that these six values contained in the InnerChange curriculum were universal in nature and included in their respective faiths.  So, the Defendants argue, really anyone—irrespective of faith—could join InnerChange, participate in its Christian worship services, devotionals, community meetings, classes, and revivals for eighteen months and glean from those experiences the universal values all religions share.  However,  virtually none of the inmate witness who experienced InnerChange, when asked

experiences.  Pls.' Ex. 74 at 18 (emphasis added).

simply the open-ended question of what they were taught in InnerChange, mentioned these universal or

civic principles.  Rather, each spoke in overt religious and biblical language about the nature of the

curriculum.  The inmates' responses were not surprising given InnerChange's own understanding that

these principles, in practice, are couched in Evangelical Christian theological language.  Again, the

InnerChange White Paper is instructive about the approach InnerChange takes at the Newton Facility:

> Biblical principles are integrated into the entire course curriculum of IFI,
> rather than compartmentalized in specific classes.  In other words, the
> application of Biblical principles is not an agenda item—it is the agenda.  IFI
> is a Christian community, where all members, staff, and volunteers seek to be
> Christ-like in their honesty, humility, and unconditional love for each other.
> Prisoners are taught Biblical principles in the context of teachable moments.
> Throughout each day they are provided time for reflection and meditation in
> order to integrate those principles in their lives.  The IFI community serves as
> the crucible for learning and testing Biblical principles. To facilitate this,
> Biblical principles and core values are prominently displayed throughout the
> facility and promoted through memorization.  Though there are many
> important Biblical values to learn, IFI highlights several that are normally
> deficient in an offender's life.  Those values are italicized and described
> below.

> *Integrity, Truth*.  By the use of the Bible verses, the inmate is encouraged
> to reflect and discuss their meaning.  Members are taught to reflect on the
> consistency of their actions, words, and beliefs and match how they relate to
> the Bible.  The *integrity* of members is central to the success of this prison
> community.  For instance[:]  *"Who may dwell in your holy hill? He who
> walks uprightly, and works righteousness, who speaks the truth in his
> tent."* (Ps. 15:102).  *"Do not lie to each other, since you have taken off
> your old self with its practices and have put on the new self, which is
> being renewed in knowledge in the image of its Creator"* (Col. 3:9-10)

> *Fellowship* is another Biblical value the program focuses on.  It is rooted in
> Jesus' example of unconditional love for His friends and enemies as
> evidenced in His actions.  This enables them to create similar relationships
> within the church when they leave prison.  The Bible is permeated with
> references to the importance of unconditional love and community.  For
> instance: *"Let us consider one another in order to stir up love and good*

*works"* (Heb. 10:24).   *"Exhort one another daily while it is called 'today' lest any of you be hardened through the deceitfulness of sin"* (Heb. 3:13).   *"[T]herefore if there is any consolation in Christ, in any comfort of love, if any fellowship of the Spirit, if any affection and mercy, fulfill my joy by being like-minded, having the same love, being of one accord, of one mind"* (Philippians 2:1-2).   *"But if we walk in the light as He is in the light, we have fellowship with one another, and the blood of Jesus Christ His Son cleanses us from all sin"* (1 John 1:7).

**Affirmation** is a value in both InnerChange and therapeutic models. However, affirmation within the IFI model is defined as God's affirmation of us rather than man's affirmation.  Prisoners learn that it is important to affirm and encourage each other consistent with God's principles.  Some inmates have never experienced affirmation given by another person and do not know what it means to be valued.  Others have been affirmed for the wrong attitudes or behaviors.  In other words, when affirming another it must be consistent with Biblical standards.  For instance: *"Not he who commends himself is approved, but whom the Lord commends"* (2 Cor. 10:18).   *"Let each examine his own work, and then he will have rejoicing in himself alone, and not in another"* (Gal. 6:4).   *"It is a very small thing that I be judged by you . . . He who judges me is the Lord"* (1 Cor. 4:3-4).   *"My soul waits silently for God above.  My expectation is from Him"* (Ps. 62:5).

**Responsibility and Restoration** are critical values of the IFI program.  In IFI there is heavy emphasis on taking responsibility for our choices, both past and present.  In IFI, members are taught to be accountable for their actions and take responsibility for initiating acts of healing and reconciliation with those they have alienated and hurt.  In this way they are restored to their Creator, families, and communities.  These verses illustrate the point: *"We must all appear before the judgment seat of Christ that each one may receive the things done in the body, according to what he has done whether good or bad"* ( 2 Cor. 5:10).   *"Let the wicked forsake his way; and the unrighteous man his thoughts; and let him return to the Lord; and He will have compassion on him and to our God, but not according to knowledge.  For they being ignorant of God's righteousness, and seeking to establish their own righteousness, have not submitted to the righteousness of God"* (Romans 10:2-3).   *"[A]nd be found in Him, not having my own righteousness, which is from the law, but that which is through faith in Christ, the righteousness which is from God by faith; that I may know Him and the power of His resurrection, and the*

*fellowship of His sufferings, being conformed to His death,"* (Philippians 3:9-10).

**Productivity** is an important value anchored in Biblical principles, and one that most inmates lack.  In IFI, productivity is defined as the effective use of one's time in line with God's principles.  Ephesians 5:16 states, *"redeeming the time, because the days are evil."*  In this context, prisoners are taught to be good stewards of their time, investing in priorities that are in line with God's will.  IFI trains prisoners to engage in productive work, so that they may become productive contributing members of their community after their release.  The Bible instructs us:  *"[B]ecause of laziness the building decays and through idleness of hands the house leaks"* (Ecc. 10:18), and *"whatever you do in word or deed, do all in the name of the Lord Jesus"* (Col. 3:17).  *"And whatever you do, do it heartily, as to the Lord and not to men"* (Col. 3:23).  Also, see these other references:  Eph. 6:5-7; Mark 10:45; 1 Thess. 3:10.

Pls.' Ex. 35 at 4–5.

While these universal, civic values can logically be separated from the biblical context in which they are presented, the intensive, indoctrinating Christian language and practice that makes up the InnerChange program effectively precludes non-Evangelical Christian inmates from participating.[30]

---

[30] The Introduction Workbook, used at the other Dept. of Corrections institutions during the introductory period, is another example of the transformational theory at work through the mixing of the six civil values and Evangelical Christianity.  The value of transformation is set within the context of the biblical story of Saul's conversion on the road to Damascus.  Pls.' Ex. 75 at 11.  Integrity is taught using the biblical story of Joseph found in Genesis.  *Id.* at 14.  Restoration is taught using the biblical story of Zacheaus being approached by Jesus; the lesson contains these typical InnerChange questions: 1) Jesus came to look for and save the lost.  (write true or false on the line); 2) If we follow Jesus, we will try to make things right with those we have wronged.  (write true or false on the line)."  *Id.* at 17–18.  Responsibility is taught using the biblical story of the Good Samaritan and, among other questions, the material asks:  "If we obey Jesus and love God, we will love others. (write true or false on the line)."  *Id.* at 21.  The section on the concept of community building is taught through the story of Jesus inviting others to be his disciples, and includes this question:  "Jesus prayed all night before He chose His 12 apostles.  What can this teach us? (write true or false on the lines.)  a. We should pray a lot before we make a big decision.  b.  We should pray about what part we should take in the InnerChange Freedom Initiative.  c.  We should pray only if we feel like it and have the time."  *Id.* at

Plaintiff-inmate Jerry Dean Ashburn ("Ashburn"), a self-described Reorganized Latter Day Saint, testified that, based on the reading of some of InnerChange's materials, he would not be comfortable joining the program. Plaintiff-inmate Bilal Shukr (a.k.a. Bobby Shelton) ("Shukr"), a Sunni Muslim, also read portions of the InnerChange curriculum and visited with the ISP chaplain to investigate whether InnerChange would be appropriate for him. The chaplain, a Dept. of Corrections employee, informed Shukr that the curriculum was strictly Christian-based and there were no opportunities for interfaith study in the program because there was no interfaith curriculum. Shukr testified that, as a Muslim, the teaching of the Bible was very important. What he could not countenance, as a Muslim, was that he would be in groups in which prayers would be offered to Jesus Christ as a deity, as God's son—something the strictly monotheistic religion of Islam would abhor. Shukr put it this way:

> [T]here was no possibility for me, as a Sunni Muslim, to partake in that
> program without desecrating my faith, without me blaspheming God. We
> believe there's only one God, and he doesn't have any sons or daughters or
> partners. He's the supreme ruler over all mankind, and we are all brothers
> and sisters under one God. For me to embrace any type of curriculum
> contrary to that, I would be desecrating my faith.

Trial Tr. at 163. There are no similar community-based programs like InnerChange based on an Islamic model. For instance, while the Dept. of Corrections allows individual Muslim inmates to observe aspects of the holy season of Ramadan, there are no communal observations of Ramadan. This fact, along with his other post-9/11 experiences of racial prejudice, Shukr testified, "just added

---

24–25. Affirmation is introduced through the story of the woman at the well contained in John's Gospel. *Id.* at 27. Productivity is explored through the story of Nehemiah contained in the biblical book by the same name. *Id.* at 31. The Introduction Workbook concludes with a bible study in six lessons: Do You Know Jesus Personally?; Salvation; Answered Prayer; Victory; Forgiveness; and Guidance.

fuel to the fire, mak[ing] it appear as though the state of Iowa has a partiality toward Christian-based programs, and not faiths of different sorts." Trial Tr. at 166. Inmate Troy Dewayne Redd ("Redd"), also a Sunni Muslim, keeps his faith through praying five times a day, making regular fasts, and attending Friday evening prayer service. For Redd, the act of joining InnerChange would be blasphemy—to do so a person "would have committed a sin against Allah, God." Trial Tr. at 292. InnerChange's own materials cast aspersions on non-Evangelical Christian faith groups.[31] The Court found very credible Kevin Watson's testimony when he stated that, as a member of the Nation of Islam, he could not join InnerChange without compromising his faith. Indeed, Watson's Dept. of Corrections counselor informed Watson that InnerChange would probably not be for him.[32]

Likewise, Dept. of Corrections inmate Glendale More, Jr. ("More"), a member of the Lubavitch Jewish faith, practices his faith by not shaving his beard, wearing a yarmulke (although not yet allowed at the Newton Facility), performing mitzvahs, and staying kosher during high holy days (he

---

[31] For example, in the InnerChange class entitled Spiritual Freedom, InnerChange inmates read *Bondage Breaker*, a text authored by Neil T. Anderson. The author states that "[t]he first step toward experiencing your freedom in Christ is to renounce (verbally reject) all past or present involvement with occult practices, cult teachings, and rituals, as well as non-Christian religions." *Bondage Breaker* at 201. In the book, InnerChange inmates are invited to renounce, among other things, "Superstitions," "Mormonism," "Jehovah's Witness," "New Age," "Christian Science," "Church of Scientology," "Unitarianism/Universalism," "Hare Krishna," "Native American spirit worship," "Islam," "Hinduism," "Buddhism (including Zen)," "Black Muslim," "and any other non-Christian religions or cults." *Id*. at 202–03.

[32] Watson, serving a fifty-year sentence for sexual abuse, was not close enough to his release date to qualify him for participation in treatment classes, including a parenting class in which he expressed interest. He learned, correctly, that InnerChange is available—including its parenting classes—to inmates regardless of their release date if they meet the other Dept. of Corrections and InnerChange requirements for entry.

pays for all his own kosher meals), praying, and staying in contact with his rabbis.  To join a group praying to and worshiping Jesus Christ, as required by InnerChange, would violate his religious faith. The Court found credible the testimony of witnesses who stated that non-religious persons were often characterized by InnerChange staff as "unsaved," "lost," "pagan," those "who served the flesh," "of Satan," "sinful," and "of darkness."  Native American inmates who enroll in InnerChange face obstacles as well.  Benjamin Burens, a Native American Dept. of Corrections inmate, characterized his religious life as living the sweat lodge ways everyday.  He does not believe Jesus Christ is God and does not use the Bible.  Like many Native American prisoners, Burens participates in the sweat lodge ceremony on a regular basis.  The costs of the sweat lodge materials—rocks, wood, etc.—are paid by those inmates who participate.  While InnerChange has provided permission to the few Native American participants in the program to practice the sweat lodge ceremony, InnerChange makes clear that a non-Christian religious observance is not considered part of the InnerChange treatment program and may only be done at InnerChange's discretion.   The Court found credible Burens' testimony that, during one-on-one sessions with an InnerChange teacher, Burens was asked whether he was saved, whether he was a Christian, and whether he believed in Jesus.  Trial Tr. at 758–59.  Burens was also asked "what was I doing going out there to the sweat lodge ceremony."  *Id.*  at 759.  Burens was told the sweat lodge ceremony was basically a form of witchcraft, against the Bible, sorcery, and worship of false idols.  The InnerChange Field Guide in use during the time Burens was in the program stated:  "As you are transformed into the image of Christ, you have more and more integrity."  Pls.' Ex. 74.  Not surprisingly, Burens did not last in the InnerChange program.  The listed reasons for Burens' expulsion from InnerChange were that, because Burens received a visitor on a Friday, he missed a Friday revival

by twenty minutes; that Burens was not growing spiritually; and that he did not "step up" in the

community meetings, i.e., he did not fully participate in the services, instead remaining seated while

others shows their involvement by singing songs, standing, and raising hands.  Trial Tr. at 762–63.

    3.   *Daily life in InnerChange.*

The InnerChange program is divided into four phases.  The first phase ("Phase I"), is twelve

months long.  The second ("Phase II") is six months in length, and immediately follows Phase I.  An

InnerChange inmate's schedule is determined by the InnerChange program and curriculum.  During the

first eighteen months of the InnerChange program (Phases I and II), participant inmates receive

biblically-based instruction for approximately four hours per day.  In addition, community meetings and

devotionals take up approximately one hour and twenty minutes per day.  Revivals are held on Friday

nights in the gymnasium located, as mentioned above, in Newton Facility building H.  Worship services

are held on Sunday mornings.  The worship services are usually led by InnerChange staff and are also

held in the Newton Facility gymnasium.  InnerChange inmates have access to electric musical

instruments that, according to InnerChange policy, are used for programming purposes only.

When they join, each InnerChange inmate is given a t-shirt with an InnerChange logo.  Non-

InnerChange inmates at the Newton Facility are not allowed to wear clothing that has any kind of

emblem or logo other than the brand name emblem.  The general rule at the Newton Facility is that GP

inmates are not allowed to have more than ten books in their cells at any one time, and religious books

count toward this limit.  Books provided by treatment programs to inmates, including InnerChange, are

considered to be treatment program materials and do not count against the ten-book limit.

InnerChange inmates enjoy a less restrictive security environment, largely the result of  living in a

former honor unit.  Some benefits are more individualized and can occur in the context of the intimate

relationships InnerChange members develop with InnerChange staff.  For example, Michael Bauer

testified he was able to listen to a streaming audio broadcast of a baseball game involving his favorite

team.  Other InnerChange inmates have been able to make telephone calls otherwise not allowed by

the strict Dept. of Corrections policies governing inmate phone use.  The Defendants presented

evidence that whenever Newton Facility personnel were made aware of loose application of Newton

Facility rules by InnerChange staff, corrections were immediately made.  Nevertheless, the lack of

security cameras and Newton Facility corrections officers in Building M, and the intimate community

created by the InnerChange program, create an atmosphere in which InnerChange inmates receive less

restrictive supervision than other GP inmates at the Newton Facility.

A typical InnerChange inmate in Phase I of the program begins his day with an optional

devotional time at 5:30 a.m.  A required small group devotional time begins at 6:00 a.m. and is

scheduled for thirty minutes.  Usually devotional time consists of four to five inmates gathering for

prayer and reading of Christian scriptures.  In most cases, one member of the group actually stands in

front of the others, reads scripture out loud, and prays.  The form of devotionals takes no required,

predetermined structure.  Breakfast is at 6:30 a.m., followed by an hour of free time at 7:00 a.m.  After

breakfast, classes convene from 8:00 a.m. to 10:00 a.m.  A unit count occurs at 11:00 a.m.  Lunch is at

11:30 a.m.

Afternoon classes resume at 12:30 p.m. and last another two hours, followed by a break period

at 2:30 p.m.  A community meeting occurs every weekday at 3:00 p.m., and lasts about forty-five

minutes to one hour in length.  Community meetings sometimes start with a prayer and usually end with

a prayer.  At community meetings, InnerChange inmates pray, make prayer requests (through which inmates ask that someone's problem or something else be prayed for and the whole group prays for it), sing religious songs, play contemporary praise-and-worship type music, read from the Bible (including things such as birthday cards containing Bible verses), and give a daily devotional message. InnerChange inmates are assigned, on a calendar basis, to prepare a devotional statement to share at community gatherings as well as being assigned to lead a community meeting in prayer.  Another unit count is taken at 4:30 p.m.   Supper is scheduled for 5:00 p.m., followed by more free time at 5:30 p.m.  Evening curriculum classes convene again from 6:00 p.m. to 8:00 p.m.  Another period of free time comes at 8:15 p.m. with a final unit count scheduled for 9:00 p.m.  Sunday mornings from 8:30 a.m. to 9:45 a.m. are reserved for required church attendance.

Each Friday evening, revivals are held in the gymnasium in Building H from 6:30 p.m. to 8:15 p.m.  The revivals are essentially another worship service, but are led by volunteer church groups that tend to fall within the Evangelical Christian camp.  Testimony revealed only one instance of a group of non-Evangelical Christians being in charge of leading the Friday night revival.  InnerChange inmates are required to bring their InnerChange-provided Bible to each Friday night revival.  Revival meetings are essentially free-form church services that begin with opening songs sung by the group or by leaders, followed by a sermon based on Christian themes, followed by more Christian songs.  The volunteer church groups are not coordinated through the Newton Facility chaplain, but through InnerChange offices.

The purpose of these revivals is to, among other things, "proclaim and worship Jesus," "present Christ to InnerChange members and members of the general prison population," and "pray for and

minister to the InnerChange members and members of the general prison population." Pls.' Ex. 71 at

1. Revivals also present another opportunity for InnerChange inmates to entertain visitors outside the

regular Newton Facility visiting policy. Since the services are led by local church volunteers,

InnerChange inmates look forward to Friday evenings as planned social events. These events are

meant to help InnerChange inmates look for possible post-release church communities they can attend,

while also providing a pro-social environment.

Former and current InnerChange inmates testified to a highly structured, busy environment as a

key component of the InnerChange unit-based model. The same schedule in Phase I continues

unabated into Phase II, except the two-hour morning class period is replaced with either work duty or

school. Also in Phase II of the program, inmates are assigned a mentor. A mentor is an InnerChange

volunteer who comes to the Newton Facility once a week and meets with the assigned InnerChange

inmate. InnerChange characterizes these mentors as a "friend and a guide supporting you in living the

Christian life through the rest of your incarceration and for up to one year after your release." Field

Guide (Pls.' Ex. 73 at 7). Phase II also begins the process of turning toward an inmate's post-release

needs. Inmates in Phase II meet with InnerChange counselors who help inmates with housing,

employment, and finding a "welcoming church." *Id.*

Each day in InnerChange usually brings homework assignments. This includes memorizing

significant portions of Christian scripture contained in what are commonly referred to as the Old and

New Testaments, as well as answering theological questions. InnerChange classes in Phase I take

place in Building M and Unit E, while some Phase II classes may also be held in the Newton Release

Center. Some videotapes shown in InnerChange classes encourage inmates to pray. InnerChange

-68-

inmates are given tests on Bible verses and biblical themes periodically, many of which are graded.

Inmates are required to attend all components of the InnerChange program in order to remain in InnerChange. Each component—classes, devotionals, community meetings, group sessions, worship services—are treated like any other Dept. of Corrections secular treatment program component. In fact, just as in any other full-time treatment program, inmates are financially compensated for the time spent in the InnerChange program. Also, just as in any other treatment program, an absence from any InnerChange component is grounds for official reporting and discipline under both InnerChange and Dept. of Corrections behavioral rules.

Both the Dept. of Corrections and InnerChange have the right to refuse to allow a particular inmate to enroll in InnerChange, and both the Dept. of Corrections and InnerChange have the right to expel inmates from InnerChange. Inmates who resign or are expelled from InnerChange are usually transferred to Unit B, except in those instances when they may be moved to Unit A because they were expelled as a result of a major violation of prison rules. If an inmate was transferred initially to the Newton Facility from another prison or facility in order to take part in InnerChange, that inmate will be transferred back to their sending institution. If already a Newton Facility inmate prior to enrolling in InnerChange, a Newton Facility inmate who resigns or is expelled will normally be returned to Unit C or Unit D—the GP living units. Before enrolling, Newton Facility inmates are made aware that, if they should resign from the program, they will be sent back to Unit B until reassignment to Unit C or Unit D. If an inmate resigns or is expelled while in the midst of an InnerChange treatment class, e.g., for substance abuse, he will not receive credit for that class, nor may he enter and finish another, similar

class that is on-going.[33]

4. *Programming in Phase I and Phase II.*

Nearly all Dept. of Corrections treatment and education programs available to inmates are prescribed by authorities such as the Iowa Parole Board.  In contrast, the Dept. of Corrections considers InnerChange to be a voluntary program—inmates may sign up for the program without it being prescribed for them, and once admitted, inmates are allowed to leave the program on their own initiative.  InnerChange does, however, contain all the educational and treatment classes that are traditionally prescribed for almost every inmate in the Dept. of Corrections system:  certified substance abuse treatment, anger management, victim impact, criminal thinking, financial management, and marriage–family–parenting.  When promoting the InnerChange program within the Dept. of Corrections, the InnerChange program is presented as one way an inmate can meet all his treatment program requirements in one setting.

In a sense, all prescribed treatment programs and education classes are voluntary.  No inmate is forced to attend rehabilitative classes or programs.  Inmates must obtain Dept. of Corrections approval to participate in any program.  The refusal to attend these offerings, of course, would be a factor taken into account by the Iowa Parole Board when assessing an inmate's eligibility for parole. On the other hand, the Court found no evidence to support the Plaintiffs' contention that the Iowa Parole Board treats InnerChange inmates differently than other non-InnerChange inmates that come before it.

---

[33]  This is a Dept. of Corrections-wide rule regarding failure to complete treatment programs.

Of course, the benefit of taking classes in InnerChange is that they can be completed within a single period and that inmates may enter the InnerChange program at an earlier time in their incarceration than they would be able to if waiting for a traditional Dept. of Corrections class or program. Because of budgetary constraints and limited class size, inmates waiting for traditional classes and programs must wait until they are close to their expected release date. Trial testimony revealed that, not surprisingly, the Iowa Parole Board would likely look favorably on any inmate who took the initiative and completed his recommended programming as early as possible. As with any sentencing decision that, by its nature, must be individualized, the Iowa Parole Board looks to many other factors besides early completion of recommended classes to decide whether an inmate is eligible for an early release.

InnerChange is considered a unit-based residential treatment program by the Dept. of Corrections. Unit-based residential treatment programs are also referred to as "therapeutic communities" or "quasi-therapeutic communities." Besides InnerChange, the Dept. of Corrections offers therapeutic community programs at other institutions. These programs include the New Frontiers Substance Abuse program at Ft. Dodge, the TCP/DAA Substance Abuse program at Mt. Pleasant, the therapeutic community substance abuse program at Anamosa, The Other Way ("TOW") substance abuse treatment program at Clarinda, the RIVERS program for youthful offenders at Ft. Dodge, the SOTP at Mt. Pleasant, and the therapeutic community substance abuse treatment program at the Iowa Correctional Institute for Women at Mitchellville ("Mitchellville"). Only the SOTP at Mt. Pleasant and the InnerChange program allow long-term participation for months at a time. The InnerChange program is the only therapeutic community or quasi-therapeutic community program at the Newton

Facility, as well as the only unit-based residential treatment program available to Dept. of Corrections inmates that is delivered by a private contractor.

Though all the treatment programs are unique, two of the therapeutic communities listed above compare to InnerChange—the RIVERS and TOW programs.  In both programs, offenders live together and take treatment classes together in class settings.  Neither program, however, can accommodate a broad range of inmate participants.  The RIVERS program is reserved only for youthful offenders and the TOW program is for offenders with mental health or developmental disabilities.

   a.  *Classes and treatment programs.*

The unique nature of the InnerChange transformational rehabilitative model is further evidenced in the types of required classes and curriculum materials.  There are four broad areas of InnerChange instruction:  Spiritual Formation & Transformation; Freedom & Wholeness; Social/Relational/Interpersonal Development; and Re-entry.  Pls.' Ex. 388.  The following is a list of the curriculum profile in the InnerChange program currently being taught at the Newton Facility:  Old and New Testament Survey; Spiritual Freedom; Old and New Testament Literature; Experiencing God; Battlefield of the Mind; Substance Abuse; Anger Management; Victim Impact; Financial Management; Criminal Thinking; Re-Entry; Community Bible Study; Family Series; Computer Training; Principles of Business and Industry; Marriage/Family/
Parenting; Mentoring; and Heart of the Problem.

The Dept. of Corrections recommends to inmates that they take specific treatment classes.  Completion of these treatment programs can make parole more likely.  The Dept. of Corrections

determines when during an inmate's incarceration time the inmate will be allowed to take a particular

Dept. of Corrections treatment program.  Not every treatment program is offered in every institution.

From late 2002 through late 2003, there was no substance abuse treatment program at the Newton

Facility, except through InnerChange.  During the first twelve months of the InnerChange program, an

inmate can complete the following treatment classes:  certified substance abuse treatment, anger

management, victim impact, criminal thinking, financial management, and marriage–family–parenting.

The InnerChange religion classes are unique to its program.  The religion classes—Old and

New Testament, Experiencing God, Community Bible Study, Battlefield of the Mind, Heart of the

Mind, and Spiritual Freedom—are wholly sectarian in nature.  The religion classes are not objective

inquiries into the religious life, comparable to an adult study or college course, offered for the sake of

discussing and learning universal secular, civic values or truths.   They are, instead, overwhelmingly

devotional in nature and intended to indoctrinate[34] InnerChange inmates into the Evangelical Christian

belief system.

An InnerChange course taught in the Spiritual Formation and Transformation area, Battlefield of

the Mind, is typical in its approach.   Purportedly, most of the stated goals comport with a secular,

cognitive approach to developing healthy life coping strategies.  For instance, class participants "will

---

[34] "To 'indoctrinate' means '[t]o instruct in a body of doctrine or principles . . . .  To imbue with a partisan or ideological point of view. . . .' *The American Heritage Dictionary of the English Language* 894 (4th ed. 2000).  The Supreme Court uses 'indoctrination' synonymously with 'inculcation.'  *See, e.g., Mitchell*, 530 U.S. at 858 (O'Connor, J., concurring in the judgment); *Agostini,* 521 U.S. at 223, 224; *Bowen,* 487 U.S. at 621; *Lemon I,* 403 U.S. at 619.  To 'inculcate is '[t]o impress (something) upon the mind of another by frequent instruction or repetition; [to] instill.' *American Heritage Dictionary* at 889 (also using "indoctrinate" as a synonym for 'inculcate')." *DeStefano v. Emergency Hous. Group, Inc*., 247 F.3d 397, 414 (2d Cir. 2001).

discover how to find peace and stop 'brain-storm' thought processes, see the truth by correct thinking,

and 'how to overcome negative and harmful thinking processes.'"  Defs.' Ex. A2.  The other stated

goal, to "discover how to use faith and spiritual 'weapons' effectively," could be interpreted as

reflective of any belief system a participant may bring to the class.  *Id.*  The single text of the class,

however, dispels any idea that a non-devotional approach is being used.  In *Battlefield of the Mind:*

*Winning the Battle in Your Mind*, class participants are taught how to "recognize, and overcome,

Satan's lying 'wilderness mentalities,'" and "how to flow in the mind of Christ."  The text is a work of

devotional literature based on countless biblical references.  The author reminds students of her prayer

and warns that:

> The mind is a battlefield!
> It is on this ground of the mind that you will either win or lose the war that
> Satan has launched.  It is my most heartfelt prayer that this book will assist
> you in casting down imaginations, and every high and lofty thing that exalts
> itself against the knowledge of God, bringing every thought into captivity, into
> obedience to Jesus Christ.

Joyce Meyer, *Battlefield* (1995) at 259 (Pls.' Ex. 455).

The texts for each of InnerChange's religion courses share the same theological and religious

perspective.   The text, *Experiencing God*, for the course with the same name, and the accompanying

workbook, *Knowing and Doing the Will of God* (Pls.' Ex. 429), promise to help readers "deal with

many significant questions:  What did God have in mind when He chose to save us?  What is the

corporate nature of God's great salvation?"  Henry T. and Melvin D. Blackaby, *Experiencing God*

*Together: God's Plan to Touch Your World* (2002) at xv (Pls.' Ex. 449).   *Heart of the Problem*,

a text used for the class with the same name, is another devotional work that, among other things,

reflects the InnerChange transformational approach:

> A massive group of people—intelligent, educated, influential, politically powerful people—who have the best interests of humanity at heart, firmly and fiercely reject the concepts of sin, a creator, and a God.  You might compare that host of people to a huge giant called Goliath.  They firmly believe:  God *isn't*. . . .
>
> In standing up to Goliath our little group might be compared to a little boy called David.  We dare to use the word *sin* and affirm there is no human remedy for sin.  You need a Savior who will cleanse you from sin and empower you to walk in the Spirit. . . .
>
> If it is sin, that's good news.  Sin is the simplest thing in the world to deal with.  Jesus died to cleanse us from sin.
>
> "Too simple," says the Goliath crowd.
>
> Make no mistake.  The people who approach life from humanistic assumptions make up a huge majority of the people you deal with every day.  How long has it been since you had a conversation about sin and its cure?
>
> You need to expand your knowledge of sin so that you know how Jesus can help you.  This book will teach you how to live free from the bondage of sin and empower you to enjoy the fruit of the Spirit.
>
> Jesus doesn't need a case history.  He knows our hearts.

Henry Brandt & Kerry L. Skinner, *Heart of the Problem* (1997) at 5–7 (Pls.' Ex. 441).

InnerChange also offers, as stated before, treatment classes in substance abuse, anger management, victim impact, financial management, business, criminal thinking, computer classes, and family-parenting classes that are also provided—though not under a single program—throughout the Dept. of Corrections.  As presented through the InnerChange program, however, these classes are also used to indoctrinate InnerChange inmates into the Evangelical Christian faith.  Only the InnerChange computer training course could be considered thoroughly secular in nature.  Even the

InnerChange financial management course utilizes a workbook entitled, "*How to Manage Your Money: An In Depth Bible Study on Personal Finances*," part of "The Christian Financial Concept Series," in which wealth is defined as "what God entrusts to us."   Larry Burkett, *How to Manage* (1975) at 11 (Pls.' Ex. 435).

No clearer picture of the transformational model at work is shown than in the InnerChange substance abuse program as set forth in the InnerChange Substance Abuse Policy.  Pls.' Ex. 389. Former InnerChange Program Director Samuel Dye drafted the entire InnerChange Substance Abuse Instructors Notebook, which is still in use today.   The InnerChange substance abuse program, according to current InnerChange Program Director Christopher Geil, is considered "an intensive outpatient substance abuse treatment, [which is] credentialed . . . every two or three years."  Trial Tr. at 1132.  The program's license was renewed in the past year.   The Substance Abuse Policy minces no words:  "The policy of the InnerChange Freedom Initiative (IFI) concerning those with substance abuse problems shall be a faith-based approach, i.e., only Jesus Christ is the cure for addiction."  Pls.' Ex. 389 at 1.  The introductory paragraph continues:

> Efforts will be made to accomodate all relevant issues as proposed by the licensure agencies and/or the American Psychiatric Association as relating to the treatment and care of those with addictive behavior problems only so long as they do not compromise IFI's position that a true cure is found in Jesus Christ.  IFI strongly contends that what is often identified as maladaptive behavior and/or substance abuse is caused by man's inadequacies within himself and a need for a right relationship with God.  When the issue of sin (alienation) is adequately addressed, reconciliation is possible; and through biblical transformation, the issues of substance abuse can be overcome.

> As a licensed substance abuse facility, InnerChange Freedom Initiative, a ministry of Prison Fellowship, shall comply with state codes as administered by the appropriate public policy governmental agency.

*Id.*   The twelve-week program, again, utilizes texts written from an exclusively Evangelical Christian

point of view.  Three of the seven stated goals for the program explicitly mention Christ.  Participants

will learn they are "products of Christ," they will learn "to understand the gospel of Christ," and they

will learn "to understand our identity in Christ."  Pls.' Ex. A2 at 7.   In Chapter Six, "Our Identity in

Christ," participants are taught that "[s]uccess is attaining God's goals for our lives and by His grace

becoming what He has called us to be."  Pls.' Ex. 390 at PD1727.  Chapter Six closes with an eleven-

paragraph long "Doctrinal Affirmation," in which participants declare, among other things, that they

"recognize Jesus Christ as the Messiah," "that apart from Christ I can do nothing," and "that the Bible

is the only authoritative standard."  *Id.* at 1729.   The Substance Abuse class offered by InnerChange

reflects the experience of every InnerChange inmate, which is that, except for computer class, each

InnerChange class, treatment program, event, or community gathering is used to indoctrinate

InnerChange participants into a particular form of the Christian faith.  The so-called secular civic values

cannot be separated from the larger intent of the curriculum, which is to make Christian disciples in the

belief that doing so will transform the inmates into pro-social individuals who will not choose to re-

offend when released from incarceration.

Nonetheless, InnerChange considers its substance abuse treatment classes to be secular in

nature and makes the remarkable contention that "the [secular] benefit of this instruction likely makes

the religious element *incidental* from a legal perspective."  Pls.' Ex. 173 at 3 (emphasis added).   In

the context of InnerChange staff salaries, particularly of its paid staff counselors, the Executive

Director of InnerChange assured Lowell Brandt, the Dept. of Corrections Director of Programming,

that "approximately 80% of staff time is *not* related to [religious instruction], being of interest to the

State because of the religious accommodation of inmates." *Id.*  Nothing could be farther from the

truth based on the evidence presented at trial in this case.  If anything, the reverse is true—the

substantial amount of time spent teaching InnerChange classes is overtly sectarian in nature.

> b. *Quarterly reviews.*

During their time in InnerChange, inmates agree to participate in a quarterly review of their

progress in the program.  InnerChange inmates are expected to improve in attitude and overall

progress during their time in the program.   Until the first few months of 2005, InnerChange counselors

used the Fruit of the Spirit Evaluation to measure inmate progress.  *See, e.g.*, Pls.' Ex. 82.   The Fruit

of the Spirit form rates inmates from a scale of one ("individual is consistently demonstrating a lack of

this fruit of the Spirit in his life") to five ("individual is consistently producing this fruit of the Spirit in his

life").  *Id.*

The term "fruits of the spirit" comes from a listing of characteristics contained in the Apostle

Paul's letter to the Galatians:   love; joy; peace; patience; kindness; goodness; gentleness; self-control.

. . .  *Id.*   Six months before trial, the Fruit of the Spirit format was replaced by a more secular model

called simply, The Quarterly Goals Review.  Pls.' Ex. 83.  It requires inmates to set goals in different

parts of their lives—spiritual, physical, educational, daily, work, and social—rating their monthly

progress in terms of the six civic virtues already discussed—integrity, responsibility, etc.

Failure to meet InnerChange expectations for growth can result in dismissal from the program.

Evidence presented at trial shows that, invariably, dismissals from the program were the result of minor

infractions and attitudinal deficiencies.  Nonetheless, InnerChange staff were not hesitant to put the

reasons for an inmate's dismissal in religious terms.  One prisoner was told that, though his conduct

was excellent, his demanding and manipulative ways meant that he simply was "not displaying the

growth needed to remain in the program.  Your focus is not on God and His Son to Change you."

Pls.' Ex. 377 at 3.   Another inmate was dismissed for having an "unteachable spirit," being spiritually

arrogant, lacking in humility, and having a "Messiah Complex."  *Id.* at 6.  As to the Messiah Complex,

the inmate was warned about his effect on the InnerChange "congregation":

> There was only one sinless person that was Christ Jesus.  The cults are filled
> with those that think they are sinless. . . .   In conclusion you have a sincere
> position of your "sinless perfection" and you are and will be a strong influence
> on immature people or Christians to stumble and struggle.  With these
> attitudes and qualities you would be destructive to a congregation and take
> advantage of others upon your release.

*Id.*  The self-understanding of InnerChange staff as presented through trial testimony and exhibits is

consistent with the stated policy and strategy informing the transformational model.

Inmates in the program are clearly held accountable in the context of a working Evangelical

Christian congregation in which they receive, among other things, all the classes that meet Dept. of

Corrections and Iowa Parole Board criteria.  The InnerChange congregation, living and working in

Unit E and Building M, creates an intimate setting in which inmates often feel safer, more connected to

other human beings, and have a greater sense of purpose as understood in its explicitly Christian

context.  What cannot be separated out from this intimate religious setting, however, is some type of

non-sectarian value system that can be accessed by those who refuse to participate actively in the

InnerChange congregational setting.  In many ways, the physical setting—Unit E, Building M, and the

Newton Facility gymnasium (for worship)—the programming, and the daily schedule all combine to

create a sort of modern, Evangelical Christian monastic setting in which every waking hour is devoted

to living out an intentional Christian experience.

     5.   *Aftercare programming.*

No other Dept. of Corrections therapeutic community treatment program comes close to offering the focused, extended aftercare programming available to inmates in InnerChange. An inmate enters phase three ("Phase III") if and when he is placed in a Dept. of Corrections work release center.  Phase four ("Phase IV") is experienced if and when an InnerChange inmate is released from prison and lives in the community.  In Phases III and IV, inmates are required to attend church weekly, stay employed, and go to a mid-week activity that InnerChange considers pro-social in scope.  When asked at trial, the Assistant Program Manager for InnerChange, Steven Casteneda, could not think of one non-Christian inmate in the InnerChange program located in the Newton Release Center.

During the introduction period, prospective inmates are notified in the InnerChange Field Guide that, in order to qualify for the InnerChange Aftercare or "IFI Reentry" program, they must agree to be an active member of a local church.  Active is defined as "attendance at a weekly congregational meeting (Sunday service) and attendance of a weekly Bible study.  This can include a men's group, prayer group, Celebrate Recovery, AA, etc." Pls.' Ex. 73 at 8.  The church cannot, however, be just any local congregation.  The reentry candidate must agree to "[a]ttend the church *we agree on* for at least 3 months before deciding to 'church shop.'" *Id.* (emphasis added). InnerChange promises to provide the reentering inmate a church and a mentor from that church.

The reentry inmate must promise to maintain "sexual purity." *Id.*  The Reentry Agreement

continues:  "'Each of you know how to possess his own vessel in sanctification and honor" (I Thess.
4:4)."  *Id.*  Further direction is targeted at the ostensibly unmarried reentry inmate, who is informed
that sexual purity means "no sexual intercourse and no 'heavy petting' or inappropriate physical
contact."  *Id.*  Regardless of marital status, the reentry inmate must "[s]ubmit to the leadership and
counsel of your pastor, mentor, and IFI reentry staff [and] abstain from the appearance of evil (I
Thess. 5:22)."  *Id.*  Indeed, throughout the program, InnerChange restricts its inmates from having
sexually explicit materials in their cells, including materials that other inmates may access under Dept.
of Corrections policy.  InnerChange's stated reason for the policy regarding sexually explicit materials
is that such materials are immoral and degrading to women.

InnerChange also condemns the human experience of homosexuality, teaching that
homosexuality is wrong and sinful.  InnerChange's disapproval of homosexuality is based on Prison
Fellowship's policy, which is based on Prison Fellowship's understanding of biblical principles.  This is
in contrast to the Dept. of Corrections official policy, which takes no official stand regarding
homosexuality.  The only related Dept. of Corrections policy commands that there be no physical
contact between inmates or sexual displays, regardless of gender.

The Court found credible the testimony of Clint Kirkpatrick, who testified that his own
search for a sexual identity left him feeling alienated and uncomfortable within the InnerChange
program.  Kirkpatrick was eventually expelled from the InnerChange program because his telling of a
joke based in sexual double entendre demonstrated "a failure to show a significant heart change."
Defs.' Ex. Kirk 3 at 1.  The InnerChange Counselor who issued the report found Kirkpatrick's
reporting of his expulsion to his Dept. of Corrections psychiatric counselor evidence of "counselor

shopping," the act of attempting to play one counselor against another.  Another inmate in the

InnerChange program told Kirkpatrick to "stop his faggot behavior or he would do something about

it." *Id.* at 3.  This comment, interestingly, appears to have been used as evidence of Kirkpatrick's

impermissible acting out, rather than as evidence of an anti-homosexual bias based in the religious

beliefs of the InnerChange program.  The testimony and evidence presented at trial clearly show that

the InnerChange program, as practiced at the Newton Facility, indoctrinates inmates in the belief that

homosexuality is morally wrong and profoundly sinful.

  In Phase IV, InnerChange helps inmates find housing, employment, a mentor, and a church, as

well as providing other aftercare services such as case management, intervention in crisis situations,

and assistance with securing immediate needs such as clothing and hygiene items.  During Phase IV,

InnerChange staff monitor whether InnerChange inmates are attending their church regularly.  The

InnerChange Aftercare Manager, Rodney Brouwer, considered an inmate's post-release connection

to a Christian church vital to the program.  An InnerChange inmate can graduate from Phase IV if, for

a period of six months, he attends church, is employed, is in contact with his mentor, and demonstrates

a lifestyle consistent with the principles taught in the InnerChange in-prison program.

  6.  *Non-Evangelical Christians*.

  Though explicitly stating that it is open to persons of all faiths, InnerChange's Evangelical

Christian tranformational model—in practice—asks inmates of other religious persuasions to

compromise, if not completely abandon, their faiths in order to participate.  Testimony revealed a

constant tension between Roman Catholic inmates involved in InnerChange and the chronic problem

of InnerChange volunteers criticizing Roman Catholic beliefs and practices.  To InnerChange's credit,

volunteers caught openly disparaging non-Evangelical Christians appear to be disciplined and even expelled from the program.  Nonetheless, the Newton Facility's own chaplain would not recommend InnerChange to a Muslim inmate and would only recommend InnerChange to a Roman Catholic inmate after learning that the Roman Catholic inmate had already spoken to his priest about entering InnerChange.  The Newton Facility Chaplain, however, would recommend InnerChange to any non-religious inmate on a case-by-case basis, if the Chaplain felt InnerChange was appropriate "for his journey."  Trial Tr. at 655.

InnerChange's Field Guide clearly warns that non-Christians and those who desire time to observe faith practices not included in the InnerChange program, e.g., Roman Catholics who wish to attend Mass or Native Americans who wish to participate in the sweat lodge ceremony, may do so only if those observances do not conflict with the InnerChange program requirements.  Clearly, the InnerChange program is more amenable to Protestant Christians, particularly those already predisposed to the Evangelical form of Christianity.

InnerChange provides programming to the dominant religious group at the Newton Facility—Protestant Christians.  The Newton Facility Chaplain estimates that there are approximately 300 Protestant Christians at the Newton Facility, including Mormons and Jehovah's Witnesses.  Only a minority of active, practicing inmates who are considered Protestant Christians are not active in InnerChange.  Before InnerChange came to the Newton Facility, the Newton Facility Chaplain organized local church groups and volunteers to lead Sunday morning worship for all Protestant Christians at the Newton Facility.  These groups represented a diverse set of Protestant faith groups, each exposing the Newton Facility inmates to different liturgical worship forms and expressions.  After

InnerChange's arrival, Sunday morning worship for all the Newton Facility Protestant Christians was turned over to InnerChange, which offers worship only in the Evangelical Christian style.

Because it is considered a treatment program at the Newton Facility, absence from any InnerChange events or classes is a ground for discipline and may be excused only by InnerChange or the Newton Facility's permission—even if the absence is to observe one's own religious practices. Any religious observances not in keeping with the InnerChange transformational model must be done during an inmate's free time. Virtually all revivals and worship services are conducted in the Evangelical Christian style; certainly none are conducted by non-Christian faith leaders or groups.

7. *Visitors*.

A person on the approved visiting list for a Level 4 GP inmate is allowed to visit that inmate up to two times a week; a person on the approved visiting list for a Level 5 inmate is allowed to visit that inmate up to three times a week. This standard rule for Level 4 and Level 5 inmates applies to all inmates, regardless of their relationship to InnerChange. The standard visiting days at the Newton Facility are Friday, Saturday, Sunday, and Monday. The Newton Facility allows InnerChange to hold its "Family Series," formerly the "Alpha Series," program in the Newton Facility visiting room once a week for the three-month duration of the class. The InnerChange family series program takes place in the Newton Facility visiting room on an evening during which the visiting room is closed—Tuesday, Wednesday, or Thursday.

During the three months of the class, an InnerChange inmate who participates in the Family Series class is eligible to receive more visits than he otherwise would be allowed. The Defendants maintain that the encounters between family members and InnerChange inmates during the Family

Series class are not real visits in the conventional sense. Instead, the Family Series encounters are focused, supervised educational and therapeutic sessions designed to strengthen the inmate's familial relationships and define his role as father and husband. Nonetheless, the InnerChange program allows a participating inmate greater exposure to loved ones than he would otherwise have without the programming.

8. *Graduation ceremonies.*

InnerChange holds graduation ceremonies for those InnerChange inmates who complete Phases I and II of the program. The graduation service is held in the Newton Facility gymnasium. The service includes an opening prayer, a sermon or speech with religious content, religious singing, and a closing prayer. InnerChange inmate graduates may invite their families to attend. The service is followed by a simple meal—usually comprised of "Pizza Hut" pizza or "Subway" sandwiches—coded as non-sectarian and paid by the state of Iowa. The food is enjoyed by inmates, volunteers, and InnerChange staff. Inmates in other, non-InnerChange groups or programs must pay for any meals or food outside that provided in the regular course of the prison meal program. All InnerChange inmates who are on parole or probation often attend graduation ceremonies, but are allowed to enter the Newton Facility only upon approval of the warden's office.

9. *Baptismal services.*

InnerChange periodically holds baptismal ceremonies during which inmates can be baptized by immersion in a state-provided tank. All baptisms in InnerChange are by immersion—that is, the person being baptized is entirely immersed under water—a practice consistent with the Evangelical

Christian nature of the program.  Other Christian baptismal practices do not involve immersion.

Instead, baptismal water is either poured or sprinkled on the new member of the faith.  The baptismal

ceremonies are usually conducted by InnerChange Program Manager Chris Geil.  Inmates are

baptized by InnerChange staff, volunteers, and inmates designated as Biblical Counselors.  At one

baptismal ceremony, about sixty to seventy InnerChange inmates were baptized.  At another

ceremony, about the same number were baptized.  At yet another ceremony, 103 inmates were

baptized.

     10.  *Disciplinary reports.*

     There are generally two types of disciplinary reports issued to inmates at the Newton

Facility—major reports ("Class I Reports") and minor reports ("Class II Reports").  Major reports

are reserved for serious rule violations—contraband, fighting, etc.  Major reports may only be written

by Dept. of Corrections officers.  Minor reports are given for less serious offenses.  A "behavior

report" is an alternative to a minor report, and may be written by InnerChange staff.   Regardless of

the nomenclature and who writes them up, seven behavior reports will result in an offender receiving a

major report.  Behavior reports may be instituted by any unit manager throughout the Dept. of

Corrections system to manage inmate behavior.  However, the only group currently subjected to

behavior reports consists of InnerChange inmates.  A behavior contract is an agreement between an

inmate and correctional staff to address particular problems or issues facing that inmate.  Often these

agreements contain not just restrictions on behavior, but may also require positive or pro-social

behaviors to instigate long-term behavior modification.  In the InnerChange program, some behavior

contract reports require the inmate to  write an essay or complete another assignment on a biblical

subject or theme.  An inmate who fails to comply with the requirements of a behavior contract or

whose rule violation results in a behavior report may be expelled from the InnerChange program.

Likewise, an inmate in any other non-InnerChange treatment program may also be expelled for failure

to follow treatment program rules.

11.  *InnerChange staff.*

InnerChange staff, like all staff with security approval, are given general access to Units A

through E and may go there to speak with inmates if they desire.  An inmate does not have to first

express a desire to speak to a staff member before the staff member is allowed to speak with the

inmate.  The Dept. of Corrections does not participate in the selection of volunteers for the

InnerChange program, although the Dept. of Corrections may prohibit certain volunteers from

participating for security reasons.

Volunteers play a key role in the daily operation of InnerChange, participating in virtually all

aspects of the program.  At the Newton Facility, InnerChange calculates that approximately 4,000

volunteer hours are donated annually.  Their presence and mission, again, reflect the transformational

model, which presupposes that positive secular values and skills can only be incorporated in an

inmate's life through spiritual transformation.  In the InnerChange program, that transformation takes

place in the context of an Evangelical Christian congregation.

In a memorandum from the former Executive Director of InnerChange, Jerry Wilger, to the

former Dept. of Corrections Director of Offender Services, Lowell Brandt, Wilger explained that

"volunteers are selected by IFI because they are motivated by the love of Christ to bring a faith-based

approach to their program participation.  The volunteers' mere presence teaches inmates about the

love of Christ for all persons, including inmates, families, and victims and their families." Pls.' Ex. 173

at 1. Though the volunteers make positive non-religious contributions such as forming relationships,

teaching vocational skills, and providing

opportunities for social work, the most important contribution volunteers bring to InnerChange,

according to Wilger, is their demonstration of "the transforming power of the love of Christ and the

importance of having caring friends who care because of the love of Christ, and not because they are

paid to care." *Id.* Attempting to meet the state's purpose of lowering recidivism through the

transformational model requires InnerChange to send a double message about the nature of its

program. Of course, InnerChange cannot come right out and say that, in order to complete the

program successfully, an inmate must be converted to Christianity. On the other hand, the conversion

experience is the program's central object. Wilger states in his memorandum to Brandt: "Personal

transformation, a permanent inner change, as a result of the love of Christ that is seen concretely in the

lives of the volunteers, is a key concept behind the IFI program." *Id.* The double message is

inescapable. Wilger explains: "While conversion to Christ is not required for the inmate participants

to successfully complete the program, the volunteers, through the Christ-centered program, teach

biblical forgiveness to help inmate participants who have been abused overcome their difficult past

history and better understand victims and the trauma and consequences of crime." *Id.* To anyone

well-acquainted with the program—as are the state Dept. of Corrections management team and the

InnerChange staff—the object of the Inner Change program is to change inmates' behavior through

personal conversion to Christianity. InnerChange's position that no one actually is required to convert

to pass through the program is mere formalism. Every waking moment in the InnerChange program is

devoted to teaching and indoctrinating inmates into the Christian faith.

     12.   *Newton Facility Chaplain*.

The Dept. of Corrections employs chaplains, who are stationed at Dept. of Corrections institutions.  One of the jobs of a prison chaplain is to facilitate and accommodate the ability of inmates to practice the religion of their choice.  A prison chaplain employed by the Dept. of Corrections attempts to provide services for all legitimate religions at an institution, answers requests by inmates about their respective religions, and provides pathways to facilitate those requests if the requests are legitimate.  Before InnerChange began at the Newton Facility, the Newton Facility prison chaplain conducted Protestant Christian services on Sundays.   Currently, InnerChange staff lead Sunday morning services at the Newton Facility.   InnerChange and non-InnerChange inmates alike are invited to the Sunday morning service.  The Newton Facility Chaplain coordinates Roman Catholic worship services and events, as well as facilitating Native American sweat lodge ceremonies.  Muslim and Jewish inmates' beliefs and needs are also assessed and responded to by the Newton Facility chaplain.

## E.   *Results*

According to Warden Mapes, the InnerChange program inside the prison walls of the Newton Facility benefits the prison community and the InnerChange inmates.  Mapes' testimony about his experience with InnerChange summarizes well the evidence presented at trial regarding the in-prison effect of InnerChange from the perspective of the Dept. of Corrections. Mapes testified that when he presents tours of the prison, a noticeable shift in atmosphere and attitude occurs when approaching Unit E.  He stated:  "[Y]ou see inmates who hold the doors, they look you in the eye, they

demonstrate prosocial behaviors that are—you don't have to tell people, you can just take them on the

tour and let them see, and their comment is universal: 'What is different here than the others?'  And it's

the pro-social behavior.  It is the thing that we hope [in] corrections make a difference."  Trial. Tr. at

1482.  Warden Mapes testified that the Dept. of Corrections receives these benefits at a good cost:

> [For $310,000], I get a substance abuse program, I get a victim impact
> program, I get a computer education program, I get pro-social skills
> programs, and I get engaged inmates who are actively involved in something
> constructive, keeping them busy, which even inmates have testified to that's a
> positive thing, and I get supervision of offenders either in classes, in activities,
> in recreation by somebody other than the limited staff that I have.

Trial. Tr. at 1483.

More significant, however, is the lack of evidence presented by the Defendants about the

effect of InnerChange on recidivism.  Aside from anecdotes, the Defendants offered no definitive study

about the actual effects the InnerChange program has on recidivism rates.  Mapes' predecessor,

Warden Mathes, communicated his desire early on in the initial RFP process that accountability for the

program be included in the contractual agreement between the parties.  Specifically, he requested "at

least annual program evaluations to include, but not limited to, re-incarceration rates and other

measurable outcomes."  Pls.' Ex. 195 ¶ 4.  But, in fact, there was no information presented at trial

about whether InnerChange participants are more or less prone to recidivism than other inmates.

### IV.  ESTABLISHMENT CLAUSE

The First Amendment, in relevant part, states:  "Congress shall make no law respecting an

establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.  The

First Amendment is applied to the states through the due process clause of the Fourteenth

Amendment, thereby preventing "a State from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion." *See Zelman*, 536 U.S. at 648–49 (citing *Agostini v. Felton*, 521 U.S. 203, 222–223 (1997)).  Though recent, successive Supreme Court cases have tested the durability of the three-part test set forth in *Lemon I*, its principles remain intact.  "Under the Lemon test, government practice is permissible for purposes of Establishment Clause analysis only if (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster an excessive entanglement with religion." *A.C.L.U. Neb. Found. v. City of Plattsmouth, Neb.*, 419 F.3d 772, 775 (8th Cir. 2005) (en banc) (citing *Lemon I*, 403 U.S. at 612-13) (citations omitted)).  Nevertheless, the "Establishment Clause 'cannot easily be reduced to a single test.  There are different categories of Establishment Clause cases, which may call for different approaches.'" *Elk Grove*, 542 U.S. at 33 (quoting from *Kiryas Joel Vill.*, 512 U.S. at 720 (O'Connor, J., concurring)).

With respect to government aid, or funding cases, the Supreme Court refined *Lemon I* in *Agostini* by providing two other discrete factors to be used when determining whether government funding or involvement has the primary effect of advancing or inhibiting religion.[35]  First, the Court must evaluate whether the government program results in governmental indoctrination and, second, whether the government program defines its recipients by reference to religion. *Agostini*, 521 U.S. at 234. *Lemon I* was further modified in *Agostini*, when the majority concluded that, because the

---

[35] Or, as Justice O'Connor has characterized both the purpose and primary effect elements, whether a government program "has the primary effect of 'endors[ing] or disapprov[ing] of . . . religion.'" *Zelman,* 536 U.S. at 669.

entanglement inquiry consists of essentially the same factors to decide whether entanglement is excessive as does the inquiry to examine effect, "it is simplest to recognize why entanglement is significant and treat it [also] . . . as an aspect of the inquiry into a statute's [or program's] effect." *Id.* at 233.

As reassuring as enunciated factors may appear, however, "[r]esolution . . . depends on the hard task of judging—sifting through the details and determining whether the challenged program offends the Establishment Clause. Such judgment requires courts to draw lines, sometimes quite fine, based on the particular facts of each case." *See Rosenberger*, 515 U.S. at 847–48 ("Justice Holmes observed in a different context: 'Neither are we troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law. Day and night, youth and age are only types.' *Irwin v. Gavit*, 268 U.S. 161 (1925) (citation omitted).") (O'Connor, J., concurring). It is to this task the Court now turns.[36]

### A.   *Secular Purpose*

The search into the matter of secular purpose is a purely objective one, "where an understanding of the official objective emerges from readily discovered fact, without any judicial psychoanalysis of a drafter's heart of hearts." *McCreary County, Ky. v. A.C.L.U. of Ky.*, 125 S. Ct. 2722, 2734 (2005) (citing *Wallace v. Jaffree*, 472 U.S. 38, 74 (1985)). "The eyes that  look to purpose belong to an 'objective observer,' one who takes account of the traditional external signs that

---

[36]   Though the prison setting of the challenged program must be considered in this analysis, the Court has already determined and given notice to the parties that the standards set forth in *Turner v. Safely*, 482 U.S. 78, 89–91(1987), are not applicable in the Establishment Clause context. *See* Mem. and Order on Cross Mot. for Summ. J. at 18 n.12  (Clerk's No. 212).

show up in the 'text, legislative history, and implementation of the statute,' or comparable official act." *McCreary County*, 125 S. Ct. at 2734 (citing *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (citations omitted)).  In *McCreary County*, the Supreme Court did away with any suggestion that the purpose inquiry was merely a preliminary step or trivial matter; instead, the purpose inquiry is a serious determination of governmental intent.  *McCreary County*, 125 S. Ct. at 2734–35.

The Plaintiffs, though wavering at times, still do not concede that the state of Iowa's decision to select and fund the InnerChange program at the Newton Facility is the result of a dominantly secular purpose.  Instead, the Plaintiffs argue that the selection process to choose a pre-release rehabilitation provider shows the state of Iowa's intent to advance religion.  The Plaintiffs point to the neutrality purportedly guaranteed by the state RFP procedure, and characterize it as a sham in this instance.  *See Santa Fe*, 530 U.S. at 308 (citing *Wallace*, 472 U.S. at 75) ("When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference.  But it is nonetheless the duty of the courts to 'distinguis[h] a sham secular purpose from a sincere one.'") (O'Connor, J., concurring)).   Though a public prayer case, *Santa Fe's* facts prove instructive here.  In *Santa Fe*, a school district's secular policy allowing an invocation to be offered at football games was to "foster free expression of private citizens . . . as well as to solemnize sporting events, promote good sportsmanship and student safety, and establish an appropriate environment for competition."  530 U.S. at 309.  In light of the history of the football game prayer regulations and other circumstances of the case, the Supreme Court found the invocation at issue in *Santa Fe* was not necessary to further any of the purposes provided by the school district.  Indeed, the Court concluded, one student offering a prayer did not seem to foster free expression,

while solemnity is itself a religious message.  *Id.*  According to the Plaintiffs, the case is the same

here—the indoctrination of inmates into the Christian faith is not necessary to meet the stated purpose

of implementing the program to reduce recidivism.

A "statute that is motivated in part by a religious purpose may satisfy the first [*Lemon I*]

criterion."  *Wallace*, 472 U.S. at 56 (citing *Schempp*, 374 U.S. at 296–303 (1963) (Brennan, J.,

concurring)); *McCreary County*, 125 S. Ct. at 2736 (when assessing the purely objective purpose of

a government's funding or involvement in religion, the courts have traditionally been deferential to state

legislative decisions); *Lemon I*, 403 U.S. at 613 (recognizing legitimate state concern to maintain

minimum school standards and considering the effort by the respective legislatures to include

precautionary provisions in program given their understanding that the programs involved could

"intrude upon . . . the forbidden areas under the Religion Clauses"); *Williams v. Lara*, 52 S.W.3d

171, 191 (Tex. 2000) (encountering evidence that public officials were motivated by religious reasons

to set up a similar religious education program to the one here, but not concluding, as a matter of law,

that the religious motives outweighed the legitimate penological concerns behind the selection of an

education program in a prison).  The facts in this case do not quite bear out the Plaintiffs' allegations.

The facts do show that highly placed corrections officials—Kautzky, the Director of the Dept. of

Corrections, and Iowa Parole Board Member Chuck Hurley—were interested in the InnerChange

program because of their belief that spiritual transformation would be a tonic for the ills of recidivism.

Evidence also revealed that, even before the initial RFP was issued, Kautzky had every intention of

bringing the program to Iowa.  A substantial part of this evidence was the gerrymandered RFP, based

on a model provided by InnerChange.   Kautzky, and the correctional officials charged with inmate

programming, however, were also confronted with the secular, pragmatic needs of running a state

prison facility with sufficient programming in a tight budgetary environment.  Further, the facts reveal

that some corrections officials also considered the long term nature of the InnerChange program, its

supportive communal environment, and its extensive post-release care program, as the best indicators

that the InnerChange program could reduce recidivism, turning a blind eye to the inherently religious

means to these otherwise neutral ends.  In cases where the proffered purpose was found to be a sham,

"the unsurprising results have been findings of no adequate secular object, as against a predominately

religious one." *McCreary County*, 125 S. Ct. at 2736.   Here, the objective history of the selection

process, which resulted in InnerChange coming to Iowa, shows that state officials at all levels were

motivated by a variety of factors, but that their primary purpose was to reduce recidivism among Iowa

inmates.  Further, though evidence shows InnerChange received a warm welcome at the Dept. of

Corrections Board, state Legislature, and Governor's Office, no evidence shows that the promotion of

religion was the primary concern of those state officials in passing legislation authorizing funding.  The

purpose inquiry is, accordingly, satisfied on the facts presented.

### B.  *Primary Effect*

1.  *Pervasively sectarian.*

A governmental entity is at the greatest risk of impermissibly advancing religion when the

"government makes direct money payments to sectarian institutions."  *See Rosenberger*, 515 U.S. at

842 (affirming citations to *Roemer v. Bd. of Pub. Works of Md.,* 426 U.S. 736, 747 (1976); *Bowen

v. Kendrick,* 487 U.S. 589, 614-15 (1988); *Hunt v. McNair,* 413 U.S. 734, 742 (1973); *Tilton v.

Richardson,* 403 U.S. 672, 679-80 (1971); and *Bd. of Ed. of Central Sch. Dist. No. 1 v. Allen,*

392 U.S. 236 (1968)).  The Establishment Clause requires:  "1) that no state aid at all go to institutions

that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones, and

2) that if secular activities can be separated out, they alone may be funded."  *See Roemer*, 426 U.S. at

755.   While the plurality opinion in *Mitchell v. Helms* maligned the "pervasively sectarian" inquiry, it

remains the law.  *See* 530 U.S. 793, 840 (2000) ("Although 'our cases have permitted some

government funding of secular functions performed by sectarian organizations,' our decisions 'provide

no precedent for the use of public funds to finance religious activities.'" (quoting *Rosenberger*, 515

U.S. at 847) (O'Connor, J., concurring)).   Despite the uncertain future of the pervasively sectarian

inquiry, this Court is bound to follow the law as it stands, rather than speculating as to how it may

develop.  *See Agostini*, 521 U.S. at 237–38 (directing lower courts to follow precedent even though

it may appear to rest on reasons rejected in other cases, leaving the Supreme Court to reinterpret its

past decisions); *Columbia Union Coll. v. Oliver*, 254 F.3d 496, 508 n.2 (4th Cir. 2001) ("[L]ower

courts should not interpret even seismic shifts in Establishment Clause jurisprudence as signifying that

prior Court decisions have been overruled indirectly.").   The Court now turns to the question whether,

based on the facts presented at trial, the InnerChange program is pervasively sectarian, and if so,

whether diversion of state funding to its sectarian components is impermissibly present.

     *a.  Pervasively sectarian in nature.*

     "Aid normally may be thought to have a primary effect of advancing religion when it flows to

an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in

the religious mission or when it funds a specifically religious activity in an otherwise substantially secular

setting."  *Hunt*, 413 U.S. at 743.  "To answer the question whether an institution is so 'pervasively

sectarian' that it may receive no direct state aid of any kind, it is necessary to paint a general picture of the institution, composed of many elements." *Roemer*, 426 U.S. at 758.   As *Roemer*, *Hunt*, and *Tilton* demonstrate, however, private sectarian institutions may benefit from state funding.

In *Hunt*, the challenged statute authorized the use of revenue bonds, monitored by a state agency, to assist the Baptist College at Charleston ("Baptist College") to finance construction and other related projects. *Hunt*, 413 U.S. at 737.   No state general funds were used to fund the project. *Id.* at 738. The Supreme Court found that Baptist College was not a pervasively sectarian institution though manifestly a religiously-affiliated school and governed by a religious organization. The Court found that there were "no religious qualifications for faculty membership or student admission, and . . . only 60% of the students were Baptist, a percentage roughly equivalent to the percentage of Baptists in the area." *Id.* at 733–44.

Unlike *Hunt*, the funding in *Tilton* was in the form of federal grants for the expansion of college and university facilities, including grants to religiously-affiliated institutions, but expressly excluded construction of facilities for sectarian instruction or worship. 403 U.S. at 676.   In *Tilton*, the Court found no evidence that the Roman Catholic colleges in question used the federally financed buildings for religious indoctrination—one was used as a language laboratory in foreign modern languages, and others were used for the study of science, music, drama, and the arts. *Id.* at 681.   The parties stipulated that each of these areas of study was "taught according to the academic requirements intrinsic to the subject matter and the individual teacher's concept of professional standards . . . [and] the schools were characterized by an atmosphere of academic freedom rather than religious indoctrination." *Id.*   The Court went on to find that the four defendant colleges did not fit the

"composite profile" of typically sectarian institutions of higher learning that could preclude funding under the Establishment Clause.  Pervasively sectarian institutions would, among other things, impose "religious restrictions on admissions, require attendance at religious activities, compel obedience to the doctrines and dogmas of faith, require instruction in theology and doctrine, and do everything [they could] to propagate a particular religion."  *Id.* at 682.   In *Roemer*, the Court relied on *Hunt* and *Tilton* to find, again, that colleges or universities could receive state funds when those institutions were relatively free from denominational control, religious exercises were not mandatory, religious practice—including prayers in class—was merely encouraged, and each institution was committed to the principles of intellectual freedom and academic excellence.  *Id.* at 758–59.

In *Committee for Public Education and Religious Liberty v. Nyquist*, the Supreme Court invalidated a New York statute that authorized funding of nonpublic elementary and secondary schools through maintenance grants, tuition reimbursements, and tax benefits.  413 U.S. 756, 763–64 (1973). Because the case was brought as a purely statutory challenge, and thus contained no factual record for each institution affected by the law, the Court recognized the district court's broad profile of institutions that would qualify for the state funding.  These institutions:

> a) impose religious restrictions on admissions; b) require attendance of pupils at religious activities; c) require obedience by students to the doctrines and dogmas of a particular faith; d) require pupils to attend instructions in the theology or doctrine of a particular faith; e) are an integral part of the religious mission of the church sponsoring it; f) have as a substantial purpose the inculcation of religious values; g) impose religious restrictions on faculty appointments; and h) impose religious instructions on what or how the faculty may teach.

*Id.* at 767–68.   In the context of this type of religion-oriented institution,  it would not be "possible . . .

to impose restrictions" intended to safeguard the distinction between sectarian and secular expenditures.  *Id.* at 774.

Based on these cases, the Defendants are correct to cite *Hunt* for the proposition that an institution is not pervasively sectarian merely because it is religiously affiliated.  413 U.S. at 743–44. Rather than analyzing the facts present here under the relevant case law, the Defendants invite the Court to consider the cases in the Free Speech arena, such as *Good News Club*, 533 U.S. 98 (2001), and *Bronx Household of Faith v. Board of Education of City of New York*, 400 F. Supp. 2d 581 (S.D.N.Y. 2005).  Under these cases, the Defendants maintain, the InnerChange program is not pervasively sectarian because its use of secular values can be separated from the program's religious viewpoint.  *Good News Club* and *Bronx Household* are irrelevant to the inquiry here.  As mentioned in footnote twelve, *supra*, the issue presented here is not whether a "standard moral code," as the Defendants describe it, can be taught at the Newton Facility from different religious or non-religious vantage points, but whether that moral code presented by InnerChange can, in fact, be separated from the state-funded, religious vehicle in which it is presented.

The Defendants often counter the Plaintiffs' claims by seeking refuge in cases protecting private, religious speech or the accommodation of religion.  What the Defendants' arguments ignore is that InnerChange and Prison Fellowship, in this case, are not private actors—they are state actors.  As a state actor, InnerChange speaks on behalf of the government.  It is not simply another voice in a forum opened for a discussion of the best rehabilitation programs for state prisoners.[37]   Neither is this

---

[37]  This reality distinguishes the present case from *Rosenberger*.  There, the state university merely funded, in a neutral fashion, a broad range of student-run publications.  515 U.S. at 822–23.

case about the right of InnerChange and Prison Fellowship to practice their religion and be allowed to

compete in an open marketplace for rehabilitative service providers.  Again, as state actors,

InnerChange and Prison Fellowship employees cloak themselves in the mantel of government.  As

providers of a state-funded treatment program, they are burdened with the same responsibilities of any

state employee:  to respect the civil rights of all persons, including the First Amendment's prohibition

on indoctrinating others in their form of religion.  In the context of this case, the Defendants have no

legitimate interest in the accommodation of their own religious beliefs, but just the opposite.  As state

actors, their interest in "*avoiding* an Establishment Clause violation 'may be characterized as

compelling.'"  *See Good News Club*, 533 U.S. at 112–13 (citing *Widmar v. Vincent*, 454 U.S. 263,

271 (1981) (emphasis added)).

The InnerChange program is pervasively sectarian in nature.  This conclusion does not, as the

Defendants warn, require the Court to "parse through hymns, verses, teaching, and ritual to separate

---

The fact that one publication had a religious agenda could not be attributed to the state since that
publication's religious viewpoint was a private choice. Here, the state knowingly chose a religious
organization to carry out a *state function*—the rehabilitation of prisoners—through the organization's
transformational methodology.  In *Rosenberger*, the benefit to religion was incidental given the
university's *function* of providing an open, neutral atmosphere for the exchange of ideas.  *See id.* at
840 ("The object of [the fund] is to open a forum for speech and support various student enterprises . .
. in recognition of the diversity and creativity of student life.").  "[The student publication] did not seek
a subsidy because of its Christian editorial viewpoint; it sought funding as a student journal."  *Id.*  Here,
on the other hand, InnerChange and Prison Fellowship sought state aid precisely because of their
unique religious programming, which was marketed as a cure for recidivist behavior.  The consequence
of the state's choice to fund InnerChange to accomplish the state's function—curing recidivism—is the
direct subsidy of religious indoctrination within a state-owned and operated prison.  *See id.* at 843
(explaining that a court's focus should not be "on the money that is undoubtedly expended by the
government, . . . but on the nature of the benefit received by the recipient").  To the objective observer
acquainted with all aspects of the program here, such a choice cannot help but imbue the InnerChange
program with the state's endorsement.

'mere worship' from the teaching of character and morals." *Bronx Household*, 400 F. Supp. 2d at

598.[38]   The pervasively sectarian inquiry does not consider the theological beliefs or dogmas

cherished by the institution in question.  Instead, the inquiry looks at the recognizable factors that

indicate whether, in practice, "aid . . . flows to an institution in which religion is so pervasive that a

substantial portion of its functions are subsumed in the religious mission or when it funds a specifically

religious activity in an otherwise substantially secular setting." *Hunt*, 413 U.S. at 743.

There are many factors that drive the conclusion that the InnerChange program is pervasively

sectarian.  The program requires attendance at worship services, religious community meetings, and

weekly revivals, and orders its participants to engage in daily religious devotional practice.

Furthermore, participants are required to lead prayers and share, publically, a personal devotional at

the weekly community meeting.  InnerChange instructors and employees must sign the Prison

Fellowship Statement of Faith.  The curriculum is restricted and does not stray from the religious

beliefs stated in the Statement of Faith.  InnerChange teachers and counselors are allowed to teach

only a pre-set, imposed religious curriculum authorized by InnerChange and Prison Fellowship.

Though an inmate could, theoretically, graduate from InnerChange without converting to Christianity,

the coercive nature of the program demands obedience to its dogmas and doctrines.

Further, InnerChange is an integral part of the religious mission of Prison Fellowship and is

under Prison Fellowship's complete control.  Unlike colleges and universities, InnerChange is not

---

[38]   Ironically, it is not the Court, but the Defendants, who rationalize state funding of
InnerChange by parsing out six universal values from the inherently religious curriculum based in a
particular form of Christianity.

characterized by an atmosphere of academic freedom.  It is devoted to inculcating religion as

described in its own explanation of the transformational model.  Every class, save for the computing

class, uses materials derived solely from the perspective of Evangelical Christian faith.  InnerChange's

daily activities, its required religious qualifications for employees, and the fact that it was chosen by the

state, in part, because its religious nature was viewed as a cure for the ills of recidivism, can only lead

to the conclusion that its non-sectarian aspects are substantially subsumed within its religious nature.

      b.  *Whether separation of InnerChange's sectarian and secular aspects is possible.*

      Funding of a sectarian institution is not forbidden when the inherently religious nature of

the institution can be separated from its secular work.  *See Bowen*, 487 U.S. at 621 ("[I]t is not

enough to show that the recipient of a challenged grant is . . . 'religiously inspired'. . . .  [A] district

court should also consider whether . . . [government] aid has been used to fund 'specifically religious

activities in an otherwise substantially secular setting.'  *Hunt*, 413 U.S. at 743."); *see also Children's*

*Healthcare is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1100 (8th Cir. 2000) (*CHILD*

*II*) (affirming the district court's decision that a Christian Science sanitoria was not a pervasively

sectarian facility because its primary function was to provide physical nursing services to sick

individuals and the physical services were separable from any religious activity taking place within the

sanitoria), *cert denied*, 121 S. Ct. 1483 (2001); *Pulido v. Cavazos*, 934 F.2d 912, 923 (8th Cir.

1991) (assuming that private elementary schools were pervasively sectarian, but allowing the

government's remedial training program, provided in separate mobile classrooms on parochial school

property, to remain because the remedial program was offered in a "truly religiously neutral location").

The principle that a government may fund the secular work of a religious institution is a long-standing

one.  *See Roemer*, 426 U.S. at 746 (citing *Bradford v. Roberts*, 175 U.S. 291 (1899) (allowing federal funding of a hospital run by a Roman Catholic sisterhood)).   Simply put, "a religious motivation on behalf of a party providing secular services does not transform such services into religious activity." *CHILD II*, 212 F.3d at 1100.  In the statutory challenge analysis of the federal funding in *Bowen*, the matter at hand involved grants to institutions to promote responsible adolescent pre-marital sexual behavior.  The Court decided that the projects contemplated by the statute—pregnancy testing, adoption counseling, prenatal and postnatal care, educational services, child care, consumer protection—were not "themselves 'specifically religious duties,' and . . . are not converted into such activities by the fact they are carried out by organizations with religious affiliations." *Bowen*, 487 U.S. at 613.

It is conceivable that the traditional state rehabilitation classes—certified substance abuse treatment, anger management, victim impact, criminal thinking, financial management, and marriage/family/parenting—could be separated from an institution's religious orientation.  Teachers could be chosen, for example, without reference to religion and the course curriculum could be based on standardized materials chosen based on factors other than religious orientation.  That is not the case presented on the facts here.

The transformational model employed by InnerChange at the Newton Facility makes it impossible to distinguish between the secular and sectarian aspects of its rehabilitation programming. This is in contrast to *Mitchell*, where a teacher in a religious school used government-funded educational tools as a mere part of a single daily class.  *Mitchell*, 530 U.S. at 860.   Neither can the InnerChange classes compare to the offering of remedial education by government teachers on the

premises of a private, sectarian school.  *Agostini*, 521 U.S. at 234–35.  In *Zobrest v. Catalina Foothills School District*, 509 U.S. 1, 10–14 (1993), the work of a government-funded interpreter on the premises of a sectarian institution could be separated from the purposes of the institution itself. Likewise, in *Witters v. Washington Department of Service for the Blind*, 474 U.S. 481, 487–89 (1986), the funding of vocational assistance to a sectarian institution to aid a visually-impaired student is distinguishable from the purposes of the institution that student chose to attend.  Here, the secular work or service of InnerChange, offering a pre-release rehabilitation program, cannot be separated from the means by which the delivery of that service is made—intentionally submersing inmates into the life of a functioning Christian congregation within a prison living unit.

The overtly religious atmosphere of the InnerChange program is not simply an overlay or a secondary effect of the program—it is the program.  There are no separate educational and religious functions in the InnerChange program as there were in *Agostini* or, as eventually determined, in *School District of City of Grand Rapids v. Ball*, 473 U.S. 373 (1985).  *See Agostini*, 521 U.S. at 235 (overruling its previous decision in *Ball*).  In *Ball*, the state-funded remedial courses, which were required to be part of an accredited school program, were offered in non-public schools but taught by public school employees.  The *Ball* "share time program" only took up "ten percent of any given nonpublic student's time." *Ball*, 473 U.S. at 375.  Here, every activity—worship services, revivals, community meetings, daily devotionals—is organized and developed by the InnerChange program and is designed to transform an individual spiritually.  Even the otherwise traditional rehabilitation classes themselves, as set forth above, have been turned into classes intended to indoctrinate inmates into the Christian faith.  The Court finds the testimony of Norm Cox and other InnerChange witnesses less than

credible when they state InnerChange does not attempt to convert inmates to Christianity.  Virtually

every piece of curriculum material is devotional in nature.  Every problem faced by inmates in their

personal lives is defined according to an exclusively theological word:  sin.  Every answer to an

inmate's personal dilemmas involves a conversion to belief in Christ.  Teachers and counselors cannot

even be employed without accepting these basic InnerChange propositions.  In the InnerChange

program, the secular task of changing criminal behavior is an essentially religious one, in purpose and in

fact.

    The Defendants argue that the facts presented prove that the InnerChange staff does not try to

"coerce or persuade inmates to adopt the specific Christian beliefs taught in the program."  Defs.' Joint

Reply to Pls.' Amended Proposed Findings of Fact and Conclusions of Law at 9.  What the

Defendants do not acknowledge is that prisons are inherently coercive environments, something the

Supreme Court has recognized in the context of delivering medical services.  *See Atkins*, 487 U.S. at

57 n.15 ("[P]risons and jails are inherently coercive institutions that for security reasons must exercise

nearly total control over their residents' lives and the activities within their confines; general schedules

strictly regulate work, exercise, and diet.  These factors can, and most often do, have a significant

impact on the provision of medical services in prisons.").  While the *Atkins* Court considered the

effects of the prison environment on limiting the medical decisions of a physician, thereby making clear

his role as a state actor, the same environment is also at work in the rehabilitation context.  From the

perspective of inmates,  the InnerChange staff shared many of the same duties as state correctional

officers and other state prison employees, such as counselors.[39]  Warden Mapes considered it a

benefit that he did not have to pay for correctional officer time because InnerChange provided inmate

supervision.  InnerChange staff are vested with the authority to impose punishment according to state

Dept. of Corrections and InnerChange codes of prison conduct.  Evidence that InnerChange staff

considered themselves peers in relation to state employees was the decision, mentioned above, to

discipline an InnerChange inmate for "counselor shopping" because he had communicated to a state

prison counselor his displeasure about the InnerChange program.  Morever, InnerChange inmates are

also in a spiritual mentoring relationship with InnerChange staff, who provide spiritual and mental health

counseling.  The teachers and counselors charged with the control of every aspect of an inmate's

physical existence and spiritual existence in the InnerChange program are the same persons who lead

communal worship services, make sure inmates are attending religiously-inspired classes, and grade

them in the program for signs of "authentic progress."  To say that such an environment is not intended

to coerce or persuade conversion to Christianity is a remarkable assertion.[40]

---

[39]  The perspective is not only that of InnerChange inmates, but the entire inmate population at Newton.  From their perspective, InnerChange and state correctional employees work together closely to run all aspects of the Unit E living unit and classroom module.  InnerChange introduction classes are conducted in non-InnerChange living units as well, providing further evidence to all the inmates that the state endorses the message of the InnerChange program.

[40]  Of course, the Plaintiffs need not show that inmates are being persuaded to join the specific form of Christianity espoused by InnerChange, although the Court finds they are in this case.  The Plaintiffs only need to show that the state is funding religious indoctrination.  An inmate could graduate from the InnerChange program without converting to Christianity, but a successful inmate must show he is moving toward authentic transformation in order to do so.  This transformation, Christian or not, is itself an inherently spiritual process to which the state contributes through direct and in-kind payments.

The Establishment Clause, of course, abhors coercion in any form.  A simple inquiry by a homeless shelter employee, whose voice is endorsed by a city, can be coercive.  For example, in

The Defendants argue that the state of Iowa pays, pursuant to the contract terms, for only those aspects of the program that are non-sectarian in nature.  They point to the percentages of employees' salaries and other daily expenses allocated according to sectarian and non-sectarian time.  There is, however, no way to accurately account for any employee's time in the InnerChange program in such a pervasively sectarian context.[41]  Neither can InnerChange's billing to the state for non-salary expenses as non-sectarian be relied upon.  "The Supreme Court

has systematically rejected attempts to unbundle religious activities through statistics and accounting."

*Freedom from Religion Found., Inc. v. McCallum*, 179 F. Supp. 2d 950, 974 (W.D. Wis. 2002)

(*Freedom from Religion I*).  In *Nyquist*, the Court did not accept the sectarian schools' assurances that public funds would be safeguarded through the use of percentages:  "Quite apart from the language of the statute, our cases make clear that a mere statistical judgment will not suffice as a guarantee that state funds will not be used to finance religious education."  *Nyquist*, 413 U.S. at 778.

This is not to mention the substantial investment of in-kind aid to support the rehabilitation

---

*Community House, Inc. v. City of Boise*, 2005 WL 2847390, at *6 (D. Idaho 2005), the court enjoined a city from participating in a lease with a homeless shelter because the shelter policy was to require a homeless person to explain why he or she would be offended by participating in a required religious meeting attendant with every meal.  Chief Judge Winmill ruled that the demand for an explanation by homeless guests who wished to skip the religious meeting brought the shelter "perilously close to advocating attendance rather than allowing an unhindered free choice."

[41]  In developing the InnerChange cost breakdowns, Jerry Wilger testified, in deposition, that an InnerChange official, Bob Jefferson, worked with legal counsel to develop sectarian and non-sectarian expense categories.  In the end, Mr. Jefferson simply sat through InnerChange classes in Iowa and Texas, went through the curriculum, "and made a determination of what number of hours that were taught had to do with a sectarian part of the class and non-sectarian."  Wilger Dep. at 22.  For other expenses, computers for instance:  "Our policy was, if the computer was going to be used for two different items, you would determine what percentage of it would be for sectarian and what percentage would be non-sectarian and then expense the computer accordingly."  *Id*. at 18.

process offered by InnerChange.  Building M, Unit E, and other Newton Facilities, like the

gymnasium, are wholly given over to the InnerChange program.  Other in-kind aid includes

InnerChange office and class furniture, as well as transportation of InnerChange inmates to the

Newton Facility.  The Defendants correctly state that this in-kind support would be necessary for any

type of similar, therapeutic rehabilitation program at the Newton Facility, and is of no extra cost to the

Iowa taxpayer.  Missing in this assertion, however, is the basic principle at work in this case that, when

used in the service of indoctrinating religious belief, in-kind giving is no longer considered neutral state

funding under the Establishment Clause.  Rather, it is tainted with the impermissible advancement of

religion.

   As set forth in the facts presented above, even the definition of what constitutes sectarian and

non-sectarian expenses has not been resolved—except that state officials are content to believe what

InnerChange and Prison Fellowship consider religious or non-religious for billing purposes.  *See*

*Mitchell*, 530 U.S. at 832 (finding agreement in the Court that mere signed assurances that

government aid will be used for nonideological purposes are unavailing); *see also New York v.*

*Cathedral Acad.*, 434 U.S. 125, 133 (1977) (stating that attempting to search out "what does or

does not have religious meaning touches the very core of the constitutional guarantee against religious

establishment").  Even if religious meanings could be ironed out, there is no actual state monitoring.

*See Mitchell* at 832 n.15 (finding inadequate the agency officials' monitoring of a program as best they

can when reviews occurred only once every three years).   The accounting in the InnerChange local

office also reflected confusion among, at least, the InnerChange Office Administrator and other

InnerChange employees about what categories should be used for items like church music licencing,

religious graduation gifts, and printing materials.  *See id.* at 833 (finding a haphazard approach to labeling equipment as government owned as evidence of inadequate safeguards).   This is to say nothing about the nature of the InnerChange salaries, each of which is paid partly by state funds and partly with private funds.   In short, there is no way to guarantee that public funds are used only for secular portions of the InnerChange program.

In the sectarian school settings in *Mitchell*, *Agostini*, *Zobrest*, and *Witters*, publically funded teachers, interpreters, vocational instruction, and equipment were discrete objects of public funding that could readily be walled off from sectarian activities.   "In those instances in which the Court has permitted funding to flow to religious schools, it has been in the context of a targeted grant, available to a limited population, for a specific purpose." *Freedom from Religion I*, 179 F. Supp. 2d at 974 (quoting *Strout v. Albanese,* 178 F.3d 57, 62 (1st Cir. 1999)).   Even when secular aid could not be walled off from some sectarian activity, as in *Mitchell*, Justice O'Connor determined the evidence of diversion in that case *de minimus* and, therefore, the public funding involved was not in grave danger of advancing religion.   Here, however, the state funding unquestionably supplants, rather than merely supplements "the regular curricula" of the InnerChange program.  *See Mitchell*, 530 U.S. at 848 (continuing to consider whether aid supplants or merely supplements a religious institution as evidence of the primary effect of that aid) (O'Connor, J., concurring); *see also id.* at 815 n.7 ("Our case law does provide some indication that this distinction [supplanting aid versus supplementing aid] may be relevant to determining whether aid results in governmental indoctrination, *see Agostini,* 521 U.S. at 228–229; *Zobrest,* 509 U.S. at 12; *but see Ball,* 473 U.S. at 396, but we have never delineated the distinction's contours or held that it is constitutionally required.") (plurality opinion).   Though

InnerChange funding also comes from private sources through its parent, Prison Fellowship, a

substantial portion of its programming comes from state funding.  To the extent Defendants argue that

InnerChange could operate completely through private funding in a separate location, those facts are

not before the Court.  Even if true, the amount of funding involved in this case, itself, indicates that the

state funding does more than merely supplement InnerChange salaries and expenses.  Here, the facts

presented show not only diversion, but direct and in-kind funding of a pervasively sectarian institution's

implementation of a program in which no set of enforceable safeguards or standards can be erected

that would enable funding of only the secular aspects involved.  Under the pervasively sectarian

analysis, by funding the InnerChange program, the state of Iowa impermissibly advances religion in

violation of the Establishment Clause.

      2.  *True private choice.*

      The Defendants argue that the funding here is not direct, but indirect.  They maintain that,

regardless of the sectarian nature of the InnerChange program, the type of public funding here is

permissible because it is the result of the true, private choice of inmates to participate.  *See Zelman*,

536 U.S. at 663 (observing that the Court's decision made permissible, for the first time, unrestricted

funds to recipient sectarian schools) (O'Connor, J., concurring).  "*Mueller*, *Witters*, and *Zobrest* . . .

make clear that where a government aid program is neutral with respect to religion, and provides

assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools

wholly as a result of their own genuine and independent private choice, the program is not readily

subject to challenge under the Establishment Clause."  *Id.* at 642.  The Court went on: "A program

that shares these features permits government aid to reach religious institutions only by way of the

deliberate choices of numerous individual recipients." *Id.* "The incidental advancement of a religious

mission, or the perceived endorsement of a religious message, is reasonably attributable to the

individual recipient, not to the government, whose role ends with the disbursement of benefits." *Id*.

Justice O'Connor explained in *Zelman*, notwithstanding that it was the first time the Supreme

Court allowed unrestricted funds to flow to sectarian schools, that the Court's decision was not a

"major departure from . . . prior Establishment Clause jurisprudence." *Id*. at 688 (O'Connor, J.,

concurring).  Justice O'Connor reassured courts that the same type of inquiry in funding cases remains.

In deciding whether the state funding of InnerChange is permissible, therefore, this Court must

consider two factors:  1) "whether the program administers aid in a neutral fashion, without

differentiation based on the religious status of beneficiaries or providers of services; 2) and more

importantly, whether beneficiaries of indirect aid have a genuine choice among religious and

nonreligious organizations when determining the organization to which they direct that aid." *Id.* at 669

(O'Connor, J., concurring).   "If the answer to either query is 'no,' the program should be struck

down under the Establishment Clause." *Id.*; *see also Agostini,* 521 U.S. at 226 (explaining that

governmental indoctrination is not present where the aid is a "'result of the private decision of

individual[s] and could not be attributed to *state* decision making") (quoting *Zobrest*, 509 U.S. at 10).

 The facts presented here reveal that the state funding of the InnerChange programming fails on both

counts.

First, despite the Defendants' refrain that the state's RFP process guaranteed a neutral choice

of a rehabilitation provider, the facts show that InnerChange was the only real contender in the bid

process.  The initial pre-RFP negotiation period, a common governmental procurement process, was a

pretext for the inevitable awarding of the rehabilitation contract to InnerChange and Prison Fellowship. The state officials in the Dept. of Corrections, the Dept. of Corrections Board, the Parole Board, the state Legislature, the offices of the Attorney General, and the Governor were all aware that the values-based program offered by InnerChange was set in the context of a Christ-centered, biblically based sectarian environment.  The evidence presented shows that the initial RFP, itself, was essentially a gerrymandered document based on the RFP contract already in place in the state of Texas for the same type of program in order to ensure that the InnerChange program would come to Iowa.[42] Though some institutional-level corrections officials did not care about what type of vehicle the rehabilitation programming came in, evidence shows that the overtly religious nature of the InnerChange program was not seen as a hindrance, but a positive benefit.

In *Zelman*, the Court found no evidence that the Ohio voucher system was developed because the religious message taught at sectarian schools was viewed as providing the answer to the educational ills of inner city school children.  536 U.S. at 653–54.  Instead, those who implemented the Ohio program did so under the belief that poor children in failing schools should and could be assisted in obtaining a quality education.  In *Mitchell*, again there was no evidence that the

---

[42]  While perhaps not in the same constitutional league as gerrymandering a whole school district in order to circumvent state and federal special education funding law, the form-fitted RFP in this case precluded other serious responses by non-religious providers.  *See Kiryas Joel Vill.*, 512 U.S. at 702 (finding that the creation of the school district by "following the lines of a religious community where the customary and neutral principles would not have dictated the same result" meant that government improperly identified "the recipients of civil authority" by "religious criterion").  So too, here, the gerrymandered RFP was not created and released according to the customary and neutral principles associated with that process.  Rather, it was crafted according to the desires of state officials who advocated a values-based release program defined by religious doctrine.

government preferred what was actually taught at religious schools over others.  "Relying on *Witters* and *Zobrest,* we noted that our cases had taken a more forgiving view of neutral government programs that make aid available generally without regard to the religious or nonreligious character of the recipient school."  *See Mitchell*, 530 U.S. at 847–48 (O'Connor, J., concurring) (citing *Agostini,* 521 U.S. at 225–26).  This is not the case here.  Here, the state officials charged with administering the funding for a rehabilitation program resorted to a non-neutral RFP process that favored InnerChange's religious model with the result of limiting the pool of possible providers.

Second, the program defines the ultimate beneficiaries—the inmates—by religion through creating incentives to join InnerChange.  *See Mitchell*, 530 U.S. at 845 (O'Connor, J., concurring) (reaffirming the *Agostini* effects criteria that, along with causing indoctrination and entanglement, government aid must not define "its recipients by reference to religion").  The "scrutiny of the manner in which a government-aid program identifies its recipients is important because 'the criteria might themselves have the effect of advancing religion by creating a financial incentive to undertake religious indoctrination.'"  *See Mitchell*, 530 U.S. at 845 (quoting *Agostini*, 521 U.S. at 231).  "Such incentives '[are] not present . . . where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis.'"  *See Zelman*, 536 U.S. at 653–54 (quoting *Agostini,* 521 U.S. at 231).  In *Zelman*, for example, parents not only were offered no incentives to favor the choice of a sectarian religious education for their children, the challenged program included the *disincentive* of a copay requirement for those who chose to participate in a scholarship program "and then enroll their children in a private school (religious or nonreligious). . . ."  *See* 536 U.S. at 654 (explaining that while

disincentives are not necessary, their presence dispels the idea that a program is unconstitutional for these reasons).

The evidence presented at trial shows that the state and InnerChange provide incentives to inmates to join the program.  The incentives come in the form of better conditions once associated and reserved for honor unit inmates and an opportunity to complete the required courses of rehabilitation classes before it would be otherwise possible.  After hearing the testimony of inmates and experts alike regarding the difference in living conditions between InnerChange and GP inmates, the Court was reminded what a tremendous shift in perspective occurs once a person is placed in a prison.  What appears insignificant to those accustomed to a wide range of normal freedoms outside of prison can be of great value and import to someone whose every minute is managed by others.

When InnerChange moved into the Newton Facility, it took over what was formerly referred to as an honor unit.   The honor unit, with its wooden doors, separate toilet facilities, dry cells, access to one's own cell key, and generally safer environment, looks and feels very much like the prison it is.  To an inmate, however, these seemingly minor benefits are desirable reminders of the freedoms associated with being a trusted prisoner.  Plaintiff–inmate Hammers put it this way when explaining how he felt upon being provided his own key and being in Unit E generally:

> You always feel better about yourself, that you're doing good, and about your environment when you have a little bit of control over your environment, whether it be as small as the door to your cell that the guards can get in at any time, or whether it's somebody not flushing a toilet a foot way from your bed, it just makes you feel good inside.  You ain't as prone to be aggressive.  You tend to let things slide because being on E means you're responsible enough—or somebody thinks you're responsible enough to be there.

Trial Tr. at 56.

-114-

The dry cells in Unit E also provide a measure of privacy and distance from the most basic of bodily functions.   Human voiding, explained Gordon Kampka,[43] is a private human act that is preferably done in private, with partitions shielding one from view.   Inmates, Kampka reported, would prefer communal restroom facilities, with their partitions and porcelain instead of stainless steel toilets situated in a shared room.

Other InnerChange-related entertainment also can be considered privileges.   It became clear at trial that there was not an InnerChange "big screen" projection television as described in Plaintiffs' pre-trial documents.   Instead, once a week or so, a movie is projected onto a standard, somewhat frail-looking, classroom white-board for InnerChange inmate group viewing.   While a privilege hardly worth mentioning outside of the prison context, inside the prison, this simple act of communal movie viewing is a small piece of normalcy in an otherwise bleak world.   This experience is not available to GP inmates.   Likewise, pizzas and sandwiches, as well as the privilege of being allowed to sit with a close family member or friend at graduation ceremonies, are all characteristic of normal human interactions outside of prison.   The use of everyday items provided to InnerChange inmates at state expense—papers, pens, folders, pencils, three-ring binders, etc., for study and personal use—also allow an inmate to experience incremental moments of normalcy unavailable to other Dept. of

---

[43] Gordon Kampka was the Plaintiffs' expert on prison conditions and testified to what prison authorities would consider incentives or benefits for inmates.   Kampka's credentials are stellar and, though Defendants attempted a crude impeachment based on a prior conviction, the Court found Kampka's conclusions about prison conditions credible and helpful.   The Defendants' expert on prison conditions was Warden Mathes.   The Court found Warden Mathes honest and appreciated his candor throughout the proceedings.   Nonetheless, to the extent Mathes contested Kampka's findings, the Court must, respectfully, take into consideration Mathes' own personal involvement in the case as the Newton Facility Warden at the time InnerChange came to Iowa.

Corrections inmates.  There is no question that prisons, and the Newton Facility in particular, may set

aside an honor section of the prison for non-violent, well-behaved, and low-risk inmates.  It is not

surprising that such honor sections are more inviting environments in which to live, as compared to the

rest of the prison.  These environments may be characterized by better living quarters, which are less

noisy, less crowded, etc., and provide more autonomy.  Such settings may also allow the use of items

not generally available to the general population—more computer time, for example—and the ability to

take required classes and counseling.  Setting aside any religious considerations, honor program areas

are reasonably meant to encourage inmates to behave well and focus on rehabilitation by allowing

them to serve their time with more freedom and greater dignity.   To say these benefits are no longer in

effect with the coming of InnerChange is to ignore realities of prison life.  There is nothing wrong with

incentives to encourage better behavior.  In this case, however, the honor setting in Unit E was

converted not only to promote better behavior, but also to encourage spiritual growth and

transformation.  Spiritual growth and transformation may be vital to changing an inmate's behavior, but

the state may not use honor unit incentives to endorse and promote that transformation.  For state

actors to do so is to impermissibly advance religion.

   The Defendants argue, however, that InnerChange's rigorous, demanding schedule, that

allows for very little personal time, no television, and no pornography, more than offsets any small

gains in privilege.  In fact, the Defendants argue, "InnerChange time" is much more difficult than doing

"regular time" in the average Dept. of Corrections facility.   Yet, InnerChange describes the busy

schedule as beneficial.  In a fictionalized, first-person account of what life is like inside InnerChange, an

inmate who had been a member for nineteen months exclaims:  "I can't believe I've been in the

program this long.  The time ha[s] gone by really fast.  And in prison, that's very good."  Pls.' Ex. 74

at 13.  Other incentives to joining InnerChange include personal safety, a feeling of community, and an

excellent aftercare program.  These benefits are so compelling that even some of the Plaintiff–inmates

expressed a desire to return to InnerChange if they could.  Again, benefits to encourage good behavior

are permissible in the prison context.  What is not permissible is to use otherwise neutral benefits to

encourage participation in a religious program.

Unit E, especially when used to conduct a therapeutic community program, became a place

where inmates could feel secure, thereby allowing them to focus on their recommended treatment

classes.  Inmates, many for the first time, were able to invest in their rehabilitation with fellow inmates

who offered support and encouragement.  Once released, the same inmates were able to experience

continued aftercare programs that prison officials consider a key component in lowering recidivism.

The Defendants are correct when they point out that the  "quality [of an offender program] cannot be

coercion."  *Freedom from Religion*, *Inc. v. McCallum*, 324 F.3d 880, 884 (7th Cir. 2003).  The

Seventh Circuit stated:

> But quality cannot be coercion.  That would amount to saying that a city
> cannot adopt a school voucher system if the parochial schools in the city are
> better than the public or private schools.  Faith Works, penalized because of
> secular competitors were unwilling to invest as much in the rehabilitation of
> offenders, would have an incentive to reduce the quality of its program, while
> those competitors would have an incentive to reduce the quality of their own
> programs in order to make Faith Works' "violation" of the establishment
> clause more perspicuous and encourage it to curtail its program.  There
> would be a race to the bottom.

*Id*.

The crux of the matter here, however, is not the difference between a quality program

compared to other similar, but lesser programs.  As the Seventh Circuit cogently stated, "It is a misunderstanding of freedom . . . to suppose that choice is not free when objects between which the chooser must choose are not equally attractive to him."  *Id.*  Here, in contrast, the Plaintiffs do not complain of program selections which are merely subjectively unattractive to them, but to an objective lack of real alternative programs sufficiently similar to InnerChange to create true choice.   Without real, genuine choice by inmates among similar, comparable alternatives, the state of Iowa impermissibly advances religion within the Dept. of Corrections.  As set forth above, the crucial inquiry is "whether beneficiaries of indirect aid have a genuine choice among religious and nonreligious organizations when determining the organization to which they direct that aid."  *Zelman*, 536 U.S. at 669.  (O'Connor, J., concurring).   The broad range of available educational options to parents in *Zelman* was critical to the finding that the Ohio program did not violate the Establishment Clause.  *See Zelman*, 536 U.S. at 655 ("[Students] may remain in public school as before, remain in public school with publicly funded tutoring aid, obtain a scholarship and choose a religious school, obtain a scholarship and choose a nonreligious private school, enroll in a community school, or enroll in a magnet school.").

Here, there is no broad range of choices available to Iowa inmates.  The choices need not be identical in nature.  In *Freedom from Religion Foundation, Inc. v. McCallum* (*Freedom From Religion II*), the district court found that the Wisconsin offenders could meet their rehabilitation treatment requirements by attending any type of post-release in-patient programs, religious or otherwise.[44]  *Freedom from Religion II*, 214 F. Supp. 2d 905, 916 (W.D. Wis. 2002).   Even though

---

[44]  Neither were Wisconsin offenders given actual vouchers.  The question of actual vouchers in these cases is not the issue.  Nor must the Defendants show money being first directed at inmates and

the other non-religious programs were shorter in length (30–90 days compared to a 9–12 month

program) and did not provide the same quality of treatment, the non-religious alternatives met the

state's post-release requirements for probation, parole, or alternative to revocation. *Id.*   There is no

therapeutic community within the Iowa Dept. of Corrections comparable to the InnerChange program

at the Newton Facility because no other program offer the full range of recommended treatment

modules—Thinking for Success, Criminal Thinking, Victim Impact, Substance Abuse and Relapse,

Marriage/Family/Parenting, Re-Entry, and Financial Management.  The RIVERS and TOW programs

closely resemble InnerChange, but they are only for youthful offenders or those with mental health or

developmental disabilities, respectively.  Even then, the youthful offender RIVERS program is a mere

four months in length and is without the substantial aftercare and post-release benefits contained in the

InnerChange program, which Dept. of Corrections officials find so crucial for declining rates of

recidivism.

Though limitations for entry into other, possible programs is a factor to be considered, even

more important is the limitation imposed on inmates who participate in the InnerChange program, itself,

given that it is primarily religious.  As set forth above, enrollment in InnerChange is limited to those

willing to engage in a spiritual transformation guided by Evangelical Christian counselors and

---

then, by inmates, to a provider.  What needs to be shown is simply that an inmate's private, genuine
choice directs the aid to the provider.  *See Freedom from Religion*, 324 F.3d at 882 ("But so far as
the policy of the establishment clause is concerned, there is no difference between giving the voucher
recipient a piece of paper that directs the public agency to pay the service provider and the agency's
asking the recipient to indicate his preference and paying the provider whose service he prefers.").  This
appears to be especially so in the prison context where, as Defendants showed, the introduction of
literal vouchers would create security concerns.

programming.  The Defendants' assertion that all inmates are welcome in the program is true in form

only.  In practice, the intensive religious content of the InnerChange program is a substantial disincentive

to joining for persons of other faiths, or those professing no faith.  Although some inmates of other faiths

may enter the program voluntarily, that does not mean the state does not endorse Evangelical

Christianity through its choice of program, funding, and in-kind aid.  The contractual relationship

between the state and InnerChange does not make the treatment program here available, in practice, to

a "broad class of individual recipients defined without regard to religion."  *Zelman*, 536 U.S. at 662.

For the past few years, the contract between the Dept. of Corrections and InnerChange called

for a per diem rate of $3.47 to be paid to InnerChange for each inmate enrolled in the program.  Even

though the Defendants argue that this payment is evidence of a true, private choice by inmates, the only

provider to which inmates can direct "their" per diem payment is InnerChange.  In *Freedom of*

*Religion II*, the undisputed facts showed that offenders also did not make their decisions in an

unrestricted environment, but were directed by their post-release agents toward pre-selected

programs[45] with information that they could refuse to participate in the religious programming because

of its content.  *See* 214 F. Supp. 2d at 916.  What distinguishes the *Freedom of Religion* cases from

the present case is that, when the Wisconsin offenders demurred for religious content, they were

immediately informed about other, secular programs available to them and were allowed to participate

in the secular programs.  Here, there are no alternative, similar programs offered to Iowa inmates who

---

[45]  "Pre-selected" does not mean favored or preferred, but pre-approved based on neutral, non-religious criteria. *See Freedom from Religion II*, 214 F. Supp. 2d at 916 (citing *Mueller*, *Witters*, and *Zobrest* as examples that schools, for instance, receiving public funding must first be accredited by the state).

are not interested in the InnerChange religious programming, but who also desire to meet their treatment

program requirements in the most timely way, be part of a residential community setting, and avail

themselves of an intensive post-release program.  Accordingly, the cost-per-inmate system in place in

this case is not a true voucher system based on the independent choice of Iowa inmates, but a mere per

diem system that does not adequately protect against state-endorsed religion.  It is worth noting that the

difference between per diem, or per capita, aid and that resulting from a true, private-choice program is

important:

> In terms of public perception, a government program of direct aid to religious
> schools based on the number of students attending each school differs
> meaningfully from the government distributing aid directly to individual
> students who, in turn, decide to use the aid at the same religious schools. In
> the former example, if the religious school uses the aid to inculcate religion in
> its students, it is reasonable to say that the government has communicated a
> message of endorsement. Because the religious indoctrination is supported by
> government assistance, the reasonable observer would naturally perceive the
> aid program as *government* support for the advancement of religion.

*Mitchell*, 530 U.S. at 842–43 (O'Connor, J., concurring).   Also, in *Mitchell*, the plurality's

opposition to the pervasively sectarian test did not keep it from distinguishing *Nyquist* from the program

in *Mitchell* because, in *Nyquist*, the aid—as in this case—was funneled to the religious schools through

a per diem arrangement in which there was virtually no chance for aid to flow to non-religious schools.

*See Mitchell*, 530 U.S. at 820 n.8 (deciding, therefore, that the aid was not truly neutral in the first

place).  In this case, the per diem arrangement only funds InnerChange, with money going directly into

InnerChange and Prison Fellowship coffers.  Again, the per diem rate is not extended to the aftercare

program, which results in the state still paying salaries and other aftercare, post-release expenses on a

direct basis.  There is no other treatment program to which the inmates can turn to spend "their" $3.47

a day in exchange for roughly the same type of services.  Here, the per-diem arrangement between the

state and InnerChange does not fall within the constitutional parameters for state-sponsored religious

enterprises.  Of course, further evidence that the InnerChange program is impermissibly favored by the

state of Iowa is that, for a substantial portion of the contractual relationship between the state and

InnerChange, there was no attempt to disguise the fact that the funds paid to InnerChange were in the

form of direct payments.  *See Mitchell*, 530 U.S. at 843 (explaining that the distinction between a "a

per-capita-aid program and a true private-choice program is important when considering aid that, [as

here], consists of direct monetary subsidies.").

      *Nyquist* remains the definitive case to which the Supreme Court turns to characterize improper

state funding of a religious institution.  The *Zelman* majority specifically distinguished the funding

scheme at work in *Nyquist* from the Ohio school voucher program there at issue.  A review of

*Zelman*'s treatment of *Nyquist* is informative.  The program in *Nyquist* failed on several fronts:  1) the

package of benefits in *Nyquist* went "exclusively to private schools and parents of private school

enrollees;" 2) though enacted for secular purposes, the "'function' of the law was 'unmistakably to

provide desired financial support for nonpublic, sectarian institutions;'" 3) the *Nyquist* aid was in the

form of direct grants to religious schools; 4) the *Nyquist* aid provided incentives for parents to send

their children to religious schools through tax breaks and tuition reimbursements; and, 5) the *Nyquist*

program prohibited the inclusion of any public school or public school parent.  *Zelman*, 536 U.S. at

661.

As in *Nyquist*, the benefits of the state funding here went only to InnerChange and those

enrolled in its programs and not to any other non-sectarian pre-release treatment program available

through the genuine choice of inmates.  Second, though the state appropriation was enacted to fight

recidivism, state officials in all branches of government were well aware that InnerChange and Prison

Fellowship would undertake that fight through the model of spiritual transformation and believed such a

model would be an asset to the Dept. of Corrections.  Third, the state funding in this case goes directly

to the coffers of InnerChange and Prison Fellowship.  Fourth, the state provides incentives to enroll in

the program in the form of honor unit living, a secure environment, and excellent post-release care.

Finally, as stated above, the initial selection process, including the gerrymandered RFP, precluded

consideration of other, non-sectarian providers and all but ensured that the only non-sectarian provider

in the most recent selection process would not be chosen.  The Court can only conclude that

InnerChange's contractual relationship with the state of Iowa, through the Dept. of Corrections, from

the viewpoint of "'the reasonable observer' who is 'aware' of the 'history and context' underlying a

challenged program," has the primary effect of impermissibly endorsing religion.  *Zelman*, 536 U.S. at

655 (quoting *Good News Club*, 533 U.S. at 119).


3.  *Excessive entanglement*.

Whether considered as an effect of the state contract in this case, or under a separate,

traditional *Lemon I* inquiry, the facts and conclusions drawn above leave no room to doubt that the

state of Iowa is excessively entangled[46] with religion through the InnerChange program. *See Zelman*,

536 U.S. at 668 (affirming that, since *Agostini*, the entanglement inquiry has been folded into the

primary effect inquiry) (O'Connor, concurring); *see also Nyquist*, 413 U.S. at 794 (declining to

consider whether the challenged aid would yield entanglement since it was already shown to have the

impermissible effect of advancing religion).   For all practical purposes, the state has literally established

an Evangelical Christian congregation within the walls of one its penal institutions, giving the leaders of

that congregation, i.e., InnerChange employees, authority to control the spiritual, emotional, and

physical lives of hundreds of Iowa inmates. *See Zelman*, 536 U.S. at 668–69 (explaining that "the

degree of entanglement has implications for whether a statute [or program] advances or inhibits

religion").   There are no adequate safeguards present, nor could there be, to ensure that state funds are

not being directly spent to indoctrinate Iowa inmates.

Not all entanglements have the effect of promoting or inhibiting religion. *See Agostini*, 521

U.S. at 233 (citing *Bowen*, 487 U.S. at 615–17, in which there was no excessive entanglement where

---

[46] The Supreme Court has considered these factors to decide whether entanglement is excessive:   1) the character and purposes of the institutions that are benefitted; 2) the nature of the aid that the state provides; 3) the resulting relationship between the government and religious authority; and 4) the risk of political divisiveness. *See Roemer,* 426 U.S. at 750–51 (citing *Lemon I*, 403 U.S. at 615, 622). The first three factors have been discussed at length, *supra*.   The presence of political divisiveness engendered by a law or program is no longer a valued criteria in the entanglement inquiry. *See Mitchell*, 530 U.S. at 825 (citing *Agostini*, 521 U.S. at 233–34, *Bowen*, 487 U.S. at 617 n.14, and *Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339–40 n.17 (1987) (plurality opinion)); *see also Mitchell*, 530 U.S. at 872 n.2 (agreeing that the Court has "moved away from considering the political divisiveness threatened by particular instances of aid . . . but we have never questioned its importance as a motivating concern behind the Establishment Clause. . . .") (dissenting opinion).

the government reviewed a counseling program, its materials, and made periodic visits, and *Roemer*,

426 U.S. at 764–65, where annual audits ensured that "grants to religious colleges were not used to

teach religion").   As stated above, and what separates this case from cases like *Bowen* and *Roemer*, is

that the transformational model employed by InnerChange forecloses any possibility that secular and

sectarian aspects of the program may be separated.   The state, through its direct funding of

InnerChange, hopes to cure recidivism through state-sponsored prayer and devotion.   While such

spiritual and emotional "rewiring" may be possible in the life of an individual and lower the risk of

committing other crimes, it cannot be permissible to force taxpayers to fund such an enterprise under

the Establishment Clause.   "As the Supreme Court has repeatedly held, one of the few absolutes in

Establishment Clause jurisprudence is the 'prohibit[ion against] government-financed or government-

sponsored indoctrination into the beliefs of a particular religious faith.'"   *DeStefano*, 247 F.3d at 416

(quoting *Bowen,* 487 U.S. at 611).

## V.   REMEDY

### A.   *Declaratory Relief*

"In a case of actual controversy within its jurisdiction . . . any court of the United States . . .

may declare the rights and other legal relations of any interested party seeking such declaration, whether

or not further relief is or could be sought."   28 U.S.C. § 2201(a).   "Of course a District Court cannot

decline to entertain such an action as a matter of whim or personal disinclination. 'A declaratory

judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion,

exercised in the public interest.'"   *Public Affairs Assoc., Inc. v. Rickover*, 369 U.S. 111, 112 (1962)

(quoting *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948)).  "The fact that a court *can* enter a declaratory judgment does not mean that it should."  *Hewitt v. Helms*, 482 U.S. 755, 762 (1987). Notwithstanding *Hewitt*'s admonition, none of the usual dangers attendant to entering a declaratory judgment are present here.  *See, e.g., Rickover,* 369 U.S. at 117 (warning against a premature decision based on an insufficient record, particularly when involving public matters of great import) (Douglas, J., concurring); *BASF Corp. v. Symington*, 50 F.3d 555, 558–59 (8th Cir. 1995) (raising concerns over forum shopping and the seeking of tactical advantage).

Given the full record in this case, the entry of a declaration by the Court seems almost anti-climactic.  Nonetheless, the Court does so now.   The Court DECLARES that the contractual relationship between the state of Iowa, as managed and directed by the named state Defendants, and InnerChange and Prison Fellowship violates the Plaintiffs' Establishment clause rights as contained in the Federal and Iowa Constitutions by impermissibly funding the InnerChange treatment program at the Newton Facility.  The Clerk of Court is ORDERED to enter a final judgment consistent with this declaration.

## B.  *Injunctive Relief*

Based on this Court's declaration, the difficult task of providing a suitable injunctive remedy remains.  "Every person who, under color of [law] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."  42 U.S.C. § 1983.

"[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable. 'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.'" *See Lemon v. Kurtzman*, 411 U.S. 192, 201 (1973) (*Lemon II*) (quoting *Brown v. Bd. of Educ.*, 349 U.S. 294, 300 (1955)).

"Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202. "Every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to complaint or other document, the act or acts sought to be restrained. . . ." Fed. R. Civ. P. 65(d). Given the full record established in this case, the Court deems the notice and hearing requirements, as set forth in § 2202, met. The parties have fully briefed the Court on the injunctive remedies available, particularly the matter of restitution. The Defendants correctly reminded the Court, should it find a constitutional violation is present, to tailor a remedy as narrowly as possible to protect the rights of the taxpayers and inmates involved.

1. *The InnerChange program at the Newton Facility.*

There is no set of circumstances under which state funds could support the transformational values-based treatment methods employed in the InnerChange program. The Defendants have urged the Court to consider changing aspects of the program, for instance, by moving its location to another living unit at the Newton Facility or discontinuing the incentives for prisoners to join the program. Also, the parties have suggested ordering the Dept. of Corrections to set up a similar, secular values-based

program, or other religion-based programs, as alternatives to the InnerChange program.  These

options, however, would encourage the Court to engage in micro-management of a state correctional

agency—something that is discouraged except in the most necessary of circumstances.  Even then, the

state is still in the position of paying for, directly and through in-kind support, religious programming.

Conceivably, a private choice program could be set up by disassociating all state aid to

InnerChange through an arrangement that would mean InnerChange and Prison Fellowship would offer

an off-site program while incurring all the costs of programming, i.e., building, salaries, supplies, and

equipment.  This remedy is too broad and is one already rejected by InnerChange and Prison

Fellowship in response to the state's initial request for a proposal for non-compensated rehabilitation

services.  The Plaintiffs have a right to not fund, or be discriminated against by, state-sponsored

religion.  The remedy to that right is to cease funding, and possibly order restitution, not to order the

Defendants to enter a completely new contractual agreement.

Accordingly, the InnerChange treatment program is hereby permanently enjoined from further

operation at the Newton Facility, or any other institution within the Iowa Dept. of Corrections, so long

as it is supported by government funding.  The Director of the Dept. of Corrections shall make

arrangements, within a reasonable period of time not to exceed sixty (60) days, for the removal of

InnerChange employees from the Newton Facility consistent with inmate safety and other correctional

needs.

2.  *Reinstatement of inmate-plaintiffs' living conditions*.

The Plaintiffs seek the reinstatement of Unit E inmates who were removed from Unit E to make

room for InnerChange.  The placement of inmates is in the sole discretion of the Dept. of Corrections

consistent with its own policies and rules.  The Plaintiffs concede, as to the inmate-plaintiffs, that this suit

is not based on a property or liberty interest in inmate living conditions, but in the inmates' interest in not

being discriminated against under the Establishment Clause.  That Unit E inmates were moved to make

room for the InnerChange program is evidence of the state's preference to endorse the religious

message of InnerChange, not a violation, per se, of those inmates' rights based on an expectation of

certain living quarters.  Upon execution of this judgment, it will be up to officials with the Dept. of

Corrections and the Newton Facility to use Unit E consistent with state correctional policy.

   3.  *Cessation of payments and recoupment*.

   Two separate questions regarding funding under the state's contract with InnerChange present

themselves here.  First, whether InnerChange and Prison Fellowship should be paid under the terms of

their current bargain with the state of Iowa.[47]  The second, and more difficult question, is whether

recoupment is a proper remedy.  The Plaintiffs seek recoupment of all state funds used to pay

InnerChange and Prison Fellowship under the terms of their past and present agreements. Specifically,

the Plaintiffs seek the return of all Tobacco Trust funds and the return of monies taken from the

Telephone Fund, by way of a *pro rata* refund, to each inmate account equal to that taken to fund the

InnerChange program at the Newton Facility.

_____

   [47]  Its difficult to guess what amount this entails.   The amount will depend upon the date of this
judgment and, even then, the InnerChange program will likely continue in the event an  appeal is taken.
Fed. R. Civ. P. 62(c).  The state of Iowa pays InnerChange on a quarterly basis.  The most, then, at
stake under the current contract would be $77,500, or one quarter of the $310,000 of state funds
promised for this year.

The first issue, bargain expectations of the parties, was the focus of the remedial analysis in *Lemon II*.  The appellants, who prevailed in *Lemon I*, made no claim that funds already paid out under the invalid Pennsylvania statute should be returned.  *Lemon II*, 411 U.S. at 194.  Instead, the appellants appealed the district court's decision not to enjoin the payment of approximately $24 million yet to be dispersed under service contracts with nonpublic sectarian schools for services[48] already rendered.  *Id.*  In *Lemon I*, the Supreme Court decided that the state scrutiny required to ensure the aid was not used in connection with "any subject matter expressing religious teaching, or the morals or forms of worship of any sect" would foster excessive entanglement.  403 U.S. at 609–10.  The first *Lemon* decision did not, therefore, reach the primary effects question.  The *Lemon II* Court decided it would be unfair to enjoin the payment under the service contracts for several reasons.  First, and foremost, the danger of excessive entanglement, the "fulcrum of *Lemon I*," had passed and, therefore, the distribution of funds would "not substantially undermine the constitutional interests at stake in *Lemon I*."  *Lemon II*, 411 U.S. sat 201.  The danger had passed because there was no evidence that the state agent charged with oversight did not do what he was charged to do, which was to make certain the state aid was not used in connection with religious instruction.  *Id.* at 202.  Further, the risk of a post-audit process implicating constitutional issues was minimal.  *Id.*  A second major consideration was the reliance each of the recipient schools had on their bargain with the state of Pennsylvania.  "It is well established that reliance interests weigh heavily in the shaping of an appropriate

---

[48]   Under a service contract, a nonpublic sectarian school would provide teachers, textbooks, and other instruction materials for purely secular, required subjects like math, foreign language, science, and physical education courses.

equitable remedy." *Id*. at 203.  The denial of payment would have created a substantial financial burden on the recipient schools.  *Id.* at 204.  The *Lemon II* Court found it significant that the appellants withdrew their request for a preliminary injunction early in the litigation based on the mutual understanding of the "practical realities of the situation." *Id.* at 205.  Equity did not demand the schools show an actual amount of their detriment based on their expectation of reimbursement. *Id.*   In response to the appellants' argument that the schools should not have relied on the money in such an uncertain area of the law, the Court stated that the inherent function of legislative bodies is to act.  Otherwise, legislatures and those who depend on their decisions would be paralyzed while they waited for some judicial determination that their agreement would not be "unraveled." *Id*. at 208.  Accordingly, the Court decided that the schools had not "acted in bad faith or that they relied on a plainly unlawful statute." *Id*. at 207.

In *Cathedral Academy*, the district court went the other way and decided to enjoin any payments *yet to be made* to New York schools for providing recording keeping and testing services already done.  434 U.S. at 126–27.  The district court held the state statute authorizing the agreements violated the Establishment Clause, a decision affirmed in *Levitt v. Committee for Pub. Educ. & Religious Liberty*, 413 U.S. 472 (1973).  The New York legislature responded to the district court's decision by enacting *its own remedy* by authoring a cause of action by which schools could petition a New York Court of Claims to decide their reliance damages.  *Cathedral Acad.*, 434 U.S. at 127.  The Supreme Court struck down the New York remedial statute, stating that to do otherwise "would expand the reasoning of *Lemon II* to hold that a state legislature may effectively modify a federal court's injunction whenever a balancing of constitutional equities might conceivably have justified the

court's granting similar relief in the first place." *Id*. at 130. Additionally, the statutory remedy would, literally, reenact the harm by authorizing "'aid that [would] be devoted to secular functions . . . not identifiable and separate from aid to sectarian activities.'" *See id.* at 131 (quoting *Levitt*, 413 U.S. at 480). "This was so because there was no assurance that the lump-sum payments reflected actual expenditures for mandated services, and because there was an impermissible risk of religious indoctrination inherent in some of the required services themselves." *Cathedral Acad.*, 434 U.S. at 131. The same type of constitutional violation active in *Cathedral Academy* is active here, and is what distinguishes the present case from *Lemon II*—at least on the question of expectations under the current contract between the state and InnerChange for services already provided. In *Lemon II*, reliance payments could be made because the constitutional risk engendered by the *process* of dispersing the aid—entanglement—was gone, while here, as in *Cathedral Academy*, the primary effect of the aid, itself, gives rise to the constitutional defect. Further, the practical outcome of the New York statutory remedy in *Cathedral Academy* would be that state courts would decide which school activities under the agreement were sufficiently non-sectarian to allow reliance on state aid, and which would result in the courts' excessive entanglement in religious affairs. *Id*. at 133. Another key distinction between the New York schools in *Cathedral Academy* and the Pennsylvania schools in *Lemon II*, was that the New York nonpublic sectarian schools were required, by law, to provide the services they rendered. The Pennsylvania nonpublic sectarian schools, on the other hand, provided services for which they bargained, thereby creating a stronger case in equity for actual contractual reliance. *Id*. at 133–34.

The factual circumstances and differences contained in *Cathedral Academy* and *Lemon II* are

helpful here in deciding whether the state of Iowa should pay for additional work provided by InnerChange.  As mentioned, the constitutional defects in the state contract with InnerChange are active in both the primary effect of the state aid and the state's excessive entanglement with the religious nature of the InnerChange program.  The funding of the program, itself, endorses the InnerChange religious message, whether that money is paid for future services or for services already rendered under the current contract.

The *Lemon II* Court, furthermore, found significant that the schools who relied on their agreement with the state would suffer not mere legal detriment, but financial hardship without the program reimbursement.  *See* 411 U.S. at 204 ("The District Court found no dispute 'that to deny the church-related schools any reimbursement for their services rendered would impose on them a substantial burden which would be difficult for them to meet.'").  While nonpublic and public schools have many things in common, there is no question that the most common characteristic is meeting the annual budgetary constraints faced by any academic institution.  Here, however, InnerChange and Prison Fellowship, in contrast to elementary and secondary schools,  have sufficient funds to weather an adverse judgment.  Prison Fellowship receives annual revenues of over $50 million; for instance, in 2004, Prison Fellowship received over $55 million in revenue.  Since InnerChange does not have its own independent fund-raising department, it receives private money through Prison Fellowship, which raises money specifically for the InnerChange program.

Accordingly, under the factors set out in *Lemon II* and *Cathedral Academy*, equity requires no further payments be made to InnerChange by the state of Iowa.  The Director of the Dept. of

Corrections shall order any and all persons associated with the payment of funds under the current contract with InnerChange to cease all payments to InnerChange or Prison Fellowship as of the date of this Order, including those expenses for services already provided in the preceding quarter.

The question of recoupment is a more difficult matter, but a question also guided by the equitable principles set forth in *Lemon II* and *Cathedral Academy*.[49]  "[R]estitution is among the remedies that a federal court can order for a violation of federal law." *Laskowski v. Spellings*, 443 F.3d 930, 935 (7th Cir. 2006) (citing *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 290-91 (1960); *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 68 (1992)); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398-99 (1946); *United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 225 (3d Cir. 2005).  "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002).  Nonetheless, "there is no per se rule that the recipient of illegal funds who has spent them cannot be forced to repay them, either in establishment clause cases or in any other class of cases." *Laskowski*, 443 F.3d at 936 (citing *Messersmith v. G.T. Murray & Co.*, 667 P.2d 655, 657–58 (Wyo. 1983)); *Equilease Corp. v. Hentz,* 634 F.2d 850, 854 (5th Cir. 1981).

The Defendants cite *Lemon II* to support their argument that when a religious institution has reasonably relied, to its detriment, on its belief that government aid is legal, restitution of those funds is

---

[49]  Again, as stated previously, the Dept. of Corrections, not counting the current $310,000 apportionment, has made direct payments totaling $1,529,182.70 to InnerChange.  $843,150 came from the Telephone Fund and $686,032.70 from the Tobacco Fund.

inequitable.  *See Lemon II*, 411 U.S. at 209 ("In short the propriety of relief . . . applying familiar

equitable principles, must be measured against the totality of the circumstances and in light of the

general principle that, absent contrary directions, state officials and those with whom they deal are

entitled to rely on a presumptively valid state statute, enacted in good faith, and by no means plainly

unlawful.").  InnerChange and Prison Fellowship give several reasons why reliance on their contract is

reasonable and entered into in good faith.  The parties agree, correctly, that Establishment Clause

jurisprudence has always been complex, and never more so than in the last decade of Supreme Court

decisions.  *See id.* at 206 (quoting *Lemon I*:  "[W]e can only dimly perceive the lines of demarcation in

this extraordinarily sensitive area of constitutional law," 403 U.S. at 612).  The Defendants also remind

the Court that, though Establishment Clause cases are often decided at the summary judgment stage,

this case has required a full trial in order to sort out the complex material facts present.   The

Defendants also assert that the InnerChange program has been developed over the years in concert

with a good faith effort to comport with developing law.   Despite these efforts,  the law regarding faith-

based programming in prisons was "not [so] clearly foreshadowed," as to show the Defendants a clear

course of action.  *Lemon II*, 411 U.S. at 206.  InnerChange and Prison Fellowship can also take

refuge in the *Cathedral Academy* decision that parties to a services contract may justifiably rely more

on that agreement than an institution or party forced to provide services by law.

Weighing in favor of recoupment, nevertheless, are also several compelling arguments.  First, is

the severe nature of the violation.  The violations in *Lemon II* and *Cathedral Academy* appear quaint

next to the intentional choice by the state of Iowa and InnerChange to inculcate prisoners as a treatment

for recidivist behavior.[50]  The Defendants' reliance on the esoteric nature of Establishment Clause law can carry them only so far.  The level of religious indoctrination supported by state funds and other state support in this case, in comparison to other programs treated in the case law, as set forth above, is extraordinary.  The Defendants' claims that a state's interest in recidivism should override concerns about violating taxpayer and inmate Establishment Clause rights is not supported by the law.  Granted, the *Zelman* Court gave weight to the challenges faced by state officials who were confronted with the inequities and poor educational conditions in disabled school systems.  The *Zelman* Court's analysis, however, does not indicate that dispositive status should be given to a state's legitimate responsibilities without safeguards, like the presence of genuine, private choice to protect the religious liberty of its citizens.

Second, the primary effect of the contract between the state and InnerChange was on-going. As stated above, the violation is not one of mere process, as in *Lemon*, where the Court was reasonably assured that no state funding was connected to supporting religion.  Rather, the primary effect of the state funding here is years of state endorsement of the religious message taught by InnerChange.  The holding in *Cathedral Academy* indicates that a violation in which sectarian and non-sectarian spending cannot be actually separated invalidates a nonpublic party's reliance on those funds.

Third, the financial burden to InnerChange and Prison Fellowship will not be insignificant, but it will not be unmanageable in light of their annual revenue, as set forth above.  As stipulated by the

---

[50] "The transformation model uses the purposeful introduction of religion as the change agent.  It also focuses on teaching religious values. . . .  Transformation is the process or the treatment effect that we use to bring about that result."  Trial Tr. 2132–33 (testimony of Norman Cox, Vice President of Prison Fellowship and National Director of the InnerChange program).

parties, the Dept. of Corrections has made direct payments of $1,529,182.70 to InnerChange.

$843,150 came from the Telephone Fund and $686,032.70 from the Tobacco Fund.  By the end of

this year, the total will be just over $1.8 million.  The cost of running all the InnerChange programs

across the country is approximately $4 million.  Irregardless of constitutional issues, from a purely

financial perspective, Norman Cox confirmed InnerChange could likely fund its own program without

state funds in the event states could not afford the program.  InnerChange is not state-funded, for

example, in Missouri, Arkansas, or Texas, although there was no evidence presented regarding in-kind

support in those states.  That said, an order of recoupment is also intended to convey that the

constitutional violation here is not insignificant, but a real deprivation of the Plaintiffs' religious liberties.

As such, the constitutional violation should not to be countenanced by the Court, just as it should not

have been permitted by the state officials, in all branches of state government, responsible for protecting

Iowa taxpayers and inmates.

The Defendants are correct to point out that the factual record in this case is substantial, and

that the material facts to be determined were sufficiently complex to warrant a trial in order to weigh the

evidence.  This fact does not, however, show the Defendants' reliance on the contract was reasonable

given the agreement's uncertain character.  While the Court needed a trial to become, hopefully, "the

reasonable observer" who must be "familiar with the full history and context" of the challenged

program, there were parties who already had that vantage point—the Defendants.  *Zelman*, 536 U.S.

at 655.  In a real sense, the Court now knows what Defendants knew before the Plaintiffs took this

action—that state funds were used intentionally to indoctrinate Iowa inmates, by a non-profit religious

service provider preferred by the state in its selection process, into a form of the Christian religion in the

belief that the indoctrination, combined with the communal rehabilitation model, would be of some help in their rehabilitation.     The state and private Defendants also retained experienced, knowledgeable legal counsel that should have been aware of the constitutional risks associated with state funding of InnerChange.  The Defendants, here, are not poorly funded nonpublic schools, but well-financed and sophisticated entities who know every contour of First Amendment law.   In addition, evidence shows that the California Department of Corrections provided InnerChange and Prison Fellowship a full legal memorandum explaining why that agency could not, in good conscience, support state funding of InnerChange in its prisons given Establishment Clause jurisprudence. *See* Pls.' Ex. 301.  Additionally, legal counsel for the Defendants had to be aware of the published Texas Supreme Court case that decided a similar in-prison program violated federal and Texas constitutional law. *Lara*, 52 S.W.3d 171.   InnerChange and Prison Fellowship provide independent legal analysis to bolster their good faith argument for state funding. *See* Pls.' Ex. 302 and 303. That analysis, however, rests on the theory that state interests in reducing criminal offenses so outweigh any indoctrination risks to inmates that programs based in spiritual transformation are permissible.  That theory, however, has never been the law under the Establishment Clause.

The type of constitutional violation here, the substantial nature of that violation, the degree of knowledge of the Defendants about the risk associated with the program, and the financial impact of the judgment on the Defendants, taken together, outweigh the reliance InnerChange and Prison Fellowship had on the contract in this case.

Accordingly, InnerChange and Prison Fellowship are ordered to repay the Dept. of

Corrections the full amount of state funds paid to InnerChange since the inception of its contractual

relationship with the Dept. of Corrections in 1999.  Since the program is on-going, that amount shall be

no less than $1,529,182.70.[51]  InnerChange and Prison Fellowship will not be required to pay the

expenses incurred by the Dept. of Corrections for in-kind support, though quite substantial, in the form

of buildings, utilities, transportation, etc.  The Director of the Dept. of Corrections is further ordered to

refund, in *pro rata* fashion, in an amount no less than $843,150, to the individual Telephone Fund

accounts from which it was taken.  The remainder of the recoupment, in an amount no less than

$686,032.70, shall be returned to the Tobacco Trust.

## C.  *Stay*

The parties to the action have all but promised the Court that an appeal will be forthcoming,

regardless of the outcome of this trial in the district court level.  In the likely event that either party

appeals the judgment in this matter, and to avoid unnecessary litigation, the Court further ORDERS that

the injunctive and other equitable relief contained herein be SUSPENDED pending the appeal.  Fed. R.

Civ. P. 62(c).  Notwithstanding this stay, InnerChange and Prison Fellowship shall post a supersedeas

bond for the amount of  $1,529,182.70 with the Clerk of Court.

## VI.  CONCLUSION

The Clerk of Court is ordered to file a judgment consistent with this memorandum and order.

Also consistent with this memorandum and order, the parties are given leave to file motions and

---

[51] Counsel for the parties in this case have done an admirable job informing the Court about the relevant financial facts.  To the extent the parties, together, determine a more precise amount, given the on-going nature of the program since trial, the Court shall amend the judgment accordingly based on a stipulation by the parties.

supporting documents regarding attorneys' fees and costs.

IT IS SO ORDERED.

This ___2nd___ day of June, 2006.

_____
ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT